UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                )
**CIRIACO PUCILLO,**            )
              **Plaintiff,**    )
                                )
       v.                       )   Case No. 03-CV-12359 MLW
                                )
**METSO PAPER, INC. AND**       )
**VALMET CONVERTING, INC.**     )
              **Defendants.**   )
_____)

### MEMORANDUM IN SUPPORT OF DEFENDANT'S
### MOTION IN LIMINE TO EXCLUDE EXPERT TESTIMONY

Defendant Valmet Converting, Inc. ("Valmet Converting"), by counsel, submits this memorandum in support of its motion in limine to exclude the opinion testimony of John Orlowski, proffered by plaintiff as an expert in this case. Orlowski's testimony fails to satisfy the minimum requirements for opinion testimony under Fed. R. Evid. 702, as construed by the Supreme Court in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) and *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Indeed, as demonstrated in this memorandum, Orlowski's proffered testimony presents precisely the type of "expertise that is *fausse* and science that is junky," that *Daubert* excludes from consideration in the fact-finding process. *Kumho Tire*, 526 U.S. at 159 (Scalia, J., concurring).

### I. BACKGROUND

This case arises from an accident that occurred at Proma Technologies in Franklin, Massachusetts ("Proma"), where plaintiff was working at a machine known as a Slitter. The Slitter malfunctioned, and a cardboard core was released from the machine, striking plaintiff.

Plaintiff attributes the malfunction to a wrongly positioned switch on an electronic circuit board, referred to as a daughter board, in the Slitter.[1]

Plaintiff has designated John Orlowski as an expert witness under Fed. R. Civ. P. 26(a)(2). Orlowski issued a report pursuant to Fed. R. Civ. P. 26(a)(2)(B), a copy of which is annexed hereto as Exhibit A. Included in his report was a copy of his Curriculum Vitae, which is annexed hereto as Exhibit B. Orlowski's deposition was conducted on January 27, 2006, and referenced selections from the transcript are attached hereto as Exhibit C.

Orlowski is, for all practical purposes, a professional witness. For the last 24 years, he has been a self-described "forensic consulting engineer." (Exhibit B at 2.) He describes his experience as including "consulting services to attorneys and insurance industry in products liability cases, fall down incidents, vehicular accident reconstruction, and other personal injury cases…." (*Id*. at 1.) For the past 15 years, "well over" ninety percent of Orlowski's work has been "related to lawsuits …. or cases that have the potential to go to suit." (Exhibit C at 26.) He has even contributed to "Cross Examination: The Comprehensive Guide for Experts" by Steven Babitsky, J.D., published by SEAK, Inc., in 2003. (Exhibit B at 2.) Orlowski has not worked outside "forensic engineering" since January 1982. (Exhibit C at 23-24.)

Prior to his forensic work, Orlowski was educated and trained as a mechanical engineer. He received a Bachelor of Science Degree in Mechanical Engineering from LaSalle University, Mandeville, Louisiana. He was licensed as a mechanical engineer in Massachusetts in 1978. (Exhibit C at 6.) Significantly, Orlowski concedes that he is not qualified to obtain a license as an electrical engineer in Massachusetts. (*Id.* at 6-9.) Inasmuch as the switch at issue in this case

---

[1] A full discussion of the facts of this case is set forth in Valmet Converting's Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment. For the convenience of the Court, defendant will not repeat that discussion here, but incorporates by reference, as if fully set forth herein, defendant's memorandum filed in support of summary judgment.

is an electrical switch located on an electronic circuit board used to regulate the speed of an electric motor through voltage feedback, Orlowski's lack of qualification in the field of electrical engineering, standing alone, might be disqualifying. Orlowski's lack of electrical expertise, however, does not stand alone. As demonstrated herein, Orlowski has no relevant industry experience, training or education.

      Moreover, even if Orlowski were qualified, Orlowski's opinions are purely subjective and based on speculation. His opinions are not based on any principles, methods or standards of electrical engineering. Neither are his opinions based on any principles, methods or standards of mechanical engineering; thus, the fact that he has an engineering background is, at best, remotely relevant. His opinions are not based on any industry standards. His opinions are not based on any governmental regulations. His opinions are not based on any survey or study of industry practices. His opinions are not based on any treatise or other authority. His opinions are not based on any actual work experience. Orlowski offers only his subjective opinions of what he claims Valmet Converting should have done in this instance – opinions formed only for this litigation and transparently crafted to suit his retention in this litigation. And, after crafting these opinions solely for the purposes of this case, Orlowski did nothing to test or validate them in any way.

      As demonstrated in this memorandum, Orlowski's opinions are not based on scientific, technical or specialized knowledge. Orlowski's opinions are not grounded in reliable principles or methods. Indeed, during the course of his deposition, Orlowski *changed* one of his two opinions, and conceded that the other opinion was based on an erroneous predicate fact. Thus, Orlowski's opinions fail to meet the minimum standards of Fed. R. Evid. 702 and should be excluded.

## II. DISCUSSION

### A. Legal Standard.

Fed. R. Evid. 702 governs the admissibility of expert testimony. Rule 702, as amended in 2000, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise**, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.**

Fed. R. Evid. 702 (emphasis added). The Advisory Committee Notes to the 2000 Amendments make clear that Rule 702, as amended, "charges trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony…." and places the burden of establishing reliability on the proponent of the evidence. Thus, as a predicate for admissibility, plaintiff, as the proponent of Orlowski's testimony, must demonstrate by a preponderance of the evidence that Orlowski's testimony satisfies each element of Rule 702. *See also United States v. Monteiro*, 407 F. Supp. 2d 351, 356 (D. Mass. 2006).

The elements of admissibility are set forth in *Monteiro*. First, plaintiff must establish that the proffered testimony is reliable. Reliability requires an evaluation of the principles and methods employed by the proffered expert to insure that the "reasoning or methodology underlying the testimony is scientifically valid. . . ." *Id.* at 357 (internal citations omitted.) The mandate for reliability applies to all expert testimony, including testimony based on experience. *Kumho Tire*, 526 U.S. at 156.

Second, if the Court finds the methodology underlying the proffered testimony reliable, then the Court must determine whether the witness is qualified to render the opinion. *Monteiro*, 407 F. Supp. 2d at 357. The witness may be qualified by "knowledge, skill, experience, training

or education . . . ." Fed. R. Evid. 702.  *See also Daubert*, 509 U.S. at 592 ("relaxation of the usual requirement of first-hand knowledge . . . is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and expertise of his discipline").

Third, if the methodology is reliable and the witness is qualified, the Court must find that the principles and methods have been properly applied to the facts of the case.  *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998); *Monteiro*, 407 F. Supp. 2d at 358.  The First Circuit referred to this element of the admissibility requirement as "special relevancy," that "requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."  *Ruiz-Troche*, 161 F.3d at 81 (quoting *Daubert*, 509 U.S. at 591-92).

Plaintiff must establish each of these elements to demonstrate that the proffered expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire*, 526 U.S. at 156.  Here, Orlowski's testimony meets none of these prerequisites to admissibility.

**B.     Orlowski's Proffered Opinions**

Orlowski's report identifies, in essence, two opinions.  First, Orlowski opines that Valmet Converting was negligent in failing to *inspect*, *set* and *secure* the switch on the daughter board prior to supplying the board to Proma.  (Exhibit A at 8.)  Specifically, Orlowski opines that Valmet Converting had an obligation to "solder" the switch into position, "put a latch over it by design" or employ some other device to permanently affix the switch into one position.  (Exhibit C at 58.)  Second, he opines that Valmet Converting was negligent in failing to instruct Proma to check the switch for its proper positioning.  (Exhibit A at 8.)

Orlowski's deposition shows that Orlowski's first opinion is not grounded in reliable principles or methods, and indeed is still evolving, as he changed that opinion twice during his deposition.  Orlowski's second opinion similarly is not grounded in reliable principles or

5                                                   DC #220362 v4

methods, and further is based on a demonstrable lack of knowledge of the facts in this case. In addition, as fully addressed in Valmet Converting's motion for summary judgment, both of Orlowski's opinions are contrary to Massachusetts law.

> **(i)  Orlowski's opinion that Valmet Converting had a duty to inspect and permanently set the daughter board switch is not the product of reliable principles and methods.**

Orlowski's first opinion, before he distanced himself from it, was that the daughter board should have been inspected and the switch on the daughter board should have been permanently set by Valmet Converting prior to its alleged shipment to Proma. (Exhibit A at 8.)[2] Orlowski's deposition testimony demonstrates that this opinion is purely subjective, and that he knows of no standard, no regulation and no other authority that requires such boards to be inspected and such switches to be set by distributors or anyone else. Orlowski testified as follows:

> Q.  Are there electronic standards that dictate that a switch be permanently affixed into one position in order to be used?
>
> A.  I haven't researched that.
>
> Q.  So you don't know?
>
> A.  At this point I don't know. . . .
>
> \* \* \* \*
>
> Q.  What standard, what industry standard or governmental regulation are you relying upon for your opinion that the seller of a component part has an obligation to preset those parts before they are sold and delivered?
>
> A.  I am relying on my experience in the industry.
>
> \* \* \* \*
>
> Q.  So you are not aware of a standard?

---

[2] Orlowski assumes for the purpose of his opinions that the daughter board involved in plaintiff's accident was supplied by Valmet Converting and supplied with the switch in an improper position, but Orlowski concedes he has no facts to support these assumptions. (Exhibit C at 108-114.) As shown in Valmet Converting's motion for summary judgment, *if* Valmet Converting supplied the circuit board at issue, then the chain of supply was from Infranor (the board manufacturer) to Atlas-UK (the Slitter manufacturer) to Valmet Converting (the spare parts distributor) to Proma (the end user and assembler of the component).

A.  No, I am not.

Q.  And you are not aware of a governmental regulation?

A.  No. None is needed.

　　* * * *

Q.  And am I correct that that opinion is based on your personal experience in the industries that you worked for?

A.  Yes.

Q.  Not based on an industry standard you can articulate or point to?

A.  That's correct.

Q.  Not based on a consensus standard that's been published, correct?

A.  Correct.

Q.  Not based on a government regulation, correct?

A.  None that I know about at this point.

Q.  Not based on some publication somewhere that talks about good sales practices that you can point to?

A.  Nothing that I can point to right now.

Q.  Not based on a survey that you took?

A.  Correct.

Q.  Not based on a survey that you read based on your personal experience, correct?

A.  That is correct.

(Exhibit C at 88-89, 97-98.) Thus, there can be no dispute that Orlowski's opinion is purely subjective.

When Orlowski was questioned about his purported experience, he admitted that he, in fact, had no applicable industry experience. Specifically, Orlowski testified as follows:

Q.  So there was an internal procedure at Lenox where you worked that opened up each box and checked each position of each switch and each circuit?

> A. I don't recall. If there was such a situation that arose, it was Lenox's responsibility to ensure that that component, whatever it happened to be, went out in the condition in which it was to be used, ultimately to be used.
>
> Q. I am asking you about the protocol used. What was used by a company that you worked for . . . to see to it that all the switches and all the circuits on all the electrical components that they resold were properly set?
>
> A. Well, all of those companies had an inspection department, inspected all manufactured components and also inspected purchased components.
>
> Q. Were you in the Lenox inspection department?
>
> A. I wasn't in the inspection department. . . .
>
> \* \* \* \*
>
> Q. At Lenox did you know that every package that came in was inspected?
>
> A. There was a protocol to do so.
>
> Q. Who created that protocol?
>
> A. I don't recall.
>
> Q. How was it published?
>
> A. All of these companies have quality control departments, and quality control is designed to do exactly that, make sure that products that go out are quality products and designed and set up to operate.
>
> Q. I am having trouble distinguishing between – sometimes I hear you say what's an assumption; that Lenox checked components before they shipped them out. Sometimes it sounds like you are saying you know that they opened up the packages, took them out of the packages and checked every component.
>
> A. It's quite a few years ago. My memory is a little fuzzy. I know that's what quality control departments do in general.

(Exhibit C at 101-102.) Thus, it is clear that whatever industry experience Orlowski has had, it does not provide a basis for his opinion in this instance.

Unable to point to any authority or any experience to support his opinion, Orlowski was asked what he did to validate his opinion. He did nothing. Indeed, in a telling exchange, Orlowski mocked the very concept that his opinion should be tested in some manner, stating:

> Q. Did you test your hypothesis [that distributors had to inspect and set component parts] in any way?
>
> A. You mean did I take a survey of suppliers of components? I did not.
>
> Q. You did not. Did you talk to any electrical component suppliers?
>
> A. Only those that I have been involved with when I was in the industry.
>
> Q. You talked to them in connection with your opinion in this case?
>
> A. No, I did not.
>
> Q. It's fair to say you didn't do anything to try to test or validate your hypothesis that equipment suppliers for component parts have an obligation to preset those before they are sold or delivered, right?
>
> A. I wouldn't call it a hypothesis. **It's a self-evident truth.**
>
> Q. Truth is in the eye of the beholder, is that fair to say?
>
> A. Yes, that's fair to say.
>
> Q. So, its your opinion, right?
>
> **A. It's the way that I functioned when I was with industry.**
>
> **Q. And its nothing more than that?**
>
> **A. I think that's sufficient.**

(Exhibit C at 89-90.) Even if Orlowski's recollections were correct, one man's anecdotal recollections do not constitute reliable expert testimony, as they may represent business practices far higher or far lower than the law requires. But, as his deposition testimony shows, this was **not** how Orlowski actually functioned in industry, because in his actual work experience he had nothing to do with inspecting or selling component parts.

When asked to support his claim that he functioned in a way that opened, inspected and preset spare parts prior to their sale, he could not. Orlowski testified as follows:

> Q. And at the companies that you worked for, they had quality control procedures in place, but you don't specifically today as you sit here know what they were, right?

A.   I don't. That's a long time ago.

Q.   You don't know whether the companies that you worked for in fact inspected every tenth product, every one hundredth product or every one thousandth product, right?

A.   I don't recall. They may have inspected every one.

Q.   You don't know when they inspected them whether they took the product out and compared it to the mechanical drawings, if it was a mechanical part, or compared it to electrical drawings if it was an electrical part?

A.   I don't have a specific recollection of that, no.

Q.   It wasn't part of your job to know that at the time, was it, in which of your jobs?

A.   No, it wasn't. In a small company you are peripherally involved with all departments.

Q.   You didn't develop or implement or publish a quality control procedure with regard to component parts at any of the companies you worked for, right?

* * * *

A.   No, I did not personally.

(Exhibit C at 106-108.)

In *Daubert*, the Supreme Court declared that trial courts must determine whether the "reasoning or methodology underlying the testimony is scientifically valid. . . ." *Daubert*, 509 U.S. at 600. The Supreme Court identified five non-exclusive factors to guide this determination: (1) whether the theory . . . can be and has been tested; (2) whether it has been subject to peer review; (3) the technique's error rate; (4) the existence of any standards; and (5) the theory's level of acceptance." *Id.* at 593-94.

Plainly, Orlowski could have tested his theory by surveying distributors. Orlowski could have sought peer review by soliciting comments on his opinion from distributors and their associations. Orlowski could have researched the applicable electrical standards and quality

control standards. Instead, he did nothing – except to mock the need for testing and to declare his opinion the "self-evident truth." (Exhibit C at 90.)

Then, demonstrating the unreliability of this self-evident truth, Orlowski *abandoned* his opinion. Orlowski changed his opinion from one requiring inspection and setting of the daughter board, to one requiring that the daughter board be ordered correctly. Specifically, Orlowski testified as follows:

> Q. You don't have a specific recollection of a protocol in place at Lenox to do that, to open the packages and check every switch and every component?
>
> A. I don't recall specifically whether they did that on every single package, but I know there was a procedure in place that in **ordering** components that they conformed specifically to the same component that was sent out with the machine initially to obviate the necessity for doing that in every single case.
>
> Q. So they had a model number and product number?
>
> A. Exactly.
>
> Q. And they would order it by model and product number?
>
> A. Yes, and if there were any special instructions, that would also be included as part of the order.
>
> Q. By ordering by model and product number, your company expected the product to arrive correctly set, right?
>
> A. Yes.
>
> Q. And they would pass it on to the customer with that same expectation that it was correctly set by whoever you got it from?
>
> A. If it was properly ordered, it should be properly set, yes.
>
> \* \* \* \*
>
> Q. All I am trying to focus on is No. 1, failing to inspect. In fact your experience [with] the inspection procedure was to **order** the right part with the right product numbers so you didn't have to do inspection, correct?
>
> A. **That's correct.**

> Q. And Opinion No. 2, you say **failing to set and secure, but that obligation is avoided by ordering the part by its correct model number and serial number, correct**?
>
> A. Apparently the part wasn't ordered correctly.
>
> Q. **Am I correct the obligation is to order it correctly**?
>
> A. **That's the obligation, yes.**

(Exhibit C at 103-105 (emphasis added).) Orlowski's changing testimony demonstrates the complete absence of any reliable methodology. Indeed, Orlowski's ability to reverse his opinion 180 degrees and create a whole new opinion on the fly demonstrates the absence of scientific principles and methods. Not only is Orlowski's changing testimony dispositive of its admissibility under *Daubert*, but it is also dispositive of plaintiff's case because there is no claim in this case that anyone ordered a wrong part, only a claim that the supplier did not set the switch on the part for Proma.

However, Orlowski was not done changing his opinion. After Orlowski abandoned his proffered opinion and declared the distributor's obligation limited to ordering the correct part, he changed his mind again and said suppliers had to at least spot check their parts. (Exhibit C at 106.) But Orlowski offered no more authority for this opinion than he did for his prior opinion, testifying:

> Q. Is there any industry standard or consensus standard that sets forth how and when a supplier needs to inspect or spotcheck products?
>
> A. There may be, but as I sit here today I don't know.
>
> Q. You are not relying upon any industry standard?
>
> A. No, I am not.
>
> Q. You are not relying upon any governmental regulation?
>
> A. No. I am relying on my experience.
>
> Q. You are not relying on any industry type publication?

> A. Well, I am not sure there are many, but I am not relying on them.

(Exhibit C at 106.)

The First Circuit has explained that expert opinions "are no better than the data and methodology that undergird them." *See SMS Maint. Serv. v. Digital Equip. Corp.*, 188 F.3d 11, 25 (1st Cir. 1999). In this case, it is plain that there is *no* data or methodology undergirding Orlowski's opinion. Indeed, it is the absence of data, principles and methodology that permits Orlowski to change his opinion on a whim and to say anything that comes to mind that he thinks might help plaintiff's claim. It is precisely this type of untested, unreliable, stream-of-consciousness, "expert" testimony that Fed. R. Evid. 702 excludes.

> **(ii) Orlowski's opinion that Valmet Converting had a duty to instruct Proma on the correct switch position is based on an erroneous factual assumption, is not based on reliable principles and methods, and is contrary to the law.**

Orlowski's second opinion, that Valmet Converting was negligent in failing to instruct Proma to check the drive board switch for proper location, like his first opinion, is based only on his subjective view of what is self-evident; but here the self-evident is based on a demonstrably invalid predicate fact. Orlowski based this opinion on a false assumption; namely that Proma did not receive instructions as to the correct setting of the switch. Specifically, Orlowski's report states:

> Nor were there specific notations on the electrical schematics calling the users' attention to the correct switch location shown on the drawing.

(Exhibit A at 8.) In his deposition, Orlowski reaffirmed that this statement correctly reflected a predicate fact for his conclusion. (Exhibit C at 93.)

As demonstrated by and conceded by Orlowski in his deposition, contrary to his assumption, the schematics in fact *did* call the user's attention to the correct switch location.

Orlowski, for whatever reason, simply had not seen or read the entire schematic drawing before it was shown to him in his deposition, even though the document was referenced by him in his report as among the material that he had relied upon in forming his opinion. (Exhibit A, Appendix C, Item 18.) Orlowski testified as follows:

> Q. Turn to Hagopian No. 6. I ask you if you have seen that document before.
>
> A. Yes, I have seen **a portion** of that document.
>
> Q. What is this document?
>
> A. That apparently is the schematic for the daughter board.
>
> Q. Does Hagopian No. 6 call the user's attention to the correct switch location?
>
> A. Does it call the user's attention to it? It shows a switch but doesn't call the user's attention to it.
>
> \* \* \* \*
>
> Q. See the note in the bottom left-hand corner? Could you read that out loud, please.
>
> A. OS13 for use with SMVE 2420. Has M55, M59 in parentheses. **It says, Set S-1 to Position 1 for M55, non-SMT; set S-2 to Position 2 for M59.**
>
> Q. Do you understand S-1 to mean switch?
>
> A. Yes.
>
> Q. **Did that notation in this drawing tell the user to set the switch to Position 1 when using the M55 drive?**
>
> A. **It does.**
>
> Q. **And to set to Position No. 2 when using the M59 drive.**
>
> A. **It does.**
>
> Q. **So this schematic in fact calls out to the user's attention the correct switch location, does it not?**
>
> A. **It does.**
>
> Q. That would mean your statement on page 8 of your report is not correct?
>
> A. **I hadn't seen that before.**

| | | |
|---|---|---|
| Q. | | You hadn't seen the notation on the drawing? |
| A. | | No. |
| Q. | | Having seen that notation on Hagopian Exhibit No. 6, is it fair to say this exhibit, this schematic shows the user how to set the switch? |
| A. | | **It informs the user how to set the switch, yes.** |

(Exhibit C at 95-97 (emphasis added).) Thus, Orlowski admitted that his opinion was based on an erroneous predicate fact.

Even if Orlowski's opinion was not grounded on an erroneous factual assumption, the opinion would nevertheless be inadmissible because, like all of Orlowski's opinions, it is not based on reliable principles or methods. Orlowski fails to cite a single standard, government regulation, survey, study or other authority for his opinion that Valmet Converting, as a component part distributor, had an obligation to warn the installer of hazards that might arise from its improper installation into an integrated product. A trial court is charged with insuring that a proposed expert's opinion is based upon "'more than subjective belief or unsupported speculation.'" *Polaino v. Bayer Corp.*, 122 F. Supp. 2d 63, 66 (D. Mass 2000); *see also SMS Sys. Maint. Serv.*, 188 F.3d at 25 ("Expert testimony that offers only a bare conclusion is insufficient to prove the expert's point."). Neither *Daubert*, nor the Federal Rules of Evidence, requires a court to admit opinion evidence, like Orlowski's, "that is connected to existing data only by the *ipse dixit* of the expert." *Polaino*, 122 F.Supp.2d at 67.

Moreover, as discussed fully in Valmet Converting's motion for summary judgment, Orlowski's opinions on the obligations of Valmet Converting as a component part distributor are contrary to Massachusetts law. *See Mitchell v. Sky Climber, Inc.*, 487 N.E.2d 1374 (1986).

C.      **John Orlowski is Not Qualified to Assist the Trier of Fact.**

In performing its gate keeping function, a court must consider "whether the putative expert is qualified by 'knowledge, skill, experience, training, or education.'" *Alvarez v. R.J. Reynolds Tobacco Co., Inc.*, 405 F.3d 36, 40 (1st Cir. 2005) (quoting *Ed Peters Jewelry Co. v. C&J Jewelry Co.*, 124 F.3d 252, 259 (1st Cir. 1997)); *see also Polaino*, 122 F. Supp. 2d at 66. Here, Orlowski is qualified by neither knowledge, skill, experience, training, or education to render his proffered opinions in this case.

Orlowski is a mechanical engineer, but relies on no engineering standards for his opinions. Instead, Orlowski claims to rely on his experience, but his testimony shows he has no relevant experience with drive boards or the distribution of component parts. Orlowski's actual work experience is in machine design, not the distribution of spare parts for the machines, and his work had nothing to do with drive boards. From 1963 to 1972, Orlowski worked for Gifford Wood Company, but Orlowski has no recollection of the Gifford Wood machines even using drive boards. (Exhibit C at 29.) Next Orlowski worked at W.B. McGuire, a company that he concedes did not use drive boards. (Exhibit C at 30.) Next, Orlowski worked at V&O Press, and here again, he has no recollection of this company using drive boards. (*Id.*) Indeed, although he bases his opinions in this case on his "years of experience in designing machinery and components," (*Id.* at 60), Orlowski testified that none of the companies for which he has worked either manufactured or designed drive boards. (*Id.* at 31.) Rather, if those companies needed a drive board, they purchased it from another vendor. (*Id.* at 31.) Thus, Orlowski, has *no* industry experience with drive boards, or their supply.

Moreover, Orlowski did nothing to educate himself with respect to the drive boards at issue in this case. Prior to this case, Orlowski had never heard of Infranor, the drive board manufacturer, and in forming his opinions, he did no research or investigation to learn anything

about Infranor or its business. (*Id.* at 34.) Nor did Orlowski conduct any research any other drive board supplier; indeed Orlowski does not even know the name of any other suppliers of drive boards, anywhere in the world, at any time since the Slitter in this case was sold in 1993. (*Id.* at 35.)

Thus, Orlowski is not qualified by education or training to opine on the obligations or practices of distributors of electronic circuit boards. Nor is he qualified by knowledge or skill. And, he did nothing in connection with this case to develop any meaningful expertise. Expert witnesses are afforded "wide latitude to offer opinions," and "expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert*, 509 U.S. at 592, 595. Accordingly, a testifying expert "should have achieved a meaningful threshold of expertise" in the subject matter of his opinions. *Alvarez*, 405 F.3d at 40. Orlowski has achieved no such expertise.

### D.   There Is No Scientific Connection to Orlowski's Opinions

The third prong of the *Daubert* analysis requires plaintiff to show that the principles and methods relied upon by the proffered expert have been properly applied to the facts of the case. *Monteiro*, 407 F. Supp. 2d at 358.

Here, Orlowski offers no principles or methods. He points to no industry standard, no consensus standard, no governmental regulation, no survey, no research and no other authority of any kind in support of his opinions. He has made no effort to test or validate his opinions. He simply proclaims that his opinions represent the "self-evident truth," because they represent "the way that I functioned when I was with the industry." (Exhibit C at 106.) Thus, there are no principles or methods to apply to the facts of this case.

Even if Orlowski could point to reliable principles and methods, there can be no claim that he applied the principles and methods with any scientific or technical rigor when reaching

his opinions in this case.  For example, as demonstrated above, Orlowski failed to read the electrical schematics before opining, incorrectly, that they failed to provide adequate instructions.

In another telling example, Orlowski conceded in his deposition that he reached his opinions in this case based on an inspection of the *wrong* switch on the *wrong* board. Specifically, in Appendix A of his report, Orlowski included photographs taken by him showing an electronic circuit board with a switch.  (Exhibit C at 36.)  On Figures 7 and 8, he added an arrow to these photographs to highlight a switch.  (*Id.* at 36.)  **At the time he prepared his report, he understood and believed the switch in the photographs to be "the switch involved in the accident."**  (Exhibit C at 46.)  **After** reaching his conclusions and issuing his report, he determined that the photographs upon which he relied in reaching his opinions, in fact did **not** depict the switch involved in the accident.  (*Id.* at 46.)  In fact, the photographs depict a mother board, not a daughter board, and the switch depicted does not control the speed of the rewind arm motor at all.  (*Id.*)  In his deposition, Orlowski conceded:  "I don't know what that switch does."  (*Id.*)

Scientific, technical and intellectual rigor require, at a minimum, that experts read the documents cited in their reports and be sufficiently familiar with the product at issue to at least recognize it and photograph it.  The sum of Orlowski's work on this matter shows a complete absence of a "valid scientific connection" to the issues in this case.  *Ruiz-Troche*, 161 F.3d at 81. It is clear that Orlowski is offering opinions in this litigation that he thinks will help his client, not opinions based on his actual experiences and not opinions based on any actual standards. The Advisory Committee notes to the 2000 Amendments to Rule 702 make clear that two indicia of *unreliability* are (1) when opinions have been developed for the purpose of testifying, as

18 <span>DC #220362 v4</span>

opposed to research independent of litigation, and (2) when the witness is not as careful on his litigation consulting as he would be in his non-litigation professional activities.  Here, Orlowski's testimony meets none of the indicia of reliability set forth by the Supreme Court in *Daubert* and shows the hallmarks of *unreliability* as set forth by the Advisory Committee.  The entirety of the record relating to Orlowski's testimony demonstrates that it would be contrary to the letter and spirit of Rule 702, *Daubert* and *Kumho Tire* to permit Orlowski to testify in this case.

### III.   Conclusion

A court's exercise of the gate keeping function is "critical because of the latitude given to expert witnesses to express their opinions on matters about which they have no firsthand knowledge, and because an expert's testimony may be given greater weight by the jury due to the expert's background and approach." *United States v. Monteiro*, 407 F. Supp. 2d 351, 358 (D. Mass. 2006).  Because Orlowski's testimony fails to satisfy the minimum requirements for opinion testimony under Fed. R. Evid. 702 and as mandated by the Supreme Court in *Kumho Tire* and *Daubert*, Valmet Converting respectfully moves the Court to exercise its gate keeping function to exclude in its entirety the testimony of John Orlowski.

Date:  June 30, 2006                    Respectfully submitted,

*/s/ David L. Kelleher*_____
David L. Kelleher, Esq. (B.B.O. #543912)
Thelen Reid & Priest, LLP
701 Eighth Street, N.W., Suite 800
Washington, DC 20004
(202) 508-4000

Mark Petersen, Esq. (B.B.O. #396840)
Michelle Hansen, Esq. (B.B.O. #561477)
Law Offices of Mark Petersen
490 Shrewsbury Street
Worcester, MA  01604
(508) 791-0300

Attorneys for Defendant Valmet Converting, Inc.

DC #220362 v4