# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| CIRIACO PUCILLO, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 03-CV-12359 MLW |
| | ) | |
| METSO PAPER, INC. AND | ) | |
| VALMET CONVERTING, INC. | ) | |
| Defendants. | ) | |

## EXHIBITS TO
## MEMORANDUM IN SUPPORT OF DEFENDANT'S
## MOTION IN LIMINE TO EXCLUDE EXPERT TESTIMONY

# EXHIBIT A



# FORENSIC ENGINEERS & TECHNOLOGISTS

**John M. Orlowski, P.E., CSP, BCFE, Director**
11 Vanderbilt Avenue, Suite 120
Norwood, Massachusetts 02062-5056

PHONE: (781)762-8377
FAX: (781)762-1862
general@fet-forensics.com
www.fet-forensics.com

January 4, 2006

## TECHNICAL REPORT TO

Maureen Counihan, Esquire
Law Offices of Maureen Counihan, P.C.
67 South Bedford Street – Suite 400 West
Burlington, MA   01803

RE:   Ciriaco Pucillo
Vs.:  Metso Paper, Inc. and Valmet Converting, Inc.
U.S. District Court C.A. No.:  03-CV-12359 ML W
Date of Injury:   March 22, 2002
F.E.T. File No.:  2809.1-P

## I.   INTRODUCTION

A.   I was retained to conduct an accident investigation relative to injuries sustained by Ciriaco (Jerry) Pucillo on an Atlas slitter rewinder.  The slitter rewinder was designed to take a large paper roll and slit the paper into two or more narrower paper rolls.  The machine was comprised of the following basic sections:  an unwind stand; a series of rolls through which the paper web is threaded; a slitting assembly; and rewind stations.[1]  Each rewind station essentially consisted of pivoted rewind arms with chucks, with one or both arms driven by pancake motors.  A core is mounted between the rewind arms and secured by the chucks as a prelude to rewinding a slit web.  The paper must be properly aligned prior to engaging the rewinding operation at full speed.  An assistant initially operates the machine in jog mode to facilitate the set-up.  It was during this condition of machine set-up that Mr. Pucillo sustained his injuries.  The paper roll core had been mounted on the rewind arm chucks.  The core was positioned against the winding drum.  Jerry Pucillo was standing in proximity to the core.  The

---

[1] Refer to the illustrations in Appendix A of this report and a machine schematic and threading diagram reproduced from the Atlas operating guide included in Appendix F of this report.

second operator, Bill Dunne, had engaged the machine in the jog mode.  Suddenly, and without warning, the winding core accelerated to a high speed in less than five seconds.  As a result of the overspeed of the winding core, the core was ejected, striking Jerry Pucillo in the face, causing serious injury.  Mr. Pucillo was employed by Proma Technologies, 24 Forge Park, Franklin, MA, at the time of his accident.

B.   I conducted an inspection of the Atlas slitter rewinder on November 19, 2002.  At that time, I met with and conferred with Nancy P. Johnson, Steve Bagley, and others employed by Proma Technologies.  In addition to inspecting the basic machine, I examined the drive control boards associated with the operation of the rewind motors.  I also looked at, and presently have in my possession, the rewind core that struck Mr. Pucillo in the face.

C.   I performed my assignment in this case by utilizing methods used by other professional engineers engaged in the profession of accident investigation and analysis.  Prior to stating my opinions, an outline of my experience, training and education in machine design and safety follows.

## II.   BACKGROUND, QUALIFICATIONS AND METHODOLOGY

A.   Selected illustrations of the machine are provided in Appendix A.

B.   My curriculum vitae is provided as Appendix B.

C.   A list of items, materials and documents I reviewed relating to my investigation and analysis is provided as Appendix C.

D.   My prior four years of trial testimony and deposition testimony is included as Appendix D.

E.   My fee schedule is provided as Appendix E.

F.   Machine schematic and threading diagram is included as Appendix F.

G.   My opinions are based on my background, expertise and experience in the field of management, machine design engineering, and recognized principles of machinery safety relating to specific issues raised by the events in this case.

H.   My expertise includes machine drafting and design of diverse machinery, including web-handling equipment such as winders and slitters, conveyors, machine tools and related controls, safety devices and warnings.

I.   My background and training include:

1.   Utilizing general principles of engineering and safety in the design, operation, and maintenance of machinery and equipment, including basic laws of physics and their application to the design of machines.

2. Since performing forensic investigations on a full-time basis, I have continued to analyze machine designs with regard to safety and human factors analysis. I co-authored *Engineering Aspects of Guarding of Machinery and Equipment* for "Products Liability," edited by Frumer and Friedman, published by Lexis Nexis Matthew Bender & Co., Inc. I updated this publication in 1994 for inclusion in release 66 of "Products Liability." I authored a further update of this publication in 2005 for inclusion in release 98 of "Products Liability." I also updated *Power Lawn Mowers* for inclusion in release 101 of "Products Liability," published in December of 2005.

J. My opinions are based on my experience, training, background, and my inspection and analysis of the Atlas slitter rewinder, its component parts and its operations; a review of items, materials and documents listed in Appendix C; and the analysis of the use of the slitter rewinder under foreseeable operator conditions.

## III. DESCRIPTIVE INFORMATION

A. Proma Technologies was in the business of manufacturing metallized paper. Manufacturing metallized paper is a multi-stage process that begins with coating the paper with a lacquer. The lacquered paper is dried and moved to the metallizer where aluminum is deposited on the paper in a high vacuum. The metallized paper is then placed in the coating-priming machine where lacquer is placed on top of the aluminum. At the completion of the final coating process, the roll is taken to the slitting machine to be slit into rolls of various widths and diameters.

The Atlas slitter rewinder was purchased in 1992 for the specific purpose of slitting metallized paper. The equipment was designated model CSE1250R, serial number 92036. The slitter rewinder could handle rolls that are ninety-four inches wide and seventy inches in diameter. The machine processed paper at speeds up to 3000 feet per minute (fpm). The machine was designed to accommodate up to five cores on the rewind stations. Each rewind arm chuck was driven by a 4.5 kw pancake motor. In addition, there was one left hand and one right hand non-driven rewind arm. These arms could be paired with a driven arm to rewind narrow width, slit paper.

The rewind arm motors were controlled by a drive board supplied to Proma Technologies by Atlas/Valmet. Each drive consisted of a motherboard and daughterboard. The drive was generic to the extent that the daughterboard was furnished with a switch that could be set in one of two positions depending on the specific application. The switch

consisted of a spring-loaded piece of wire that could be placed under one of two hooks, in position 1 or position 2. Alternatively, the switch could be placed in neither the 1 nor the 2 position, but simply left open.

Ronald Dean Purcell was a senior field service technician with the manufacturer of the slitter rewinder. Mr. Purcell worked with Greg Hagopian, and others from Proma Technologies, post accident, to attempt to determine the cause of the events that led to Jerry Pucillo's injuries. After discounting all other causes, the drive boards were investigated. The following findings were documented: the drive for winding arm 2 left had the switch in neither position; 2 right was in the correct position; 1 left was in neither position; 5 left was in neither position; and the remainder of the drive switches were set properly. It was concluded that an incorrect switch setting on a drive board caused the rewind core to accelerate to high speed, resulting in Mr. Pucillo's accident. Ronald Purcell soldered the switches at Proma Technologies in the proper position.

## IV.  DISCUSSION AND ANALYSIS

A.  It is axiomatic that replacement components for equipment conform to original machinery items and specifications. This is essential to safety and to insure that machinery will function as originally intended. Where a purchased component requires a modification or adjustment by the machine manufacturer, such modification must be specified and identified by a part number assigned by the equipment manufacturer. In a typical machine design engineering/manufacturing environment, all manufactured and purchased components are assigned a part number. A manufactured part must be depicted on an engineering drawing. A purchased component may be illustrated on a drawing showing any specific settings or modifications, or may be identified by description and part number. Again, the description must be specific to insure that the original component and all subsequent replacement parts are essentially identical. It was essential that Atlas/Valmet[2] follow the above procedures when furnishing drive control boards to Proma Technologies. Robert Lyons, former vice president of Atlas/Valmet, testified that Atlas/Valmet did, in fact, assign their own part number to drive boards.[3] However, subsequent testimony by Mr. Lyons, and others, indicated that Atlas/Valmet failed to establish any definitive procedure for insuring that the switches on the drive boards were checked and properly set by Atlas in England or in the Charlotte, NC Atlas/Valmet facility, prior to final shipment to Proma Technologies. Consider the following testimony by Mr. Lyons:[4]

---

[2] Valmet purchased Atlas' NC facility in the year 2000.
[3] Deposition transcript page 71, lines 1 through 4, inclusive.
[4] Deposition transcript page 60, lines 19 through 25, and page 61, lines 1 through 7, inclusive.

| 19 | Q. | If Van Leer wanted to purchase a new Infranor drive board for |
| 20 | | use in one of their rewind arms, am I correct that one of their |
| 21 | | options would be to contact Atlas or Valmet, whatever you |
| 22 | | were calling yourself at the time, in North Carolina and |
| 23 | | purchase the drive board that way, correct? |
| 24. | A. | Yes. |
| 25 | Q. | And when that order came into Atlas or Valmet, did Van Leer |
| 1 | | specify the setting for the switch? |
| 2 | A. | I don't know. |
| 3 | Q. | Do you know what the procedure was in order to purchase that |
| 4 | | board? |
| 5 | A. | There would not have been any specific procedure.  They |
| 6 | | would have ordered the board.  We would have sent them the |
| 7 | | board. |

Mr. Lyons further testified that he doesn't know if the switches on the drive boards were set prior to the drive boards being shipped by Atlas in England.  This fact notwithstanding, Mr. Lyons testified that no inspections or checks of switch positions were conducted in the NC facility when the boards were received.  The following was extracted from Mr. Lyons' transcript:[5]

| 24 | Q. | So you don't have any information regarding whether or not |
| 25 | | that switch was set on a new board before it left England? |
| 1 | A. | I don't specifically, no. |
| 2 | Q. | And Atlas Valmet doesn't do any inspections of the boards |
| 3 | | when they come from England, before they're sent out to |
| 4 | | the customer.  Is that correct? |
| 5 | A. | I'm not aware of any inspections we do on parts we get from |
| 6 | | our parent – you know, from our division in England. |
| 7 | Q. | Well, when a board comes in from England, what happens to |
| 8 | | that board in order to then get it to the customer in the states? |
| 9 | A. | Normally it comes in, in a consolidated shipment, so there will |
| 10 | | be parts in the shipment for other – so it's just segregated and |
| 11 | | repackaged, and sent off to the customer. |

---

[5] Deposition transcript page 71, lines 24 and 25, inclusive, and page 72, lines 1 through 11, inclusive.

Similar testimony about the absence of any definitive procedure to set the drive board switches was elicited from other knowledgeable Atlas/Valmet employees. The following testimony was given by Atlas/Valmet senior field service technician, Ronald Dean Purcell:[6]

| | | |
|---|---|---|
| 20 | Q. | Am I correct those are switches that are |
| 21 | | spring-loaded wires?  Is that a simple way to |
| 22 | | describe them? |
| 23 | A. | Yes. |
| 24 | Q. | Who sets those switches? |
| 25 | A. | I don't know. |
| 1 | Q. | Who would know? |
| 2 | A. | Someone in the UK. |

Proma Technologies' personnel testified that they never received any instructions about setting switches on the drive boards. They had no knowledge of any obligation on their part to adjust or modify any part they purchased from Atlas/Valmet. Proma Technologies would had every reasonable expectation that any component they purchased from Atlas/Valmet, including the drive boards, would be compatible with their equipment, without modification.  Ronald Dean Purcell testified[7] that Proma Technologies did not change their application from that of the equipment originally supplied. This would negate any necessity for having an alternate switch position on the drive board from that originally supplied with the Atlas slitter rewinder.

In summary, there has been no testimony or documentation to show that Atlas/Valmet specified the switch position setting when purchasing the drive boards. There has been no testimony or documentation to show that Atlas in England set the switches on the drive boards prior to shipping the components to the United States. And there has been no evidence that the Atlas part number assigned to the drives included any specifications for setting the switches. There has been testimony that Atlas/Valmet in NC did not check or set the switches on the drive boards prior to sending the items to Proma Technologies.

A proper and necessary procedure by Atlas/Valmet would have been to inspect and set the switches and fix the switches in position, as, for example, by soldering, prior to

---

[6] Deposition transcript page 66, lines 20 through 25, inclusive, and page 67, lines 1 and 2.
[7] Deposition transcript page 74, lines 3 through 9, inclusive.

shipment. Atlas/Valmet could have, and should have, added an instruction – such as a simple decal with the package – to inspect the switch for proper location. This procedure would have averted Jerry Pucillo's injuries.

B.    Robert Lyons testified that Atlas/Valmet provided extensive training to operators and maintenance personnel in conjunction with installing a machine.[8]  When queried specifically about setting the switch on the drive boards, the following was transcribed:[9]

| | | |
|---|---|---|
| **22** | **Q.** | **Do you go through the electrical schematics with them?** |
| **23** | **A.** | **Yes.** |
| **24** | **Q.** | **And do you go through all the potential switch settings?** |
| **25** | **A.** | **I don't know.** |

Ronald Dean Purcell also testified that he was unaware of anyone from Atlas/Valmet providing any training or instructions to Proma employees with respect to setting the switch on the Infranor drive boards.[10]

In addition to providing training during equipment installation, Atlas/Valmet technicians were on site at Proma Technologies for service calls on at least three occasions, and possibly more. The Atlas/Valmet technicians again failed to avail themselves of the opportunity to instruct Proma employees about an item that was crucial to machine operation and operator safety. When asked about this subject, Ronald Dean Purcell responded as follows:[11]

| | | |
|---|---|---|
| **25** | **Q.** | **Prior to March of 2002, with this** |
| **1** | | **accident, do you have any memory of ever telling** |
| **2** | | **anyone at Van Leer or Proma that the switch** |
| **3** | | **needed to be checked before a new board was** |
| **4** | | **installed?** |
| **5** | **A.** | **No.** |

Furthermore, there were no instructions in the Atlas Operating Guide about the necessity for properly setting the drive switches. Nor were there warnings about the potential devastating consequences should the switches be improperly set. There were no

---

[8] Deposition transcript page 64.
[9] Deposition transcript page 64, lines 22 through 25, inclusive.
[10] Deposition transcript page 113, lines 22 through 25, inclusive.
[11] Deposition transcript page 119, line 25, and page 120, lines 1 through 5, inclusive.

instructions included with the drive boards about proper setting of the switches.  Nor were there specific notations on the electrical schematics calling the users attention to the correct switch location shown on the drawings.

The purpose of instructions and warnings is to control or modify the reasonably fore-seeable behavior of individuals in order to prevent personal injury.  In order to accomplish its intended purpose, a warning must be designed and located to immediately rivet one's attention.  This is done in several ways.  A warning must be of sufficient size to be conspicuous.  Also, a warning crucial to safety, as was necessary in this case, should be placed in more than one location on the machine to ensure that it will be seen and read.  The warning must contain an appropriate signal word alerting one of a hazard.  The two most effective signal words are Danger and Warning.  An additional way of grabbing one's attention is through the use of colors.  Red, yellow and orange are common.  The warning must be forceful enough to alter a user's behavior.  The warning must be intense and communicate a sense of urgency.  A warning that lacks intensity will tend to minimize the potential for danger.

The absence of instructions and warnings on the machine, in the manual, and with the drive boards, contributed to the cause of Jerry Pucillo's injuries.  Instructions and warnings must not, however, be used in lieu of, but as an adjunct to, safe quality control procedures.  In this case, a safe quality control procedure would have included permanently securing the drive switches in position.  Atlas/Valmet had opportunity to inspect and secure the switches prior to shipping the drive boards to Proma Technologies.

## V.    SUMMARY OF FINDINGS

A.    It is my professional opinion, to a reasonable degree of certainty, subject to supplementation should additional relevant information become available, that:

1.    Atlas/Valmet was negligent in failing to inspect the switch on the drive board prior to shipping the board to Proma Technologies;.

2.    Atlas/Valmet was negligent in failing to set and secure the switch on the drive board prior to shipping the board to Proma Technologies;

3.    Atlas/Valmet was negligent in failing to instruct Proma Technologies to check the drive board switch for proper location;

4.   the negligence of Atlas/Valmet caused the Atlas model CSE1250R slitter rewinder to operate in an unreasonably dangerous manner; and

5.   the negligence of Atlas/Valmet, and the unreasonably dangerous operation of the Atlas model CSE1250R slitter rewinder, as described in this report and outlined above, was a direct and proximate cause of Jerry Pucillo's accident and consequent injuries.

Submitted by:

John M. Orlowski, P.E., CSP, BCFE
Director

2809rpt






**Fig. 1**



**Fig. 2**

**Fig.'s 1 & 2:   Depicts the Atlas model CSE1250R slitter rewinder that caused Jerry
                   Pucillo's injuries.**

JERRY PUCILLO                    APPENDIX A-1

F. E. T. FILE NO.:  2809.1-P



**Fig. 3:  View of the metallized paper web.**



**Fig. 4:  Illustration of two rewind stations with partially rewound rolls.**

JERRY PUCILLO                    APPENDIX A-2



**Fig. 5:   View of rewind arm, partially rewound roll, and winding drum.**



**Fig. 6:   Depicts a core chuck on a rewind arm.**

F. E. T. FILE NO.:  2809.1-P



**Fig. 7**



**Fig. 8**

**Fig.'s 7 & 8:   Depicts a drive board with switch.**

JERRY PUCILLO                    APPENDIX A-4

# Appendix  B



# FORENSIC ENGINEERS & TECHNOLOGISTS

**John M. Orlowski, P.E., CSP, BCFE, Director**
11 Vanderbilt Avenue, Suite 120
Norwood, Massachusetts 02062-5056

PHONE: (781)762-8377
FAX: (781)762-1862
general@fet-forensics.com
www.fet-forensics.com

## JOHN M. ORLOWSKI, P.E., CSP, BCFE
### *Curriculum Vitae*

### EXPERIENCE SYNOPSIS

Background encompasses over 45 years of diversified drafting, design engineering and consulting experience. Has been in responsible charge of significant engineering work in such diverse project areas as chemical processing machinery, material handling equipment, paper roll systems, and predominantly, machine tools. Provides consulting services to attorneys and the insurance industry in products liability cases, fall down incidents, vehicular accident reconstruction, and other personal injury cases, as well as damage assessment to high technology equipment.

### FIELDS OF EXPERTISE

Accident Investigation/Reconstruction
Machine Guarding/Safety
Product Safety Evaluation
Ladders and Scaffolds

Automobile Accidents
Safety Standards/Regulations
Building Codes
Premises Liability

### PROFESSIONAL LICENSES

Licensed Professional Engineer in Massachusetts, License #29341
Licensed Professional Engineer in New York State, License #55671
Licensed Professional Engineer in Maine, License #6208

### PROFESSIONAL CERTIFICATION

Board Certified Safety Professional in Engineering Aspects, Certification #9231
Board Certified Forensic Examiner, Certification #3784

### PROFESSIONAL AFFILIATIONS

Executive Committee Member of the Automotive, Metals and Power Press Section
    of the National Safety Council
Diplomate: American College of Forensic Examiners International
Member of the ASTM International F-13 Committee on Pedestrian/Walkway Safety
    and Footwear
Member of the American Society of Safety Engineers
Member of the American Society of Mechanical Engineers
Member of the Society of Automotive Engineers

## EDUCATION

Bachelor of Science in Mechanical Engineering, LaSalle University, Mandeville, LA. Additional short courses and seminars including, but not limited to, *vehicle dynamics for passenger cars and light trucks, air bag sensor design, vehicular accident reconstruction, fluidic circuitry design* and *machinery safeguarding.*

## PRINCIPAL PUBLICATIONS

Mr. Orlowski has co-authored *Engineering Aspects of Guarding of Machinery and Equipment* for release 39 of "Products Liability," edited by Frumer and Friedman, published by Lexis Nexis Matthew Bender & Co., Inc. This publication was updated by Mr. Orlowski in 1994 for inclusion in release 66 of "Products Liability." This publication was again updated by Mr. Orlowski in 2005, for inclusion in release 98 of "Products Liability." Mr. Orlowski has updated Chapter 100 of Frumer and Friedman's "Products Liability" entitled *Power Lawn Mowers. Power Lawn Mowers* was published by Lexis Nexis Matthew Bender & Col., Inc. in 2005. Mr. Orlowski is also a contributing author to "Forensic Accident Investigation: Motor Vehicles," edited by Dr. Thomas L. Bohan and Dr. Arthur Damask, published by the Lexis Nexis Matthew Bender & Co., Inc. in 1995. Mr. Orlowski authored Chapter 5 entitled *The Effects of Payload on Large Truck Rollover.* He also authored the "2001 Cumulative Supplement Volume I" to Chapter 5, which addresses the issue of SUV rollover threshold. Submitted materials for inclusion in "The Comprehensive Forensic Services Manual" by Steven Babitsky, JD, et als, published by SEAK, Inc., in 2000. Contributed to "Cross Examination: The Comprehensive Guide for Experts" by Steven Babitsky, JD, et al, published by SEAK, Inc., in 2003.

## BUSINESS EXPERIENCE

*03/88-present*:            **DIRECTOR**
Forensic Engineers & Technologists
Norwood, Massachusetts

Is the owner and director of Forensic Engineers & Technologists. Functions primarily as a forensic consulting engineer. Also assigns, interfaces with, and directs activities of engineers and technical personnel in diverse consulting case investigations. Provides expert witness testimony as needed.

*01/82-06/94*            **DIRECTOR**
Orlowski & Associates
Norwood, Massachusetts

Functioned primarily as a forensic consulting engineer. Provided assistance to the legal sector in products liability and damage assessment cases. Also provided design-engineering services to industry on a consulting basis.

*01/79-01/82*            **MANAGER, APPLICATIONS ENGINEERING**
(Transferred from the Waltham, Massachusetts facility)
Nichols DeHoff Division, Cranston, Rhode Island
a W. H. Nichols Co.
Waltham, Massachusetts

Developed conceptual designs for machinery, fixtures and tooling needed to machine work pieces to specific dimensions and tolerances. Directly interfaced with, and aided the product design group. Worked with the Machinery Remanufacturing Department to assist in determining extent of wear and damages, and provided design assistance necessary to rebuild equipment. Was the designated 30(b)6 expert.

12/77-12/78                     **CHIEF ENGINEER**
                                Nichols Machine Tool Group
                                a W. H. Nichols Co.
                                Waltham, Massachusetts

Supervised, directed and trained mechanical and electrical design engineering personnel in the design of milling machines and ancillary equipment. Spearheaded the standardization of a milling machine anti-tie down, two-hand machine control in the interests of operator safety. Also added, as standard equipment, a dynamic brake to the milling arbor to prevent excessive cutter rotation on equipment shutdown.

02/77-12/77                     **PROJECT ENGINEER**
                                Lenox Machine Co., Inc.
                                Lenox, Massachusetts

Engineered and designed complete systems necessary to the "dry" end processing of paper, such as winders, slitters and paper roll conveyor systems.

12/72-02/77                     **PROJECT ENGINEER**
                                V & O Press Co., Inc.
                                Hudson, New York

Performed mechanical and electro-mechanical design necessary to manufacture presses and related equipment to customer specifications, or in conjunction with research and development. Engineered a 500-ton capacity, 30-foot stroke swaging machine for a United States Government arsenal. Also designed and developed an ultra high-speed mechanical punch press, and engineered a 150 ton and 200 ton capacity straight-sided mechanical punch press.

07/72-12/72                     **PROJECT ENGINEER**
                                W. B. McGuire Inc.
                                Hudson, New York

Developed a sequential hydraulic valve required for the successful operation of a truck "dock leveler," and engineered, designed and supervised the drafting and the actual construction of a prototype spring-actuated mechanical dock leveler.

02/63-06/72                     **CHIEF PRODUCT ENGINEER**
                                (Initially hired in capacity of design draftsman and
                                promoted through the "ranks" to above position)
                                Gifford Wood Co., Inc.
                                Hudson, New York

Provided overall engineering service for the chemical processing equipment line, and supervised all engineering activities associated with in-house or field problems. Was charged with conducting laboratory experiments to determine the feasibility of processing a prospective customer's product. Authored technical instruction manuals. Tested and approved final set-up of special machines with interest toward safety of operation, functionability, reliability and agreement with customer specifications. (Began engineering studies in 1964.)

*08/60-02/63*                    **DETAIL/DESIGN DRAFTSMAN**

Worked in various areas of drafting/design. Initial assignments were to generate detailed parts drawings from engineering layouts, with rapidly increasing level of responsibilities, including assembly and layout work. Worked both direct for V & O Press Co., Inc., Hudson, New York, and on contract for Allstates Design Co., Colonie, New York (assigned to Xerox Corp., Rochester, New York), and Northern Industrial Services, Colonie, New York (assigned to both the home office and Beloit Jones - formerly E. D. Jones, Pittsfield, Massachusetts).

## CONSULTING EXPERIENCE SUMMARY

*Accident Investigations* including, but not limited to: Slip/Trip and Fall Cases, including slip resistance index measurements where necessary, and determination of conformance to Building Codes, Scaffolds, Ladders, Vehicular Accident Reconstruction, Mechanical Punch Presses, Milling Machines, Woodworking Machinery, Printing Machinery, Exercise Machines; Bicycles, Garden Equipment, Wallpaper Steamers, Construction Incidents, Electric Stove Accidents, Dumbwaiters, Pallet Trucks, Fork Lift Trucks.

*Damage Assessment* (damage due to fire, water and/or shipment) including, but not limited to: Textile Machinery, Offset Printing Presses, Food Processing Machinery, Chemical Processing Machinery, Photocopying Machines, Conveying Equipment, EDM Machines, Metrology Instrumentation, Robots, Tablet Making Machinery.

*Failure Analysis* including, but not limited to: Refuse Trucks, Oil Tankers, Heat Exchangers, Structural Shelves, Relief Valves, Construction Vehicles, Elevating Lifts, Air Conditioners, Injection Molding Machinery, Bottled Gas Containers.

*Mechanical Engineering Design* including, but not limited to: Intricate positioning mechanisms utilizing ballscrews and piezoelectric crystals, laser film plotting and scanning equipment, a desiccation chamber, created a quality assurance program in conformance to FDA regulations for a manufacturer of medical products, the "safe load" certification of lifting devices.

## EXPERT WITNESS TESTIMONY

Has testified as an expert witness in court for both plaintiffs and defendants. Testimony has been in both civil and criminal cases. Has been qualified in diverse subject areas such as: slip index measurements of a floor; table saw accidents; milling machine injuries; structural failures; falls on stairs; slip and falls on snow and ice; machine guarding; punch press accidents; food equipment injuries; and vehicular accident reconstruction.

**PARTIAL LIST OF COURTS IN WHICH TESTIMONY WAS PROVIDED**

- United States District Court, Boston, MA
- United States District Court, Central Islip, NY
- United States District Court, Concord, NH
- United States District Court, New York, NY
- United States District Court, Portland, ME
- United States District Court, Springfield, MA
- Barnstable Superior Court, Barnstable, MA
- Bristol Superior Court, Attleboro, MA
- Bristol Superior Court, Fall River, MA
- Dukes Superior Court, Edgartown, MA
- Essex Superior Court, Lawrence, MA
- Essex Superior Court, Salem, MA
- Hampden Superior Court, Springfield, MA
- Middlesex Superior Court, Cambridge, MA
- Norfolk Superior Court, Dedham, MA
- Plymouth Superior Court, Brockton, MA
- Suffolk Superior Court, Boston, MA
- Worcester Superior Court, Worcester, MA
- Providence Superior Court, Providence, RI
- Washington Superior Court, Kingston, RI
- Norwich Superior Court, New London, CT
- Cheshire Superior Court, Keene, NH
- Hillsboro Superior Court, Nashua, NH
- Merrimack Superior Court, Claremont, NH
- Superior Court of the State of New York, Bronx, NY
- Superior Court of the State of New York, Goshen, NY
- Superior Court of the State of New York, Mt. Kisco, NY
- York Superior Court, Alfred, ME



# FORENSIC ENGINEERS & TECHNOLOGISTS

**John M. Orlowski, P.E., CSP, BCFE, Director**
11 Vanderbilt Avenue, Suite 120
Norwood, Massachusetts 02062-5056

PHONE: (781)762-8377
FAX: (781)762-1862
general@fet-forensics.com
www.fet-forensics.com

## Items Reviewed Relative to the Case Investigation

1. A report from TM Seger Claim Service, Inc., dated April 11, 2002

2. Thirty-five laser copies of photographs submitted by TM Seger Claim Service, Inc.

3. A five-page report of the post accident investigation, by Harold Isherwood, Greg Hagopian and David Peavey

4. Copy of an e-mail from Harold Isherwood to John Brook

5. Copy of an e-mail from Harold Isherwood to Greg Hagopian, et als.

6. Atlas Model CSE1250R Slitter Rewinder Operating Guide

7. The deposition transcript of Harold Isherwood

8. The deposition transcript of Greg Hagopian

9. The deposition transcript of David G. Peavey

10. The deposition transcript of Frank H. Sereno

11. The deposition transcript of Alan W. Petzold

12. The deposition transcript of Robert Paul Langley

13. The deposition transcript of Ronald Dean Purcell

14. The deposition transcript of Ricky K. Howe

15. The deposition transcript of Robert Lyons

16. Telecopy transmitted from George Rice of Van Leer Metallized Products to Martin Phillips of Atlas Converting, dated June 10, 1996

17. A visit report from Ron Purcell to Bob Lyons, dated April 15, 2002

18. A wiring diagram showing the drive board switch location

19. Memorandum in Support of Plaintiff's Motion to Amend the Complaint

# Appendix  D



# FORENSIC ENGINEERS & TECHNOLOGISTS

**John M. Orlowski, P.E., CSP, BCFE, Director**
11 Vanderbilt Avenue, Suite 120
Norwood, Massachusetts 02062-5056

PHONE: (781)762-8377
FAX: (781)762-1862
general@fet-forensics.com
www.fet-forensics.com

### Trial and Deposition Testimony
### of
### John M. Orlowski, P.E., CSP, BCFE

**Case Caption:**  Pauline Spirito v. Divi Resorts, et. al.
Jury Trial, December 8, 2005:  Essex Superior Court, Lawrence, MA
Plaintiff Case: Wade M. Welch, Esq., of Welch & Donohoe, LLP, Boston, MA

**Case Caption:**  Jean F. Fenelon, et al v. Liberty Mutual Insurance Co.
Arbitration, December 5, 2005
Plaintiff Case: Paul B. Shagoury, Esq., of Shagoury & Tominey, Hyde
                Park, MA

**Case Caption:**  Theodore J. Vlachos v. Charles River Park, et als.
Jury Trial, November 29 and 30, 2005:  Middlesex Superior Court,
                Cambridge, MA.
Plaintiff Case: Harry J. Vlachos, Esq., of Law Offices of Harry J.
                Vlachos, Waltham, MA

**Case Caption:**  Justin Joyce v. Minuteman Trucks, Inc., et al.
Deposition, September 16, 2005
Plaintiff Case: Martin Kantrovitz, Esq., of The Law Offices of Martin
                Kantrovitz, Boston, MA

**Case Caption:**  Commonwealth of Massachusetts v. William Wilson
Jury Trial, September 15, 2005: Hampden Superior Court, Springfield, MA
Defense Case:   Joseph M. Kenneally, Esq., Three Rivers, MA

**Case Caption:**  YCN Transportation, Inc., v. Edward A. Michienzie
Bench Trial, August 11, 2005:  Dedham District Court, Dedham, MA
Plaintiff Case: Elliot Savitz, Esq., of Law Office of Elliot Savitz,
                Dedham, MA

**Case Caption:**  Josephine Galvin v. Donna Corcoran, et als.
Jury Trial, July 29, 2005:  Norfolk Superior Court, Dedham, MA
Plaintiff Case: Barbara M. Garrity, Esq., Quincy, MA

**Case Caption:**    Robert G. Hooper, Jr., et al. v. Davis-Standard
                     Corporation, et als.
Deposition, July 22, 2005
Plaintiff Case: Benjamin R. Zimmerman, Esq., of Sugarman and Sugarman,
                P.C., Boston, MA


**Case Caption:**    Victoria E. Jacob v. Kevin G. Polvani, et al.
Jury Trial, July 7, 2005:  New Haven Superior Court, Meriden, CT
Defense Case:    Jonathan A. Beatty, Esq., of Esty & Buckmir, LLC,
                 New Haven, CT


**Case Caption:**    Victoria E. Jacob v. Kevin G. Polvani, et al.
Deposition, June 13, 2005
Defense Case:    Jonathan A. Beatty, Esq., of Esty & Buckmir, LLC,
                 New Haven, CT


**Case Caption:**    Vittorio Spera v. Pfizer, Inc.
Deposition, June 10, 2005
Plaintiff Case: Michael R. Denison, Esq., of Stratton Faxon,
                New Haven, CT


**Case Caption:**    Commonwealth of Massachusetts v. Sheryl Clarke
Bench Trial, May 23, 2005:  Brockton District Court, Brockton, MA
Defense Case:    Gregory G. Nazarian, Esq., of Law Offices of Gregory
                 Nazarian, Brockton, MA


**Case Caption:**    YCN Transportation, Inc., v. Francis A. Fisher
Bench Trial, May 19, 2005:  Dedham District Court, Dedham, MA
Plaintiff Case: Elliot Savitz, Esq., of Law Office of Elliot Savitz,
                Dedham, MA


**Case Caption:**    Victoria E. Jacob v. Kevin G. Polvani, et al.
Deposition, May 4, 2005
Defense Case:    Jonathan A. Beatty, Esq., of Esty & Buckmir, LLC,
                 New Haven, CT


**Case Caption:**    Catherine G. Monaco v. Hallmark Health System, Inc.
Jury Trial, February 15, 2005:  Woburn District Court, Cambridge, MA
Defense Case:    Kurt M. Schmidt, Jr., Esq., of Foster & Eldridge, LLP,
                 Cambridge, MA


**Case Caption:**    Joel Sekeres, et al. v. Greater Providence YMCA
Jury Trial, January 27, 2005: Providence Superior Court, Providence, RI
Plaintiff Case: Jeffrey S. Michaelson, Esq., of Michaelson & Michael-
                son, North Kingstown, RI

**Case Caption:**   Robert R. Crawford, et al. v. Peter W. Downey
Deposition, January 4, 2005
Plaintiff Case:  Brett D. Baber, Esq., of Law Office of Brett D. Baber,
                 PA, Bangor, ME


**Case Caption:**   Christopher Blakey, et al. v. Ogden Projects of Wall-
                 ingford, L.P., et al.
Deposition, September 29, 2004
Defense Case:   William P. Antonoff, Esq., of Gibson & Behman, P.C.,
                 Burlington, MA


**Case Caption:**   Charles Jordan v. Arthur Lindelof
Jury Trial, September 13, 2004:  Norfolk Superior Court, Dedham, MA
Plaintiff Case:  Mark R. Karsner, Esq., of Karsner & Meehan, P.C.,
                 Taunton, MA


**Case Caption:**   Mark W. Fortier, et al. v. Giddings & Lewis Machine
                 Tools, LLC
Deposition, July 28, 2004
Plaintiff Case:  Michael R. Palmieri, Esq., of Donovan & O'Connor, LLP,
                 North Adams, MA


**Case Caption:**   Edward J. Peters v. Crawford Truck Sales, et als.
Deposition, July 21, 2004
Plaintiff Case:  Andrew W. Pasquina, Esq., of Law Offices of Andrew W.
                 Pasquina, Boston, MA


**Case Caption:**   Jacqueline Langlais v. Daniel R. Desjardins
Deposition, June 24, 2004
Plaintiff Case:  Alexei J. Plocharczyk, Esq., of Halloran & Sage, LLP,
                 Hartford, CT


**Case Caption:**   Cara Campbell v. H.C. Duke & Sons, Inc.
Deposition, June 17, 2004
Plaintiff Case:  Jennifer L. Booker, Esq., of the Reardon Law Firm,
                 P.C., New London, CT


**Case Caption:**   Marion Douglas Isenhour v. Summerwood Condominium
                 Trust of Mashpee
Jury Trial, June 14, 2004:  Barnstable Superior Court, Barnstable, MA
Plaintiff Case:  David G. Sullivan, Esq., of the Law Office of David G.
                 Sullivan, Milton, MA

Case Caption:    Juan Carlos Mejia, et al., v. Worthington Communities
                 Inc., et als.
Deposition, January 26, 2004
Plaintiff Case: John R. Sutton, Esq., of Sutton & Montoto, P.A., South
                Miami, FL


Case Caption:    Mark Van Culin, et al. v. Haines Equipment, Inc.
Jury Trial, December 11, 2003: Supreme Court of the State of New York,
                 County of Orange, Goshen, NY
Defense Case:   Steven M. Sold, Esq., of Pilkington & Leggett, P.C.,
                White Plains, NY


Case Caption:    Raimondo Terrasi, et al. v. SCM Group S.p.A., et als.
Jury Trial, November 17, 2003: Middlesex Superior Court, Cambridge, MA
Plaintiff Case: Timothy G. Lynch, Esq., of Swartz, McKenna & Lynch LLP
                Boston, MA


Case Caption:    Kenneth Gagnon, et al. v. Steego Corp., et al.
Deposition, October 20, 2003
Plaintiff Case: Francis J. Lynch, III, Esq., of Lynch & Lynch, South
                Easton, MA


Case Caption:    Claudia J. Aiken v. Worcester State College
Jury Trial, September 16, 2003: Worcester Superior Court, Worcester, MA
Plaintiff Case: Sonja Anastasi, Esq., of Law Offices of Anastasi &
                Associates, P.C., Oxford, MA


Case Caption:    Walter Whitbeck, et al. v. Jones Mfg. Co., et al.
Deposition, August 8, 2003
Plaintiff Case: Craig T. Dickinson, Esq., of Madsen, Prestley & Par-
                enteau, LLC, New London, CT


Case Caption:    Paul Richard v. Delta International Machinery Corp.,
                 et al.
Deposition, June 26, 2003
Plaintiff Case: Andrew W. Pasquina, Esq., Boston, MA


Case Caption:    Carlos Perez v. Northeast, et al.
Deposition, June 25, 2003
Plaintiff Case: John R. Seebold, Esq., of Capasso & Massaroni, LLP,
                Schnectady, NY


Case Caption:    James Gillespie, et al. v. Sears, Roebuck and Company,
                 et. al.
Jury Trial, June 9, 2003: U.S. District Court, Boston, MA
Plaintiff Case: Michael B. Flynn, Esq., of Flynn & Associates, P.C.,
                Boston, MA

**Case Caption:**    Raimondo Terrasi, et al. v. SCM International, S.p.A.,
                     et al.
<u>Deposition, June 6, 2003</u>
Plaintiff Case: Fredric A. Swartz, Esq., of Swartz, McKenna & Lynch,
                Boston, MA


**Case Caption:**    Albert Shay v. Pacific Press & Shear, Inc.
<u>Deposition, May 30, 2003</u>
Plaintiff Case: Paul F. Leavis, Esq., of Leavis and Rest, P.C.,
                Boston, MA


**Case Caption:**    Luis E. Bonta v. Ward Machinery Company
<u>Deposition, May 28, 2003</u>
Plaintiff Case: Mary B. Buonanno, Esq., Takoma Park, MD


**Case Caption:**    Nancy Boutcher et al v. Sunoco, Inc., et al
<u>Jury Trial, May 21, 2003</u>:  U.S. District Court, Concord, NH
Plaintiff Case: Edwinna C. Vanderzanden, Esq. of Getman, Stacey, Tamposi,
                Schulthess & Steere, P.A., Bedford, NH


**Case Caption:**    Commonwealth of Massachusetts v. William Powers
<u>Jury Trial, March 18, 2003</u>:  Suffolk County Superior Court, Boston, MA
Defense Case:   John G. Tardif, Esq., Winthrop, MA


**Case Caption:**    Rebekha J. Abreu v. Ann & Hope, Inc.
<u>Jury Trial, March, 12, 2003</u>:  U.S. District Court, Boston, MA
Defense Case:   Scott R. Behman, Esq., of Gibson & Behman, P.C.,
                Burlington, MA


**Case Caption:**    Barry Funfar et als. v. Falmouth Supply Company
<u>Deposition, March 5, 2003</u>
Defense Case:   James T. Buchanan, Esq., of Clark, Hunt and Embry,
                Cambridge, MA


**Case Caption:**    Nancy Boutcher et al v. Sunoco, Inc., et al
<u>Deposition, February 27, 2003</u>
Plaintiff Case: Edwinna C. Vanderzanden, Esq. of Getman, Stacey, Tamposi,
                Schulthess & Steere, P.A., Bedford, NH


**Case Caption:**    James Gillespie et al. v. Sears, Roebuck & Company,
                     et al.
<u>Deposition, February 14, 2003</u>
Plaintiff Case: Lori A. McCarthy, Esq., of Flynn & Associates, P.C.,
                Boston, MA

**Case Caption:**     Sung Jin Fasteners, LTD, v. Northstar Equipment Corp.,
                      et als.
Bench Trial, February 5, 2003:  U.S. District Court, Eastern District,
                      Central Islip, NY
Plaintiff Case: Mark Sternick, Esq., of Forest Hills, NY


**Case Caption:**     Sandra L. Freilich, et al. v. Home Depot, et al.
Deposition, January 28, 2003
Plaintiff Case: Stacey Forget, Esq., of Shannon & Peters, Worcester, MA


**Case Caption:**     Timothy Joyce, et al. v. Intex Recreational Corp.
Jury Trial, January 14, 2003:  Hillsborough Superior Court, Southern
                      District, Nashua, NH
Plaintiff Case: David Gottesman, Esq., of Gottesman & Hollis, Nashua, NH


**Case Caption:**     John Wesley and Betty Wesley v. Ariens Company, et al.
Jury Trial, January 8, 9 and 13, 2003:  Supreme Court of the State of
                      NY, County of Bronx, Bronx, NY
Plaintiff Case: Douglas Emanuel, Esq., of Bloom & Mintz, New York, NY


**Case Caption:**     Estate of Elizabeth Ann Nell v. Trustees of the Sandbar
                      Village Condominium Trust
Deposition, November 13, 2002
Plaintiff Case: Daniel M. Kelly, Esq., of Fratar, Kern & Kelly, LLP,
                      Springfield, MA


**Case Caption:**     Cindi Fagan v. Country Estates Condominium, et al.
Jury Trial, November 8, 2002:  Worcester Superior Court, Worcester, MA
Defense Case:     James J. Higham, Jr., Esq., of Faille, Higham &
                      Daniels, Springfield, MA


**Case Caption:**     Joseph Fahy v. Boston Edison Company
Deposition, October 29, 2002
Plaintiff Case: Kevin G. Kenneally, Esq., of Donovan Hatem, LLP,
                      Boston, MA


**Case Caption:**     John Burnham v. NAACO Materials Handling Group, et al.
Deposition, October 9, 2002
Plaintiff Case: Richard J. Sullivan, Esq., of Sullivan & Sullivan,
                      LLP, Wellesley, MA


**Case Caption:**     Orphesus McCloud v. Pro-Eco Limited, et als.
Deposition, September 6, 2002
Plaintiff Case: Scott B. Gibson, Esq., of Gibson & Kopsick, Ltd., Wau-
                      kegan, IL

-6-

**Case Caption:**    Sean Patrick Stack v. Milacron, Inc.
Deposition, July 30, 2002
Plaintiff Case: Fredric Bremseth, Esq., of Doshan & Bremseth, Wayzata, MN


**Case Caption:**    Deborah S. Collamati, et al. v. 4 Seasons Rental Centers,
                     Inc., et al.
Deposition, July 9, 2002
Plaintiff Case: Robert H. Furbish, Esq., of Smith, Elliott, Smith &
                Garmey, P.A., Portland, ME


**Case Caption:**    Wayne J. Hebert v. Brian W. Augustine, et al.
Arbitration, June 25, 2002
Plaintiff Case: William A. Curry, Esq., of the Law Offices of William A.
                Curry, P.C., Somerville, MA


**Case Caption:**    Bill Williams v. Knudson Mfg., Inc.
Deposition, June 11, 2002
Plaintiff Case: Peter W. Schroeter, Esq., of Smith, Elliott, Smith &
                Garmey, P.A., Saco, ME


**Case Caption:**    Beatriz Rubianogroot, Administratix of the Estate of
                     Jamie A. Rubianogroot, et als. v. William E. Swanson,
                     et als.
Deposition, May 21, 2002
Plaintiff Case: Daniel R. Brooks, Esq., Brooks Associates, Boston, MA


**Case Caption:**    Commonwealth of Massachusetts v. Daryl Pottinger
Jury Trial, March 26, 2002:    Bristol Superior Court, Attleboro, MA
Defense Case:    James M. Caramanica, Esq., of the Law Offices of John
                 C. Carleen, P.C., Saugus, MA


**Case Caption:**    Thomas Kirker, Jr. v. Melroe Company, et als.
Deposition, March 25, 2002
Plaintiff Case: Dina S. Fisher, Esq., of Robinson & Cole, LLP,
                Hartford, CT


**Case Caption:**    Thomas Kirker, Jr. v. Melroe Company, et als.
Jury Trial, March 19 and March 28, 2002:  Norwich Superior Court,
                New London, CT
Plaintiff Case: James A. Wade, Esq., of Robinson & Cole, LLP,
                Hartford, CT


**Case Caption:**    Raymond Mayo, Jr., v. Electri-Cable Assemblies, Inc.
Deposition, March 8, 2002
Defense Case:    Anne Kelly Zovas, Esq., of Pomeranz, Drayton, & Stabnick,
                 LLC, Glastonbury, CT

**Case Caption:**    Theodore P. Stelmack v. U.S.S. Industrial Park
                     Associates, L.L.C., et al.
<u>Deposition, March 1, 2002</u>
Plaintiff Case: Frederic N. Halstrom, Esq., of Halstrom Law Offices,
                P.C., Boston, MA


**Case Caption:**    Geraldine F. Stanton v. Stop & Shop Supermarket Co.
<u>Jury Trial, January 29, 2002:</u>  Middlesex Superior Court, Cambridge, MA
Plaintiff Case: James R. Burke, Esq., West Newton, MA


**Case Caption:**    Thomas Kirker, Jr. v. Melroe Company, et als.
<u>Deposition, January 22 and March 25, 2002</u>
Plaintiff Case: Dina S. Fisher, Esq., of Robinson & Cole, LLP,
                Hartford, CT


**Case Caption:**    Barbara Greene v. Star Markets Company, Inc. et al.
<u>Deposition, January 10, 2002</u>
Plaintiff Case: Francis E. Jenney, Esq., of Harnish, Jenney, Mitchell
                & Resh, Waltham, MA


Test4yr

F·E·T·

# FORENSIC ENGINEERS & TECHNOLOGISTS

John M. Orlowski, P.E., CSP, BCFE, Director
11 Vanderbilt Avenue, Suite 120
Norwood, Massachusetts 02062-5056

PHONE: (781)762-8377
FAX: (781)762-1862
general@fet-forensics.com
www.fet-forensics.com

## FEE SCHEDULE

**FORENSIC CONSULTING** (excluding legal testimony):
- Senior Forensic Engineer / Specialist           $190.00  per hour
- Forensic Engineer / Specialist                  $170.00  per hour
- Staff Consultant                                $150.00  per hour
- Technician                                      $130.00  per hour
- Consultants with unique qualifications may be
  invoiced at rates other than those noted above.

**(1)**   Travel time is invoiced from office or home to site (or lodging), and return, at the above rates.
**(2)**   Legal testimony is invoiced at 1.5 times the above rates.
**(3)**   Legal testimony is invoiced at a four-hour per day minimum.
**(4)**   Expenses such as photoprocessing, meals, car rental, lodging and airfare, will be invoiced at cost.
**(5)**   Automobile mileage is invoiced at the current IRS allowance.

**TERMS:**
**(1)**   F.E.T. requires a $1,500.00 retainer prior to beginning work on new case assignments. We bill against the retainer. We will invoice additionally depending on the time and cost expended. We will refund the unused retainer on request if we have not been named as an expert witness(s). Subsequent to naming F.E.T. as expert witnesses, no refunds will be granted.
**(2)**   F.E.T. requires a retainer prior to appearing for court testimony, depositions and other legal testimony. The amount of the retainer will be based on estimated time and expenses. We bill against the retainer. We will invoice additionally depending on the time and cost expended. Please note that should the case settle, or be otherwise concluded prior to trial or deposition, F.E.T. will retain $1,500.00 and refund the unused balance, if any.
**(3)**   No deposition will be scheduled until after receipt of retainer. Trial retainers must be received 10 days prior to trial to allow sufficient time for preparation.

APPENDIX E

**Threading diagram**

1.    CANTING DRIVEN CHROME ROLL
2.    DRIVEN CHROME ROLL
3.    DRIVEN DANCER ROLL
4.    DRIVEN CHROME ROLL
5.    SCRAP WINDER NIP ROLL
6. - 9.    DRIVEN CHROME ROLLS
10.    DRIVEN BOWED ROLL
11.    DRIVEN CHROME ROLL
12.    DRIVEN CHROME ROLL
13.    PACER NIP ROLL
14.    DRIVEN CHROME ROLL
15.    FEMALE KNIFE SHAFT
16.    MALE KNIFE TRUNNION
17.    DRIVEN CHROME ROLL
18. & 19.    WINDING DRUM
20. & 21.    WINDING DRUM NIP ROLL

ATLAS CONVERTING EQUIPMENT

APPENDIX  F

EXHIBIT B



# FORENSIC ENGINEERS & TECHNOLOGISTS

John M. Orlowski, P.E., CSP, BCFE, Director
11 Vanderbilt Avenue, Suite 120
Norwood, Massachusetts 02062-5056

PHONE: (781)762-8377
FAX: (781)762-1862
general@fet-forensics.com
www.fet-forensics.com

## JOHN M. ORLOWSKI, P.E., CSP, BCFE
### *Curriculum Vitae*

## EXPERIENCE SYNOPSIS

Background encompasses over 45 years of diversified drafting, design engineering and consulting experience. Has been in responsible charge of significant engineering work in such diverse project areas as chemical processing machinery, material handling equipment, paper roll systems, and predominantly, machine tools. Provides consulting services to attorneys and the insurance industry in products liability cases, fall down incidents, vehicular accident reconstruction, and other personal injury cases, as well as damage assessment to high technology equipment.

## FIELDS OF EXPERTISE

Accident Investigation/Reconstruction
Machine Guarding/Safety
Product Safety Evaluation
Ladders and Scaffolds

Automobile Accidents
Safety Standards/Regulations
Building Codes
Premises Liability

## PROFESSIONAL LICENSES

Licensed Professional Engineer in Massachusetts, License #29341
Licensed Professional Engineer in New York State, License #55671
Licensed Professional Engineer in Maine, License #6208

## PROFESSIONAL CERTIFICATION

Board Certified Safety Professional in Engineering Aspects, Certification #9231
Board Certified Forensic Examiner, Certification #3784

## PROFESSIONAL AFFILIATIONS

Executive Committee Member of the Automotive, Metals and Power Press Section
    of the National Safety Council
Diplomate: American College of Forensic Examiners International
Member of the ASTM International F-13 Committee on Pedestrian/Walkway Safety
    and Footwear
Member of the American Society of Safety Engineers
Member of the American Society of Mechanical Engineers
Member of the Society of Automotive Engineers

## EDUCATION

Bachelor of Science in Mechanical Engineering, LaSalle University, Mandeville, LA. Additional short courses and seminars including, but not limited to, *vehicle dynamics for passenger cars and light trucks, air bag sensor design, vehicular accident reconstruction, fluidic circuitry design* and *machinery safeguarding.*

## PRINCIPAL PUBLICATIONS

Mr. Orlowski has co-authored *Engineering Aspects of Guarding of Machinery and Equipment* for release 39 of "Products Liability," edited by Frumer and Friedman, published by Lexis Nexis Matthew Bender & Co., Inc. This publication was updated by Mr. Orlowski in 1994 for inclusion in release 66 of "Products Liability." This publication was again updated by Mr. Orlowski in 2005, for inclusion in release 98 of "Products Liability." Mr. Orlowski has updated Chapter 100 of Frumer and Friedman's "Products Liability" entitled *Power Lawn Mowers. Power Lawn Mowers* was published by Lexis Nexis Matthew Bender & Col., Inc. in 2005. Mr. Orlowski is also a contributing author to "Forensic Accident Investigation: Motor Vehicles," edited by Dr. Thomas L. Bohan and Dr. Arthur Damask, published by the Lexis Nexis Matthew Bender & Co., Inc. in 1995. Mr. Orlowski authored Chapter 5 entitled *The Effects of Payload on Large Truck Rollover.* He also authored the "2001 Cumulative Supplement Volume I" to Chapter 5, which addresses the issue of SUV rollover threshold. Submitted materials for inclusion in "The Comprehensive Forensic Services Manual" by Steven Babitsky, JD, et als, published by SEAK, Inc., in 2000. Contributed to "Cross Examination: The Comprehensive Guide for Experts" by Steven Babitsky, JD, et al, published by SEAK, Inc., in 2003.

## BUSINESS EXPERIENCE

**03/88-present:**
                    **DIRECTOR**
                    Forensic Engineers & Technologists
                    Norwood, Massachusetts

Is the owner and director of Forensic Engineers & Technologists. Functions primarily as a forensic consulting engineer. Also assigns, interfaces with, and directs activities of engineers and technical personnel in diverse consulting case investigations. Provides expert witness testimony as needed.

**01/82-06/94**
                    **DIRECTOR**
                    Orlowski & Associates
                    Norwood, Massachusetts

Functioned primarily as a forensic consulting engineer. Provided assistance to the legal sector in products liability and damage assessment cases. Also provided design-engineering services to industry on a consulting basis.

**01/79-01/82**
                    **MANAGER, APPLICATIONS ENGINEERING**
                    (Transferred from the Waltham, Massachusetts facility)
                    Nichols DeHoff Division, Cranston, Rhode Island
                    a W. H. Nichols Co.
                    Waltham, Massachusetts

-2-

Developed conceptual designs for machinery, fixtures and tooling needed to machine work pieces to specific dimensions and tolerances. Directly interfaced with, and aided the product design group. Worked with the Machinery Remanufacturing Department to assist in determining extent of wear and damages, and provided design assistance necessary to rebuild equipment. Was the designated 30(b)6 expert.

12/77-12/78                     **CHIEF ENGINEER**
                                Nichols Machine Tool Group
                                a W. H. Nichols Co.
                                Waltham, Massachusetts

Supervised, directed and trained mechanical and electrical design engineering personnel in the design of milling machines and ancillary equipment. Spearheaded the standardization of a milling machine anti-tie down, two-hand machine control in the interests of operator safety. Also added, as standard equipment, a dynamic brake to the milling arbor to prevent excessive cutter rotation on equipment shutdown.

02/77-12/77                     **PROJECT ENGINEER**
                                Lenox Machine Co., Inc.
                                Lenox, Massachusetts

Engineered and designed complete systems necessary to the "dry" end processing of paper, such as winders, slitters and paper roll conveyor systems.

12/72-02/77                     **PROJECT ENGINEER**
                                V & O Press Co., Inc.
                                Hudson, New York

Performed mechanical and electro-mechanical design necessary to manufacture presses and related equipment to customer specifications, or in conjunction with research and development. Engineered a 500-ton capacity, 30-foot stroke swaging machine for a United States Government arsenal. Also designed and developed an ultra high-speed mechanical punch press, and engineered a 150 ton and 200 ton capacity straight-sided mechanical punch press.

07/72-12/72                     **PROJECT ENGINEER**
                                W. B. McGuire Inc.
                                Hudson, New York

Developed a sequential hydraulic valve required for the successful operation of a truck "dock leveler," and engineered, designed and supervised the drafting and the actual construction of a prototype spring-actuated mechanical dock leveler.

02/63-06/72                     **CHIEF PRODUCT ENGINEER**
                                (Initially hired in capacity of design draftsman and
                                promoted through the "ranks" to above position)
                                Gifford Wood Co., Inc.
                                Hudson, New York

Provided overall engineering service for the chemical processing equipment line, and supervised all engineering activities associated with in-house or field problems. Was charged with conducting laboratory experiments to determine the feasibility of processing a prospective customer's product. Authored technical instruction manuals. Tested and approved final set-up of special machines with interest toward safety of operation, functionability, reliability and agreement with customer specifications. (Began engineering studies in 1964.)

**08/60-02/63**                    **DETAIL/DESIGN DRAFTSMAN**

Worked in various areas of drafting/design. Initial assignments were to generate detailed parts drawings from engineering layouts, with rapidly increasing level of responsibilities , including assembly and layout work. Worked both direct for V & O Press Co., Inc., Hudson, New York, and on contract for Allstates Design Co., Colonie, New York (assigned to Xerox Corp., Rochester, New York), and Northern Industrial Services, Colonie, New York (assigned to both the home office and Beloit Jones - formerly E. D. Jones, Pittsfield, Massachusetts).

## CONSULTING EXPERIENCE SUMMARY

*Accident Investigations* including, but not limited to: Slip/Trip and Fall Cases, including slip resistance index measurements where necessary, and determination of conformance to Building Codes, Scaffolds, Ladders, Vehicular Accident Reconstruction, Mechanical Punch Presses, Milling Machines, Woodworking Machinery, Printing Machinery, Exercise Machines, Bicycles, Garden Equipment, Wallpaper Steamers, Construction Incidents, Electric Stove Accidents, Dumbwaiters, Pallet Trucks, Fork Lift Trucks.

*Damage Assessment* (damage due to fire, water and/or shipment) including, but not limited to: Textile Machinery, Offset Printing Presses, Food Processing Machinery, Chemical Processing Machinery, Photocopying Machines, Conveying Equipment, EDM Machines, Metrology Instrumentation, Robots, Tablet Making Machinery.

*Failure Analysis* including, but not limited to: Refuse Trucks, Oil Tankers, Heat Exchangers, Structural Shelves, Relief Valves, Construction Vehicles, Elevating Lifts, Air Conditioners, Injection Molding Machinery, Bottled Gas Containers.

*Mechanical Engineering Design* including, but not limited to: Intricate positioning mechanisms utilizing ballscrews and piezoelectric crystals, laser film plotting and scanning equipment, a desiccation chamber, created a quality assurance program in conformance to FDA regulations for a manufacturer of medical products, the "safe load" certification of lifting devices.

## EXPERT WITNESS TESTIMONY

Has testified as an expert witness in court for both plaintiffs and defendants. Testimony has been in both civil and criminal cases. Has been qualified in diverse subject areas such as: slip index measurements of a floor; table saw accidents; milling machine injuries; structural failures; falls on stairs; slip and falls on snow and ice; machine guarding; punch press accidents; food equipment injuries; and vehicular accident reconstruction.

EXHIBIT C

Volume I
Pages 1 to 121
Exhibits (1)

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

– – – – – – – – – – – – – – – – –
CIRIACO PUCILLO,
                    Plaintiff(s),

        v.                              Civil Action
                                        No. 03-CV-12359MLW
METSO PAPER, INC. AND
VALMET CONVERTING, INC.,
                    Defendant(s).

– – – – – – – – – – – – – – – – –


    DEPOSITION OF JOHN M. ORLOWSKI, a witness called

by counsel for the Defendant Valmet Paper Converting,

Inc., taken pursuant to the applicable rules, before

Diane L. McElwee, Registered Merit Reporter and

Notary Public in and for the Commonwealth of

Massachusetts, at the Law Offices of Mark Petersen,

490 Shrewsbury Street, Worcester, Massachusetts, on

Friday, January 27, 2006, commencing at 9:50 AM.




                ─────────
        JAMES GIBBONS AND ASSOCIATES
              617-438-0402

1    A    That is correct.

2    Q    Let's just take a few minutes and work our

3   way through that C.V.

4    A    Certainly.

5    Q    Professional licenses, it says you are a

6   Licensed Professional Engineer in Massachusetts; is

7   that correct?

8    A    Correct.

9    Q    When was that license obtained?

10    A    To the best of my recollection that license

11   was obtained in October of 1978.

12    Q    And the New York license was obtained when?

13    A    In April of 1978.

14    Q    How about the license in Maine?

15    A    That was attained in January of 1989.

16    Q    As a licensed professional engineer in any

17   of those three jurisdictions, are you licensed in a

18   particular subject matter area?  Are you licensed

19   generally as an engineer?

20    A    In New York State I am licensed as an

21   engineer, as a professional engineer.  In

22   Massachusetts I am licensed as a mechanical

23   professional engineer.

24    Q    In order to obtain your mechanical

1    engineering license in Massachusetts, did you take a

2    test specifically on the subject of mechanical

3    engineering?

4        A    I took a test in New York State on the

5    subject of engineering.  There were questions that we

6    could select from various disciplines, and the

7    questions I selected were pretty much in the area of

8    mechanical engineering.  It's a two-day examination.

9        Q    Did you take an examination for the license

10   in Massachusetts and the license in Maine?

11       A    I did not.  I obtained that license through

12   a reciprocity agreement with New York.  I did,

13   however, have to go through the entire application

14   process.

15       Q    So your license in New York is by

16   examination?

17       A    Correct.

18       Q    Your license in Massachusetts and in Maine

19   is by reciprocity?

20       A    That is correct.

21       Q    Does Massachusetts provide for a general

22   engineering license, or are all their licenses by

23   subject matter?

24       A    I believe all their licenses are by subject

1    matter.

2       Q    Just explain to me, if you would, if

3    New York grants a general engineering license, how

4    does Massachusetts know what subject matter license

5    to give you?

6       A    Based on the application that I submit.  I

7    submitted an application to obtain my license as a

8    professional mechanical engineer.

9       Q    And did you have to show certain

10   qualifications in the mechanical engineering field in

11   order to get that license, or was it purely

12   reciprocity?

13      A    As I said, I had to go through the entire

14   process, including my background, including the

15   requisite references, as I recall, five references or

16   six references, three or four of which had to be

17   Registered Professional Engineers; and they contacted

18   New York State, to the best of my knowledge, and

19   obtained a copy of the examination.

20      Q    What I am trying to think through my head is

21   could you have checked the box to be a structural or

22   chemical engineer in Massachusetts and received that

23   license?

24      A    I don't think I would have received that

1    license because they contact the State of New York to

2    obtain a copy of my examination, and it would be

3    apparent by looking at a copy of my examination that

4    I did not answer questions related to chemical

5    engineering, for example.

6         Q    As a licensed mechanical engineer, what is

7    it that that entitles you to do as opposed to a

8    structural engineer or chemical engineer or any other

9    engineer?

10        A    Well, there is obviously a lot of overlap

11   between the various disciplines of engineering.  A

12   mechanical engineer basically utilizes mathematics

13   and the physical sciences to design machinery and

14   equipment.  However, designing a machine requires a

15   certain amount of structural knowledge because

16   machine components are in fact structures.  It

17   requires a certain amount of electrical engineering

18   knowledge because machines are operated typically by

19   electrical motors or other types of motors.

20             So there is a lot of overlap, but in

21   essence a mechanical engineer will design machinery

22   and equipment.

23        Q    Your C.V. shows you have two professional

24   certifications; is that correct?

1      Q      Tell me what that job entailed.

2      A      That entailed the supervision and direction

3   of electrical engineers, designers, draftsmen in

4   designing milling machines, modifying milling

5   machines, designing tooling, work-holding fixtures

6   for a specific customer's requirements.

7           Again Nichols had standard milling

8   machine product lines, and most of what we did were

9   modifications to those product lines or the design of

10   a work-holding fixture for a specific purpose. There

11   was an electrical engineer under my supervision that

12   designed the electrical circuitry for the machines,

13   depending on the cycle that was required to

14   manufacture a specific product.

15      Q      You stayed at Nichols Machine Tool Group for

16   about a year?

17      A      Well, Nichols Machine Tool Group was part of

18   the W.H. Nichols Company, and what had happened is

19   they made a decision to transfer the milling machine

20   product line to their Rhode Island facility. When

21   they transferred the milling machine product line,

22   they transferred me with the product line, and I

23   became the manager of the application and engineering

24   department, which was basically the conceptual

1    engineering phase of it as opposed to the actual

2    engineering phase of it.

3        Q    Still with the milling machines?

4        A    Still with the milling machines, but I was

5    also in charge of a couple of engineers that did the

6    application engineering on boring machines, deep hole

7    milling machines and any specialized machines we

8    might have gotten involved in.

9        Q    So you really spent four years with the same

10   company?

11       A    Yes, that is correct.

12       Q    Then in 1982 you went off on your own?

13       A    That's correct.

14       Q    And you founded, is that correct, Orlowski &

15   Associates?

16       A    That is correct.

17       Q    In 1988 were you a founder of Forensic

18   Engineers & Technologists?

19       A    It gets a little convoluted.  Me and another

20   individual purchased a company called Staller

21   Associates, S T A L L E R, and Staller Associates was

22   involved with consulting for insurance companies

23   regarding damage assessment, high-tech equipment,

24   such as computers.  When we purchased Staller

1   A    Or FET, yes.

2   Q    Am I correct as I read this C.V. that since

3   1994 your work in essence has been related to claims

4   or lawsuits, investigating claims and lawsuits for

5   trial?

6   A    Pretty much, not a hundred percent. We do

7   occasionally consult with industry, but the principal

8   portion of the business is related to lawsuits, yes,

9   or cases that have the potential to go to suit.

10  Q    When you say "the principal portion," would

11  you say over 90 percent?

12  A    Yes, well over 90 percent.

13  Q    Well over 90 percent?

14  A    Yes.

15  Q    Well over 90 percent for the last 15 years?

16  A    I would say that's a fair statement, yes.

17  Q    Are you familiar with a company known as

18  Infranor, I N F R A N O R?

19  A    I am since I became involved in this case,

20  yes.

21  Q    You were not before you became involved in

22  this case?

23  A    I was not, no.

24  Q    Before you became involved in this case you

1    estimate that drive boards became part of the

2    machinery that you were building and selling, if

3    ever?

4        A    It's going to be difficult for me to be very

5    specific.  We are going back a few years.

6        Q    Let me ask it another way.

7             The drive boards that are focused on in

8    this case, is that a technological development that

9    occurred at some point in time?

10       A    At some point in time.

11       Q    Is it a technological development that

12   occurred later than 1970?

13       A    Probably later than 1970, but I am not a

14   hundred percent sure of that.

15       Q    I guess I am trying to see whether or not

16   electric drive boards -- is that what we decided

17   to -- no, drive boards -- whether drive boards were

18   used in the machines that you made for Gifford Wood,

19   for example.

20       A    The machines that I made for Gifford Wood I

21   don't recall.  There may have been drive boards in

22   those machines.  I know there were some machines that

23   we became involved in that had variable RPMs, but I

24   don't recall specifically when those came into

1    effect.

2        Q    Do you recall whether there were drive

3    boards in the dock levelers at W.B. McGuire?

4        A    I am quite sure there were no drive boards

5    in the dock levelers.

6        Q    At V & O press, the presses you made, did

7    they have drive boards?

8        A    I don't recall.  Most of the presses were

9    constant speed, but there may have been variable

10   speed drives on those presses that would have

11   contained drive boards.

12       Q    But if there was, you were not involved in

13   that aspect of the machine?

14       A    I would have been involved in some aspect of

15   the drives.  I would have been involved in

16   determining horsepower requirements, for example,

17   speed requirements, and I may have been involved in

18   some degree to specifying the specific drive which

19   included the drive boards on a press or on a type of

20   machinery.

21       Q    When you say you may have been included in

22   specifying the particular drive, are you saying like

23   the name of the company, like an Infranor drive?

24       A    The name of the company, the specific model

1    number, other specifications, such as speed, torque,

2    whatever other requirements might be necessary, yes.

3        Q    Did any of the companies that you worked

4    for -- I was going to say prior to Orlowski &

5    Associates, but I can ask it at any point in time.

6    Have any of the companies that you have worked for at

7    any point in your career designed drive boards?

8        A    No.

9        Q    Have any of the companies that you have

10   worked for in your career manufactured drive boards?

11       A    Not to my recollection, no.

12       Q    If the machinery that you designed for any

13   of the companies you worked for needed a variable

14   drive and a drive board was going to be used in the

15   machine, would you have purchased that drive board

16   from another vendor?

17       A    Yes.

18       Q    Are there particularly well-known companies

19   that sell and manufacture drive boards?

20       A    Typically one would buy -- and there may be

21   exceptions to this.  Typically one would buy a drive

22   as a system, a motor, and electronic components.  If

23   I was a design engineer designing a hypothetical

24   piece of machinery, I wouldn't buy a motor or drive

34

1       A       Okay.

2       Q       You told me before prior to this case you

3   were not familiar with the name Infranor.

4       A       That is correct.

5       Q       Having been involved in this case now, did

6   you do some research or analysis to determine how

7   long Infranor has been in business?

8       A       No, I have not.

9       Q       Have you tried to find out whether they are

10  well-known in the area for providing drive boards?

11      A       No.

12      Q       Do you have any information on their

13  reputation?

14      A       I don't.

15      Q       Do you know how popular or unpopular their

16  drive boards are?

17      A       No, I don't.

18      Q       Do you know who their competitors are?

19      A       Not directly other than the two names that I

20  just mentioned.

21      Q       This machine was made and delivered in 1993,

22  correct?

23      A       I understand, yes.

24      Q       Since 1993 has either Eaton or U.S. Motors

1    made drive boards?

2        A    I don't know.

3        Q    Other than Infranor, do you know the name of

4    any company anywhere in the world that made drive

5    boards for machinery since 1993?

6        A    I don't.

7        Q    When I look at a drive board, there is a

8    bunch of circuits.  That's what it looks like to me.

9        A    Components, yes.

10        Q    But a bunch of components.  In this room is

11    a bunch of components, tables, chairs, and lamps.

12    It's just a piece of wires and metal put on a board,

13    and the board is attached to something bigger and

14    heavier.

15        A    Okay.

16        Q    How many different types of drive boards are

17    there?

18        A    There has to be a multitude of different

19    types of drive boards, depending on the system.

20        Q    Okay.  So if we look at the drive board in

21    this case, is it distinguishable from any other drive

22    board anywhere in the world?

23        A    A drive board would be identified by a

24    specific model number, serial number, or some type of

1    identification.  Any other drive board, either by the

2    same manufacturer or by another manufacturer, would

3    have its own designation.  Even if it looked the

4    same, it wouldn't necessarily be the same if it

5    didn't have the identical designation.

6        Q    Let me ask you to take a look at Exhibit

7    No. 1.  There are some photographs in there.  Maybe

8    this is the way to do it.  I believe Exhibit 7

9    maybe --

10       A    Appendix A.

11       Q    -- Appendix A, Figure 7 and Figure 8 --

12       A    Yes.

13       Q    -- contains two photographs of a circuit

14   board, correct?

15       A    They do.

16       Q    Did you take these pictures?

17       A    I did.

18       Q    Did you put the arrow on the pictures?

19       A    I did.

20       Q    What does Figure 7 show?

21       A    It shows a drive board with a switch.

22       Q    What does Figure 8 show?

23       A    Same thing, the same board.

24       Q    Same board.  With the same switch?

1    pointing to a switch that is a speed limiting device?

2        A    I don't know what that switch does.  That's

3    the board I was shown during my initial inspection,

4    and it was represented to me that that was the switch

5    involved in the incident.  I now know that is not the

6    switch that was involved in the incident.

7        Q    You know it's not the switch involved in the

8    incident because you know that's not the drive board

9    that was in the machine; is that right?

10        A    Well, that's partly right, yes.

11        Q    Do you also know that's not the switch that

12    controls the speed limiting device?

13        A    It's my understanding it probably does not.

14    I don't know what that switch does.

15        Q    Your understanding that it probably does not

16    comes from where?

17        A    Comes from the review of the documents.

18              There is another switch involved in the

19    incident that was on a daughter board.  That's not

20    the switch on the daughter board.

21        Q    Where is that switch found?

22        A    That's on the basic mother board.

23        Q    When did you put this report together?

24        A    January 4th.

58

1       Q    What is the basis for your opinion that the

2   switch needs to be secured in place?  Let's just get

3   on the record what's clear.  You can set the switch

4   by pushing the wire under the hook, correct?

5       A    Correct.

6       Q    That's set.  It's in the right position,

7   right?

8       A    It's either in the right position or the

9   wrong position, yes.

10      Q    But it's set?

11      A    It's set in a position.

12      Q    Your testimony is it needs to be set and

13  secured, correct?

14      A    Sure.

15      Q    By "secured" you mean soldered?

16      A    That's one way of doing it.

17      Q    What other ways are there?

18      A    To have a design so it can't come out, put a

19  latch over it by design.  Soldering is pretty basic.

20  There is always the possibility that during shipment

21  a switch could come loose if it's not secured.

22      Q    So there is the possibility the switch could

23  come loose if it's merely latched, correct?

24      A    Possibly, yes.

1    if there is any possibility of it coming loose,

2    coming unlatched, it should be secured, yes.

3        Q    So I said that would no longer be a switch,

4    and you said, right, that would be a circuit?

5        A    Right.

6        Q    So now we have changed the switch to a

7    circuit.  I am asking you the basis for your opinion

8    that it's improper to use a switch.

9        A    If the supplier cannot ensure that the

10   switch remains in its proper position, then it

11   shouldn't be a switch.  The only reason it's a switch

12   is to save money.

13       Q    I understand your testimony.  Now I want to

14   know the basis for it.

15       A    The basis for it?

16       Q    Yes.

17       A    My years of experience in designing

18   machinery and components.

19       Q    Are there standards in the electrical

20   industry, electronics industry that prohibit the use

21   of a switch?

22       A    I don't think you would find a standard that

23   would be that specific, no.

24       Q    Are there standards that say when a switch

1    A    Yes.

2    Q    You told me that Atlas U.S. sold replacement

3  parts for it.

4    A    Correct.

5    Q    So who is the machine manufacturer?

6    A    Well, Atlas U.K. is the machine

7  manufacturer, but Atlas/Valmet supplied the boards.

8    Q    So Atlas/Valmet or Atlas U.S. is not the

9  machine manufacturer?

10    A    Not the machine manufacturer, but they are

11  the supplier of the boards which should have been

12  supplied correctly.

13    Q    What standard, what industry standard or

14  governmental regulation are you relying upon for your

15  opinion that the seller of a component part has an

16  obligation to preset those parts before they are sold

17  and delivered?

18    A    I am relying on my experience in the

19  industry.

20    Q    No standard?

21    A    There may be a standard, but that's such an

22  obvious apparent truth that I wouldn't expect

23  something like that to even be in a standard.

24    Q    So you are not aware of a standard?

1    A    No, I am not.

2    Q    And you are not aware of a governmental

3    regulation?

4    A    No.  None is needed.

5    Q    Now did you get your hypothesis in any way,

6    conduct a survey?

7    A    I have spent dozens of years in the

8    industry, and I know that when someone purchased a

9    component from us, we took great pains to ensure that

10   component was the same as originally supplied.

11   That's true throughout the industry.

12   Q    Did you test your hypothesis in any way?

13   A    You mean did I take a survey of suppliers of

14   components?  I did not.

15   Q    You did not.  Did you talk to any electrical

16   component suppliers?

17   A    Only those that I have been involved with

18   when I was with the industry.

19   Q    You talked to them in connection with your

20   opinion in this case?

21   A    No, I did not.

22   Q    It's fair to say you didn't do anything to

23   try to test or validate your hypothesis that

24   equipment suppliers for component parts have an

1    obligation to preset those before they are sold and

2    delivered, right?

3        A    I wouldn't call it a hypothesis.  It's a

4    self-evident truth.

5        Q    Truth is in the eye of the beholder, is that

6    fair to say?

7        A    Yes, that's fair to say.

8        Q    So it's your opinion, right?

9        A    It's the way that I functioned when I was

10   with industry.

11       Q    And it's nothing more than that?

12       A    I think that's sufficient.

13       Q    Okay.  You can buy electrical components at

14   a hardware store, isn't that true?

15       A    You can, yes.

16       Q    You could go to Mike's Electrical Supply and

17   by electrical components, right?

18       A    Standard off-the-shelf electrical

19   components, yes.

20       Q    You can buy voltage regulators, for example?

21       A    True.

22       Q    And when you are in industry, if you are at

23   the Lenox Machine Company, for example, where you

24   worked, from time to time would the electricians or

1    location shown on the drawings."

2            Do you see that sentence?

3        A    No.  I am sorry.  All right.  Yes.  I see

4    that sentence.

5        Q    Is that sentence true?

6        A    Yes.

7        Q    Didn't you tell me earlier there were

8    schematics?

9        A    Yes.

10       Q    And the schematics showed the correct switch

11   setting?

12       A    Yes.

13       Q    It would show someone how to set the switch?

14       A    If they looked at the schematics.

15       Q    Is that sentence saying there were no

16   schematics showing --

17       A    There were no specific instructions

18   instructing those looking at the schematics that the

19   switch setting was extremely important to the

20   operation of this machine.

21       Q    Wouldn't everything on the schematics be

22   extremely important to the operation of the machine?

23       A    Some items more so than others.

24       Q    But everything on there is important?

95

1    Proma Technologies including the electrical

2    schematics.

3        A    No, I haven't seen that.

4        Q    I show you No. 2 and ask you if you

5    recognize this document as the index to the

6    electrical schematics of Proma Technologies.

7        A    I haven't seen that before either.

8        Q    Let me show you Hagopian Exhibit No. 5 and

9    ask you if you recognize that document.

10       A    No, I don't recognize that document.

11       Q    Have you seen that before?  That's a

12   schematic layout of the M59 drive.

13       A    No.

14       Q    Turn to Hagopian No. 6.  I ask you if you

15   have seen that document before.

16       A    Yes, I have seen a portion of that document.

17       Q    What is this document?

18       A    That apparently is the schematic for the

19   daughter board.

20       Q    Does Hagopian No. 6 call the user's

21   attention to the correct switch location?

22       A    Does it call the user's attention to it?  It

23   shows a switch but doesn't call the user's attention

24   to it.

1    Q    Where does it show the switch?

2    A    (Witness indicated).

3    Q    See the note in the bottom left-hand corner?

4    Could you read that out loud, please.

5    A    OS13 for use with SMVE 2420.  Has M55, M59

6    in parentheses.  It says, Set S-1 to Position 1 for

7    M55, non-SMT; set S-2 to Position 2 for M59.

8    Q    Do you understand S-1 to mean switch?

9    A    Yes.

10    Q    Did that notation in this drawing tell the

11    user to set the switch to Position No. 1 when using

12    the M55 drive?

13    A    It does.

14    Q    And to set to position No. 2 when using the

15    M59 drive?

16    A    It does.

17    Q    So this schematics in fact calls out to the

18    user's attention the correct switch location, does it

19    not?

20    A    It does.

21    Q    That would mean your statement on page 8 of

22    your report is not correct?

23    A    I hadn't seen that before.

24    Q    You hadn't seen the notation on the drawing?

1     A    No.

2     Q    Having seen that notation on Hagopian

3  Exhibit No. 6, is it fair to say this exhibit, this

4  schematic shows the user how to set the switch?

5     A    It informs the user how to set the switch,

6  yes.

7     Q.   Let's continue on page 8 and let's look at

8  the summary of findings.

9               There is numbered Part 1, 2, 3, 4, 5.

10 In shorthand are those the five opinions you have in

11 this case?

12    A    As I sit here today, yes.

13    Q    One, Atlas, slash, Valmet -- we are talking

14 about the U.S. company, correct?

15    A    Yes.

16    Q    -- was negligent in failing to inspect the

17 switch on the drive board prior to shipping the board

18 to Proma Technologies.

19               That's your opinion?

20    A    Correct.

21    Q    And am I correct that that opinion is based

22 on your personal experience in the industries that

23 you worked for?

24    A    Yes.

98

1      Q      Not based on an industry standard you can

2   articulate or point to?

3      A      That's correct.

4      Q      Not based on a consensus standard that's

5   been published, correct?

6      A      Correct.

7      Q      Not based on a government regulation,

8   correct?

9      A      None that I know about at this point.

10     Q      Not based on some publication somewhere that

11  talks about good sales practices that you can point

12  to?

13     A      Nothing I can point to right now.

14     Q      Not based on a survey that you took?

15     A      Correct.

16     Q      Not based on a survey that you read based on

17  your personal experience?

18     A      Correct.

19     Q      And you have never worked for a company that

20  sold electrical components, correct?

21     A      That is correct.

22     Q      And you have never worked for a company that

23  receives components from various vendors and then

24  ships those components to end users?

1  those drives.

2    Q    So was there an internal protocol at Lenox

3  where you worked that opened up each package and

4  opened up each box and checked each position of each

5  switch and each circuit?

6    A    I don't recall.  If there was such a

7  situation that arose, it was Lenox's responsibility

8  to ensure that that component, whatever it happened

9  to be, went out in the condition in which it was to

10  be used, ultimately to be used.

11    Q    I am asking you about the protocol used.

12  What was used by a company that you worked for,

13  including Lenox, to see to it that all the switches

14  and all the circuits on all the electrical components

15  that they resold were properly set?

16    A    Well, all of these companies had an

17  inspection department, inspected all manufactured

18  components and also inspected purchased components.

19    Q    Were you in the Lenox inspection department?

20    A    I wasn't in the inspection department.  I

21  was in charge of quality control, for example, at

22  Gifford --

23    Q    Let's stick with Lenox, and we will go to

24  Gifford Wood afterwards.

1    A    All right.

2    Q    At Lenox did you know that every package

3  that came in was inspected?

4    A    There was a protocol to do so.

5    Q    Who created that protocol?

6    A    I don't recall.

7    Q    How was it published?

8    A    All of these companies have quality control

9  departments, and quality control is designed to do

10  exactly that, make sure that products that go out are

11  quality products and designed and set up to operate.

12    Q    I am having trouble distinguishing

13  between -- sometimes I hear you say what's an

14  assumption; that Lenox checked components before they

15  shipped them out.  Sometimes it sounds like you are

16  saying you know that they opened up the packages,

17  took them out of the packages and checked every

18  component.

19    A    It's quite a few years ago.  My memory is a

20  little fuzzy.  I know that's what quality control

21  departments do in general.

22    Q    You don't have a specific recollection of a

23  protocol in place at Lenox to do that, to open the

24  packages and check every switch and every component?

1    A    I don't recall specifically whether they did

2    that on every single package, but I know there was a

3    procedure in place that in ordering components that

4    they conformed specifically to the same component

5    that was sent out with the machine initially to

6    obviate the necessity for doing that in every single

7    case.

8    Q    So they had a model number and product

9    number?

10    A    Exactly.

11    Q    And they would order it by model and product

12    number?

13    A    Yes, and if there were any special

14    instructions, that would also be included as part of

15    the order.

16    Q    By ordering by model and product number,

17    your company expected the product to arrive correctly

18    set, right?

19    A    Yes.

20    Q    And they would pass it on to the customer

21    with that same expectation that it was correctly set

22    by whoever you got it from?

23    A    If it was properly ordered, it should be

24    properly set, yes.

1    Q    Now in all of the companies that you worked

2    for, the same quality control control type procedure

3    existed, is that your assumption?

4    A    Standard throughout the industry, yes.

5    Q    So when you worked for a company and the

6    product came in, Lenox or Gifford --

7    A    Gifford Wood.

8    Q    -- Gifford Wood didn't take the component

9    part out of its box and out of its bubble wrap and

10   solder the switches into place, right?

11   A    If the component were properly ordered, the

12   switches would be in place.

13   Q    All I am trying to focus on is No. 1,

14   failing to inspect.  In fact your experience was the

15   inspection procedure was to order the right part with

16   the right product numbers so you didn't have to do

17   inspection, correct?

18   A    That's correct.

19   Q    And Opinion No. 2, you say failing to set

20   and secure, but that obligation is avoided by

21   ordering the part by its correct model number and

22   serial number, correct?

23   A    Apparently the part wasn't ordered

24   correctly.

1    Q    Am I correct the obligation is to order it

2    correctly?

3    A    That's the obligation, yes.

4    Q    It's not to open the box and adjust the

5    product before you send it out?

6    A    Well, that certainly depends on what type of

7    arrangement Atlas/Valmet had with their supplier.  I

8    mean if they had an arrangement where they were just

9    to order generic boards, then, yes, it was certainly

10   their responsibility to inspect and set and secure.

11   Q    And if their operating procedure was to

12   order a specific board by number from Infranor so

13   that Infranor could properly set the switches and

14   build the drive for the end user, the obligation

15   would not be to open it, inspect it, and set it?

16   A    By their own testimony they had no real

17   procedure in place for doing or ensuring that the

18   right board came in.

19   Q    Want to answer my question?

20   A    What was it?

21            MR. KELLEHER:  Would you read it

22   back.

23        (Record read)

24   A    If they had some assurance that the board

1    was shipped to them with the switch in the proper

2    location, they might not have an obligation to open

3    each and every one, but they certainly would have an

4    obligation to spotcheck.  All companies do that.

5        Q    I will go back to my questions I asked you

6    you with regard to Paragraph 1.

7                Is there any industry standard or

8    consensus standard that sets forth how and when a

9    supplier needs to inspect or spotcheck products?

10       A    There may be, but as I sit here today I

11   don't know.

12       Q    You are not relying upon any industry

13   standard?

14       A    No, I am not.

15       Q    You are not relying upon any governmental

16   regulation?

17       A    No.  I am relying on my experience.

18       Q    You are not relying on any industry type

19   publication?

20       A    Well, I am sure there are many, but I am not

21   relying on them.

22       Q    And at the companies that you worked for,

23   they had quality control procedures in place, but you

24   don't specifically today as you sit here know what

1    they were, right?

2        A    I don't.  That's a long time ago.

3        Q    You don't know whether the companies that

4    you worked for in fact inspected every tenth product,

5    every one hundredth product or every one thousandth

6    product, right?

7        A    I don't recall.  They may have inspected

8    every one.

9        Q    You don't know when they inspected them

10    whether they took the product out and compared it to

11    the mechanical drawings, if it was a mechanical part,

12    or compared it to electrical drawings, if it was an

13    electrical part?

14        A    I don't have a specific recollection of

15    that, no.

16        Q    It wasn't part of your job to know that at

17    the time, was it, in which of your jobs?

18        A    No, it wasn't.  In a small company you are

19    peripherally involved with all departments.

20        Q    You had an understanding that you sold good

21    products and you stood behind your products?

22        A    Certainly.

23        Q    You didn't develop or implement or publish a

24    quality control procedure with regard to component

1    parts at any of the companies you worked for, right?

2        A    I am sorry.  Repeat the question.

3                MR. KELLEHER:  Could you read it

4    back.

5            (Record read)

6        A    Me personally?

7        Q    Yes.

8        A    No, I did not personally.

9        Q    You were not involved in it personally?

10       A    I was not involved in it personally, but

11   certainly it would depend on the component as well as

12   to the degree of inspection necessary.

13       Q    Do you have an opinion as to the condition

14   of the drive boards and the position of the switch at

15   the time this machine was originally sold and started

16   up in 1993?

17       A    Yes.

18       Q    What's your opinion?

19       A    The same position in which Mr. Purcell put

20   the switches in.

21       Q    Excuse me.  Say that again.

22       A    The same position in which the switches were

23   put in after Mr. Pucillo's accident.

24       Q    So it's your opinion that at the time of

1    startup in 1993 all the switches were in their proper

2    position, is that your opinion?

3        A    I don't know.  I wasn't there in 1993.

4        Q    Okay.

5        A    Maybe I misunderstood your question.

6        Q    Maybe.

7            I am asking you do you have an opinion

8    as to whether the switches were properly set or

9    improperly set when the machine was first installed

10   in 1993?

11       A    I don't know.  All I can tell you is that

12   during my initial meeting with Proma in 2002 I was

13   told there had been several what they call phantom

14   startups.  They didn't know the causes of them.

15   Whether that dates back from when the machine was

16   installed, I don't know.

17       Q    So the switch at issue in this case could

18   have been improperly set in 1993, correct?

19       A    I don't know.  I have no opinion on that.

20       Q    It would have been properly set in 1993?

21   You have no opinion?

22       A    Anything is possible.

23       Q    You have no knowledge either way?

24       A    I don't.

110

1       Q      You have no knowledge as to when the switch

2    on the drive board board at issue was either put into

3    the improper position or became improperly

4    positioned, correct?

5       A      It's my opinion it was improper when it was

6    shipped to Proma or Van Leer.

7       Q      Tell me the facts upon which you have

8    concluded that that switch was in the improper

9    position at the time it was received by Proma.

10      A      There is no reasonable cause for anybody at

11   Van Leer or Proma to move that switch to an improper

12   position.

13      Q      Therefore it's your opinion it is improperly

14   positioned by somebody prior to it arriving at Proma?

15      A      Yes.

16      Q      So you have ruled out the fact that someone

17   installing the drive inadvertently moved the switch,

18   correct?

19      A      Well, this wasn't the only switch --

20      Q      Answer my question.  Have you ruled that out

21   as a possibility?

22      A      It's improbable.

23      Q      Would you rule it out?

24      A      Can't rule out anything at this point.

1      Q    Did you rule out the fact that the switch

2  may have been improperly positioned or caused to be

3  improperly positioned by its means of storage at

4  Proma Technologies?

5      A    Pretty much, yes.

6      Q    Did you rule out the fact that it was

7  improperly positioned in or about 1996 at the time

8  that Mr. Rice was discussing Proma Technologies'

9  confusion with respect to the switch settings?

10     A    That paragraph is unclear.  I don't know

11 what they are referring to, and I don't know which

12 switch they are referring to.

13     Q    You have ruled out the fact that Proma

14 Technologies or Van Leer was confused and improperly

15 set the switch?

16     A    There is nothing in that paragraph that said

17 they have made any switch changes or any switch

18 settings.  They are asking where the switch should be

19 set.  I don't even know if they are talking about

20 this particular switch.

21     Q    You told me it's your opinion that this

22 switch was improperly set before it arrived at Proma.

23 I am trying to find out if you ruled out all the

24 possibilities of it being improperly positioned at

```
 1   Proma.

 2      A    I ruled out the probabilities.

 3      Q    How did you rule out those probabilities?

 4      A    I considered what is more probable than not.

 5      Q    What facts did you consider to make that

 6   statistical analysis?

 7      A    I have considered all the information I have

 8   reviewed.  I considered my experience in the

 9   industry.  I have considered the fact that people

10   don't typically adjust switches or misadjust

11   switches.  It's my opinion this switch was received

12   in the improper position.

13      Q    In your experience in industry do electrical

14   engineers ever make a mistake in setting switches?

15      A    Everyone makes mistakes.

16      Q    Do licensed electricians make mistakes?

17      A    Everyone makes mistakes.

18      Q    Tell me how come it's not at all probable

19   that a mistake was made at Proma Technologies.

20      A    Well, it's not the only mistake.  There are

21   other mistakes that were incorrect positions.  There

22   were switches that were open.  It doesn't make any

23   sense that that would have been done at Proma

24   Technologies.
```

1    Q    Who installed all the drives?

2    A    Who installed the drives?

3    Q    Yes.

4    A    Proma.

5    Q    Now how many drives on this machine had the

6    switch correctly set?

7    A    I don't recall.

8    Q    Is it in your report?

9    A    It may be.  I don't know if Atlas/Valmet may

10   have installed some of those drives during their

11   service calls.

12   Q    Let me direct your attention to page 4.

13   A    I just found it.

14   Q    Paragraph above the Roman IV.

15   A    Mm-hmm.

16   Q    Take a look at that paragraph.  Tell me how

17   many drive boards there are on this machine.

18   A    It doesn't tell you how many drive boards

19   are in the machine.

20   Q    Do you know?

21   A    One for each drive.  I believe there are

22   ten drives.

23   Q    So that would be ten drive boards then,

24   correct?

1    A    Yes.

2    Q    And how many were not properly positioned?

3    A    Four.

4    Q    So six were properly positioned, correct?

5    A    Correct.

6    Q    How did they get properly positioned?

7    A    How do they get properly positioned? Maybe

8    they were received that way.

9    Q    What's the probability?

10    A    The probability that they were received that

11    way?

12    Q    What's the probability that those six

13    switches were properly positioned prior to arriving

14    at Proma Technologies?

15    A    I would say it's pretty good.

16    Q    If the same procedure was followed by the

17    seller of the component part for the four that were

18    improperly positioned as was used for the six that

19    were properly positioned, isn't it probable those

20    four would have received by Proma Technologies

21    correctly positioned?

22    A    I don't know anything about the procedure

23    for setting or checking switches or quality control

24    inspections.  I can't answer that question.

1    COMMONWEALTH OF MASSACHUSETTS   )

2    NORFOLK, SS.                        )

3

4

5

6

7

8           I, DIANE L. McELWEE, Registered Merit
Reporter and Notary Public in and for the
9   Commonwealth of Massachusetts, do hereby certify
that there came before me on the 27th day of
10  January, 2006, at 9:50 AM, the person
hereinbefore named, who was by me duly sworn to
11  testify to the truth and nothing but the truth
touching and concerning the matters in controversy
12  in this cause; that there was an examination under
oath and the examination was reduced to transcript
13  form under my direction and that the deposition is
a true record of the testimony given by the witness.

14           I further certify that I am neither
attorney nor counsel for, nor related to or employed
15  by any of the parties to the action in which this
deposition is taken; and further that I am not a
16  relative or employee of any attorney or counsel
employed by the parties hereto or financially
17  interested in the action.

18           In witness whereof, I have hereunto set
my hand and seal this 2cd day of February, 2006.

19

20

21                                    _____

DIANE L. McELWEE, Notary Public
22  My commission expires:

23  January 24, 2008

24