UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| **CIRIACO PUCILLO,** | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 03-CV-12359 MLW |
| **METSO PAPER, INC. AND VALMET CONVERTING, INC.** | ) | |
| Defendants. | ) | |

### STATEMENT OF MATERIAL FACTS OF RECORD
### TO WHICH THERE IS NO GENUINE ISSUE

Defendant Valmet Converting, Inc., in support of its motion for summary judgment and pursuant to Local Rule 56.1, respectfully submits this Statement Of Material Facts Of Record To Which There Is No Genuine Issue. Attached to this statement, for each citation to the record, is a copy of the deposition transcript or document containing the supporting testimony.

For the convenience of the Court, the referenced attachments are as follows:

| | |
|---|---|
| Attachment 1: | Complaint |
| Attachment 2: | Deposition Excerpts of Frank Sereno |
| Attachment 3: | Deposition Excerpts of Ciriaco Pucillo |
| Attachment 4: | Deposition Excerpts of David Peavey |
| Attachment 5: | Deposition Excerpts of Paul Langley |
| Attachment 6: | Deposition Excerpts of Greg Hagopian |
| Attachment 7: | Deposition Excerpts of Harold Isherwood |
| Attachment 8: | Deposition Excerpts of Ron Purcell |
| Attachment 9: | Schematic Drawing |
| Attachment 10: | Deposition Excerpts of Robert Lyons |
| Attachment 11: | Deposition Excerpts of Rick Howe |
| Attachment 12: | Deposition Excerpts of John Orlowski |
| Attachment 13: | Deposition Excerpts of Alan Petzold |
| Attachment 14: | Expert Report of John Orlowski |

For its statement of material facts of record to which there is no genuine issue, Valmet Converting states as follows:

1. Plaintiff's claim arises from an accident that occurred at Proma Technologies in Franklin, Massachusetts ("Proma"), when plaintiff was struck by a cardboard core that was released from a slitter machine (the "Slitter"). At the time of the accident, plaintiff was an employee of Proma. (Attachment 1 at ¶¶ 6, 7 and 11.)

2. Proma acquired the business operations in Franklin in January 2000. Prior to January 2000, the business was owned by a Dutch company known as Royal Packaging-Van Leer ("RP-VL") and was operated through a subsidiary known as Van Leer Metalized Products ("Van Leer"). In January 2000, RP-VL was acquired by a Finnish company known as Huhtaimka, and Proma acquired the assets of Van Leer from Huhtaimka. (Attachment 2 at 5-9.) In 2005, Proma sold the business to Vacumet. (Attachment 3 at 5.)

3. In 1992, Proma (then known as Van Leer) acquired the Slitter involved in this case. Van Leer's parent company, RP-VL, purchased the Slitter through a subsidiary in France, from a company in England known as Atlas ("Atlas-UK"). The Slitter was manufactured by Atlas-UK and delivered in 1993. (Attachment 2 at 13, 18; Attachment 10 at 23-24, 35-36, 38.)

4. The Slitter was one of three slitter machines used by Proma in the production of metalized paper. (Attachment 2 at 20-21; Attachment 4 at 16.) The Slitter was approximately thirty feet long and ten to twelve feet wide, and was used to reduce large sheets of paper produced by the coater machine into multiple smaller sheets wrapped on cardboard cores. (Attachment 2 at 5; Attachment 4 at 19-20.)

5. The Slitter had the capacity to wrap paper onto at least five cardboard cores simultaneously. (Attachment 4 at 20-21; Attachment 8 at 33.) Each cardboard core was held by two mechanical arms, referred to as rewind arms. Each rewind arm had a motor that rotated the core and each motor was controlled by an electronic drive, also known as a drive board.

(Attachment 2 at 38-40; Attachment 4 at 20-21; Attachment 8 at 37-38.)  There were a total of 10 rewind arm drive boards in the Slitter.  (Attachment 8 at 38.)

6.    A drive, also referred to as a drive board, is a printed electrical circuit board. (Attachment 5 at 34.)

7.    At all relevant times, the rewind arm drive boards – both mother boards and daughter boards – were manufactured by a company in Germany known as Infranor.  The boards were labeled Infranor and had model numbers and serial numbers affixed to them for identification; however, at no time did Proma retain records of the serial numbers of any of the boards in its possession.  (Attachment 5 at 72.)

8.    The drives controlling the rewind arm motors were one of three drive systems in the Slitter.  The other two drive systems were associated with the unwind section and the main drum.  (Attachment 4 at 19, 22-23; Attachment 6 at 19, 21.)  Two of the drive systems used drives manufactured by Infranor, including the drives to the rewind arm motors.  (Attachment 4 at 25-26.)  The two Infranor drives are the same, except that the drives for the rewind arms have the daughter board attached to regulate speed.  (Attachment 4 at 26, 32.)

9.    Each rewind arm drive board consisted of two electronic circuit boards referred to as a mother board and daughter board.  (Attachment 4 at 28, 32.)  Each daughter board was approximately 2-inches by 4-inches in size and was mounted to a mother board.  (Attachment 2 at 70; Attachment 4 at 36; Attachment 6 at 49.)

10.    At the time of plaintiff's accident, only one cardboard core was in use and the core was held between Rewind Arm 2Right and Rewind Arm 2Left.  (Attachment 7 at 25, 89.)

11.    An accident investigation concluded that the core was released from the Slitter because of two independent events:  (1) the rewind arms lifted the core from the Slitter's drum,

at the same time that (2) an electronic switch on the daughter board assigned to Rewind Arm 2Left was not properly set. Both events were required for the Slitter malfunction to occur; therefore, the condition of the wrongly positioned switch could have existed without incident for any length of time. (Attachment 8 at 137-138, 148-151; Attachment 7 at 78.)

      12.     The switch on the daughter board was made from wire, it was spring-loaded, and could be connected to either of two positions, or it could be set in neither position. (Attachment 4 at 32-33; Attachment 8 at 70.)

      13.     The switch on the daughter board was to be connected to one hook position if the drive received its speed control data from tachometer feedback and connected to the opposite hook position if the drive received its speed control data from voltage feedback. (Attachment 8 at 65, 70-71; Attachment 4 at 32-33; Attachment 6 at 49-52.)

      14.     All rewind arm drives in the Slitter received speed control data from voltage feedback. (Attachment 4 at 32; Attachment 8 at 70-71.)

      15.     There were two models of Infranor mother boards, one referred to as M55 and the other referred to as M59. The M59 was a later generation model that used surface mounted technology for resistors as opposed to the resistors with plug-through-holes on the M55. (Attachment 8 at 45-46.)

      16.     Infranor's daughter board could be used with either a M55 mother board or a M59 mother board. (Attachment 8 at 45.) When the daughter board was mounted to an M55 mother board the switch was to be set in "Position 1" and when the daughter board was mounted to an M59 mother board the switch was to be set in "Position 2." (Attachment 6 at 49-52; Attachment 12 at 95-97; Attachment 9.)

17. The proper position settings for the switch on the daughter board were shown in a schematic diagram provided to and maintained by Proma for reference purposes. (Attachment 6 at 41, 49-52; Attachment 9; Attachment 12 at 95-97.)

18. The proper position setting for the switch was expressly described in English text on the schematic drawing. (Attachment 6 at 49-52; Attachment 9; Attachment 12 at 95-97.)

19. The accident investigation determined that the switch was not set to either Position 1 or Position 2. (Attachment 8 at 138.)

20. No record was made at the time of the accident identifying the daughter board assigned to Rewind Arm 2Left at the time of the accident. (Attachment 5 at 67, 77.)

21. No record was made at the time of the accident whether the daughter board assigned to Rewind Arm 2Left was mounted to a M55 mother board or a M59 mother board. (Attachment 5 at 67.)

22. There is no way for Proma to determine what drive board was involved in Pucillo's accident. (Attachment 5 at 77.)

23. When the Slitter was delivered to Proma in 1993, it was equipped with an initial set of drive boards, including daughter boards. (Attachment10 at 57.) These boards were installed before the Slitter was delivered to the U.S. (Attachment 10 at 57.) Valmet Converting was not involved in the delivery or start-up of the Slitter. (Attachment 10 at 36-37.)

24. The drives in the Slitter had varied service lives. Some drives lasted months or years, and other drives were still in the Slitter from the original installation as late as December 2004. (Attachment 5 at 39.)

25. Proma did not maintain records of when drives in the Slitter were replaced. (Attachment 5 at 27, 38.)

26.     Proma has no records to show how many replacement drives were purchased for the Slitter since its acquisition in 1993. (Attachment 2 at 44; Attachment 5 at 24.)

27.     Proma created purchase orders for its purchases, but maintained these records for only a short time before destroying them. (Attachment 2 at 44-45, 100-101.) Typically, records were maintained by Proma only until the next purchase. (Attachment 5 at 24.)

28.     Some replacement drives were purchased for Proma through affiliated Van Leer corporations. This practice continued until the mid-1990's. Proma has no record of the purchases of replacement drives acquired through the Van Leer affiliated companies during that period. (Attachment 2 at 44-46, 100-101.)

29.     Some replacement drives and some repaired drives were purchased from Valmet Converting. Proma does not have historical records of these purchases, but estimates that it purchased new or repaired boards at a rate of about one per year. (Attachment 5 at 23-24, 28-29.)

30.     Daughter boards were sometimes purchased by Proma separately from mother boards. When a daughter board was purchased separately, it was mounted to a mother board by Proma's technicians. No records were kept of when daughter boards alone were replaced. (Attachment 5 at 34, 37.)

31.     When drives were delivered to Proma, either new drives or repaired drives, they were placed in storage until needed. (Attachment 5 at 40-42, 64.) Between 1993 and the date of the accident, Proma employed the same intake procedure for the spare drives that it purchased or repaired. (Attachment 5 at 31.) Upon receipt by Proma, the spare drives were removed from their boxes and placed on a shelf in Proma's storage room. (Attachment 5 at 32.) At the time the

spare drives were delivered to Proma, no inspection was made of the drive and no determination was made as to the position of the switches. (Attachment 5 at 32, 41-42, 64.)

32.     Each drive had a label, a model number and a serial number identifying it as an Infranor drive. Proma made no record of the serial numbers of the drives that it purchased. (Attachment 5 at 31-33, 41, 61, 63-64, 72.)

33.     When drives were removed from storage for use in the machine, no record was made of which drive was removed from storage. (Attachment 5 at 33.)

34.     There is no way for anyone at Proma to tell which drive was replaced, or when, in the years prior to the accident. (Attachment 5 at 38-39.)

35.     There is no way for Proma to tell how many drives were replaced in the Slitter. (Attachment 5 at 38.)

36.     There is no way for Proma, even if given a drive's serial number, to tell whether the drive was in the Slitter, in storage, or previously disposed of at the time of the accident. (Attachment 5 at 61.)

37.     Proma had no inspection protocol in place to determine the position of the drive's switches at the time they were installed in the Slitter by Proma's electricians. (Attachment 5 at 42.) There was no procedure at Proma that required anyone to compare the drive to the electrical schematics or manual before installing the drive in the Slitter. (Attachment 5 at 44.)

38.     At all times, Proma had a maintenance staff as well as an engineering staff. The maintenance staff performed preventative maintenance and general repairs. The engineering group oversaw machine upgrades and original installations. (Attachment 5 at 8; Attachment 2 at 26-29.) The number of electricians and engineers on staff fluctuated from time to time as personnel changed from time to time. (Attachment 2 at 26-28, 53; Attachment 5 at 20.)

39. Proma's in-house maintenance department performed routine and periodic maintenance, as well as preventative maintenance, to Proma's machines. Maintenance of the Slitter included replacing drive boards; Proma's staff electricians were responsible for replacing the drive boards. (Attachment 13 at 11; Attachment 5 at 18-19.) There was no specific individual responsible for the drives, it would have been any of Proma's electrical technicians and the identity of those people changed over time. (Attachment 5 at 20.)

40. Proma's maintenance department replaced drives when the drive was suspected of a machine malfunction. (Attachment 5 at 18; Attachment 4 at 43.) Failed drives in the Slitter were replaced in either of two ways: (1) a suspect drive would be "swapped" with a working drive in the Slitter, or (2) a suspect drive would be replaced with a drive from the store room. (Attachment 4 at 29, 81-82; Attachment 5 at 40-41.)

41. Failed drives that were swapped with other drives in the Slitter may have remained in the Slitter with a rewind arm that was not being used, or they may have been sent for repairs. (Attachment 4 at 82.)

42. Failed drives that were sent for repairs may have been repaired and returned to Proma, or may have been replaced with a new drive. (Attachment 5 at 40-41.)

43. No record exists of which mother boards or daughter boards were removed from the Slitter before or after the accident. (Attachment 4 at 82.)

44. No service contract or retainer agreement ever existed between Proma and Valmet Converting. (Attachment 2 at 99-100; Attachment 5 at 82; Attachment 6 at 8.) Valmet Converting did not perform routine inspections of the Slitter. (Attachment 4 at 63.)

45. Proma's first purchase of spare drives was within a year of start-up. (Attachment 5 at 83.)

46. The Slitter was delivered to Proma with reference manuals and machine drawings, including the electrical schematic drawings. (Attachment 2 at 18-19, 23; Attachment 5 at 24-26.)

47. Proma maintained a binder of the Slitter's electrical schematics. It was kept at the Slitter next to the electrical cabinet. (Attachment 6 at 41.)

48. Greg Hagopian, one of Proma's electrical engineers, referred to the schematics for reference. (Attachment 6 at 41.)

49. David Peavey, a Proma electrician, referred to the schematics many times. (Attachment 4 at 88.)

50. The schematic drawing for the Armature Feedback Board, a/k/a the daughter board, show the switch and its two position settings. (Attachment 4 at 93; Attachment 9.) The note on the drawing explains the switch settings, stating "SET S1 to POS 1 FOR M55; SET S1 TO POS 2 FOR M59." (Attachment 4 at 94; Attachment 6 at 51-52; Attachment 9.) In the schematic, "S1" referenced the switch and "M55" and "M59" referenced two models of mother boards. (Attachment 4 at 94.) Anyone who looked at Exhibit 6 would know of the switch and its correct position. (Attachment 6 at 63-64.)

51. Proma could have hired someone to change its drive boards, but elected to do the work itself with its electricians and electrical engineers. (Attachment 6 at 52-53.)

52. The Slitter was manufactured, sold, delivered, installed and started-up by Atlas-UK. (Attachment 10 at 23-24, 35, 38.)

53. Valmet Converting did not manufacture the Slitter. (Attachment 11 at 11.)

54. Atlas-UK was a company located in Kempston, England. (Attachment 10 at 10-11.)

55. In or about 1997, Atlas-UK was acquired by a company in Finland known as Valmet. (Attachment 10 at 10-11.)

56. Prior to 1997, there was a company in Charlotte, North Carolina, known as Atlas Group, America ("AG-A"). AG-A was previously known as Atlas Converting Equipment, USA ("Atlas Converting"). (Attachment 10 at 11.)

57. In 1997, when Valmet acquired Atlas-UK, the company in Charlotte changed its name from AG-A to Valmet Converting, Inc. (Attachment 10 at 17.)

58. At all times, the company in Kempston, England, referred to as Atlas-UK, was the parent company of the Charlotte company known as Valmet Converting, Inc. (Attachment 10 at 18-19.)

59. In or about 2004, Valmet Converting was sold to a company known as Bobst and became known as Bobst Group USA. (Attachment 8 at 7-8.)

60. At no time since the sale of the Slitter in this case has Valmet Converting been in the business of manufacturing slitters. (Attachment 10 at 23-24, 27.)

61. Valmet Converting was not involved in the manufacture, design, or sale of the Slitter. (Attachment 10 at 23-24, 35-36, 38.)

62. At all relevant times, Valmet Converting was a distributor of spare parts and provider of machine repair services, including slitters. Valmet Converting did not manufacture any of its spare parts; it acquired them from other vendors. (Attachment 11 at 10-13.)

63. Thereafter, Proma estimates that it acquired, on average, one new or repaired drive per year. (Attachment 5 at 28.)

64. Proma's business practice was to retain records of its purchases for only a short time. (Attachment 2 at 100-101.) Generally, Proma maintained records of its purchases only

until the time of the next purchase. (Attachment 5 at 24.) With each new purchase, the prior records were discarded. (Attachment 2 at 101; Attachment 5 at 24.)

65. There was no system for rotating the stock in storage, and no record was made of what drive was taken from storage. (Attachment 5 at 32-33, 40-42, 64.)

66. Nor was an inspection made, or a record of the switch position created, at the time the drives were installed in the Slitter. (Attachment 5 at 42-44.)

67. The switch on the daughter board could have been wrongly positioned for weeks, months or years prior to the malfunction. (Attachment 8 at 151.)

68. Orlowski described the board as "generic to the extent that the daughter board was furnished with a switch that could be set in one of two positions depending on the specific application." (Attachment 14 at 3.)

69. Orlowski will not opine in this case that the daughter board as manufactured and designed by Infranor, including its use of the switch, was defective in any way. (Attachment 12 at 61-64.)

70. Orlowski offers two opinions. First, he opines that Valmet Converting, as the assumed intermediate distributor of the daughter board at issue, was obligated to inspect and **modify** the daughter board, by permanently affixing the switch into one position before delivering it to Proma, "soldering" the switch, "put a latch over it by design," or some other permanent device. (Attachment 12 at 58; Attachment 14 at 8.)

71. Alternatively, Orlowski opines that Valmet Converting had an obligation to instruct Proma to check the switch position during its installation of the daughter board into the Slitter. (Attachment 14 at 8.)

72. Proma had no discussions with Valmet Converting concerning Proma's specific application of the drive boards. (Attachment 5 at 73-74.)

73. Proma did not know if anyone at Valmet Converting was responsible for setting the switch on the drive boards. (Attachment 5 at 74, 78-79; Attachment 2 at 91-92.)

74. Valmet Converting ordered replacement drives from its upstream supplier, Atlas-UK, by providing Atlas-UK with the Slitter's serial number. (Attachment 12 at 28.)

75. Valmet Converting did not repair drive boards. Valmet Converting received boards from Proma for repair and passed the boards on to Atlas-UK. (Attachment 12 at 38-39, 42.)

76. When Proma ordered a new drive board, or daughter board, from Valmet Converting, Valmet Converting obtained from Proma the Slitter's model number and serial number. (Attachment 11 at 23.) Valmet Converting conveyed this information to Atlas-UK and, in turn, Atlas-UK obtained the product from Infranor. (Attachment 11 at 23, 27-28.)

77. The new drive was shipped to Valmet Converting from Atlas-UK. (Attachment 11 at 29.)

78. The new drive was received by Valmet Converting wrapped in bubble wrap and in a box. Unless the box was damaged, Valmet Converting did not open the box, before sending the box to Proma. (Attachment 11 at 32-33.)

79. Drives received from Proma for repair were sent to Atlas-UK. (Attachment 11 at 42.)

80. Repaired drives were returned to Proma in two ways. If time was of the essence, Atlas-UK would ship the drive to Proma directly. Otherwise, the repaired drive was shipped to Valmet Converting for shipment to Proma. (Attachment 11 at 42.)

Date: June 30, 2006                                    Respectfully submitted,


                                                       */s/ David L. Kelleher*_____
                                                       David L. Kelleher, Esq. (B.B.O. #543912)
                                                       Thelen Reid & Priest, LLP
                                                       701 Eighth Street, N.W., Suite 800
                                                       Washington, DC 20004
                                                       (202) 508-4000

                                                       Mark Petersen, Esq. (B.B.O. #396840)
                                                       Michelle Hansen, Esq. (B.B.O. #561477)
                                                       Law Offices of Mark Petersen
                                                       490 Shrewsbury Street
                                                       Worcester, MA  01604
                                                       (508) 791-0300

                                                       *Attorneys for Defendant Valmet Converting, Inc.*