**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| CIRIACO PUCILLO, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 03-CV-12359 MLW |
| | ) | |
| METSO PAPER, INC. AND | ) | |
| VALMET CONVERTING, INC. | ) | |
| Defendants. | ) | |

**ATTACHMENTS 11 - 14 TO**
**STATEMENT OF MATERIAL FACTS OF RECORD**
**TO WHICH THERE IS NO GENUINE ISSUE**

# ATTACHMENT 11

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIRIACO PUCILLO,                      )
                                      )
            Plaintiff,                )
                                      )
vs                                    )   CASE NO. 03-CV-12359 MLW
                                      )
METSO PAPER, INC., and                )
VALMET CONVERTING, INC.,              )
                                      )   COPY
            Defendants.               )
_____       )

DEPOSITION

OF

RICKY K. HOWE

Taken by Plaintiff
Charlotte, North Carolina
February 8, 2005

Reported by:  Colleen J. Cain, CSR

---

# Cain & Crane Court Reporters, LLC
### Post Office Box 23833
### Charlotte, North Carolina 28227
### Phone (704) 545-3510 * Fax (704) 545-3950

1  parts and that sort of thing.  Eventually they

2  stopped manufacturing equipment.  When they did

3  that, they retained me to run the spare parts

4  side of it.  I did that for several years until

5  eventually things changed to where I became over

6  the technicians too.

7       Q.  When did they stop manufacturing

8  equipment?

9       A.  I think we built machines for about

10  three years.

11       Q.  After 1989?

12       A.  That's rough.  That's not exact, because

13  again, I wasn't really prepared to be exact on

14  any of that.

15       Q.  That's okay.  When you said for three

16  years, I wasn't sure if you meant for three years

17  that Atlas was in operation or for your first

18  three years of employment at Atlas.

19       A.  Right.

20       Q.  And you meant the latter, your first

21  three years, approximately?

22       A.  Yeah, I came on board and we built

23  machines for about three years.

24       Q.  Was the Atlas slitter one of the

25  machines you built?

1        A. Yes.

2        Q. Do you know whether the Atlas slitter

3   which is in the Proma facility, currently in

4   Franklin, Massachusetts, was built in the United

5   States?

6        A. No, it was built in England.

7        Q. So that particular model was not built

8   here?

9        A. Right.  We didn't build machines over

10   about three years.  Those machines are larger.

11        Q. I can eliminate that whole group of

12   questions --

13        A. I'm trying to help you.

14        Q. Now, once you stopped manufacturing

15   equipment in the United States, it's my

16   understanding that you then went into more of a

17   customer service position?

18        A. That's correct.

19        Q. And you oversaw spare parts?

20        A. That's correct.

21        Q. What do you mean when you say you

22   oversaw spare parts?

23        A. Well, you can imagine a company in

24   England trying to do business in the United

25   States.  We needed to be able to manufacture

12

1    parts and find local parts to be able to sell

2    to -- just to respond quicker to the customers.

3    That was the job they created to keep me, more or

4    less.

5         Q. So customers who would have Atlas

6    slitters in the United States that would need

7    replacement parts would get those through you?

8         A. Yeah.

9         Q. When I say "you," I mean in general,

10   Atlas.

11        A. Right.

12        Q. But specifically that would be part of

13   your job responsibility?

14        A. Yes.

15        Q. And what would you do to obtain the part

16   that they needed?

17        A. Well, it just depended.  If it was a

18   mechanical part, you looked at the drawings.  If

19   it was something that was capable of being

20   manufactured here without a lot of trouble, we

21   manufactured the parts here.  Parts that I

22   thought were a little risky to manufacture here,

23   I would just have them built in the UK.

24        Q. The parts that were manufactured here,

25   are they still being manufactured here?

1      A. A good many of them are, yeah.

2      Q. Are they being manufactured at the

3  Charlotte, North Carolina, facility?

4      A. We don't manufacture.  I go to vendors

5  and have everything produced outside.  We don't

6  do any manufacturing.

7      Q. So when you say it's manufactured, you

8  mean manufactured by someone other than

9  Atlas/Valmet/Bobst?

10      A. That's correct.

11      Q. At some point, in addition to overseeing

12  spare parts, you also oversaw the Titan branch,

13  you said?

14      A. Yes, they make a small, what we call a

15  secondary slitter.  And eventually we started

16  selling spare parts for them too, because we were

17  successful with what we were doing for the larger

18  machines.  Titan wasn't represented in the

19  States, more or less.  So eventually they came

20  along and said it makes sense that we start doing

21  the same thing for Titan, and eventually for the

22  general vacuum, which was another machine that

23  was built in England, all owned by the Atlas

24  group.

25      Q. And as part of your position overseeing

1    whatever drive they ask for.  But as commonplace,

2    we don't use the Infranor drives anymore.

3         Q. What about with customers that have

4    older pieces of equipment that have been using

5    the Infranor drives; are they still continuing to

6    use the Infranor drives?

7         A. Yes, replacement drives.

8         Q. For example, Proma, we know have the

9    Infranor drives, correct?

10        A. Right.

11        Q. And if they were to call you and say, "I

12   need a new drive," that would be an Infranor

13   drive, correct?

14        A. Well, you have to be specific on your

15   machine model and serial number.  The records are

16   kept in the UK on all of that.  So we would take

17   that and go back and tell England, this is what

18   we're looking for.

19        Q. Let's focus in on the recordkeeping on

20   the serial numbers.  What recordkeeping is kept

21   with respect to each order of a replacement

22   drive?

23        A. A copy of the sales order, a copy of the

24   purchase order to the UK, any sort of fax,

25   correspondence, quotations, anything like that,

27

1          A. Serial number.  Generally we'd --

2     because of the records we kept in England, it

3     would tell if there was any sort of special setup

4     on anything on any of the drives.

5          Q. The serial number that you're referring

6     to is a serial number for the Atlas slitter,

7     correct, not the Infranor drive board?

8          A. That's right.

9          Q. So that would be your first level of

10    inquire, would be, what is the serial number of

11    the machine that this is going into; is that

12    correct?

13         A. We'd start there, right.

14         Q. And you would communicate with Atlas UK

15    in England, and they would be able to tell you

16    particular to that serial number what

17    modifications need to be made to the board?

18         A. Right.

19         Q. And am I correct that they then purchase

20    the board from Infranor?

21         A. Yes.

22         Q. Are you involved with the process by

23    which Infranor provides Atlas UK with the board?

24         A. No.

25         Q. Do you know whether Atlas communicates

1    with Infranor the modifications that need to be

2    made to the board?

3        A. I don't know that, no.

4        Q. But at some point, modifications are

5    made to the board that are unique to that

6    particular serial number, correct?

7        A. I don't know that for certain.

8        Q. Let's assume hypothetically that that

9    particular serial number does have modifications

10   required for that particular serial number.  Do

11   you know whether the Proma serial number, the

12   92036, does that have any indication that

13   modifications are going to be made to those

14   boards?

15       MR. KELLEHER:  Objection.

16       You can answer the question, if you can.

17       A. I don't know that, no.

18       Q. So if somebody from Proma calls you, you

19   get the serial number, you call Atlas UK, and you

20   say:  I need an Infranor drive board for that

21   serial number, correct?

22       A. That's correct.

23       Q. You don't say anything about

24   modifications, correct?

25       A. To England?

1      Q. To England.

2      A. No.

3      Q. So somewhere in England then, Atlas UK

4   sends you back a board, correct?

5      A. Sure.

6      Q. Do you assume that that board that has

7   come to you has any modifications done to it that

8   needed to be done to it?

9          MR. KELLEHER:  Objection.

10      A. I don't have to assume anything at that

11   point in time.  There wouldn't be a reason to

12   assume anything.  I have done what we've

13   portrayed needed to be done correctly.  So

14   there's not an assumption one way or the other.

15   That's the reason I went to England to buy it in

16   the first place.  I don't assume the drive is

17   modified.  I don't assume anything.  I go there

18   and buy that drive because it's the place to go

19   and get it.  If any modifications have to be

20   made, or whatever, they would do it there.

21      Q. That's what I'm saying.  It's your

22   understanding that any modifications that need to

23   be made are done there, correct?

24          MR. KELLEHER:  Objection.

25      A. Right.

1    boards, am I correct that Bobst Group, Valmet,

2    and prior to that, Atlas, does not make any

3    modifications to Infranor drive boards once

4    they're received from Atlas UK?

5         A. That's correct.

6         Q. So if I'm understanding this and

7    following this, if Proma calls you and asks for a

8    new board, you simply call Atlas, and whatever

9    takes place in Europe takes place in Europe, but

10   you don't do anything to those boards before you

11   send them back to Proma?

12        A. That's correct.

13        Q. Do you keep any physical records at the

14   North Carolina facility that would indicate

15   whether or not there are any modifications made

16   to the Infranor drive boards before they go to

17   Proma?

18        A. I don't know.

19        Q. Who would have custody of those records?

20        A. Well, the guy you just had here would

21   have been able to answer those questions.  I'm

22   not going to guess at this point in time.  I'm

23   going to tell you what I know.  The salespeople

24   sell the drive, it comes in, and we ship it.

25        Q. When it comes in, do you do any

1    inspection of the drive before you ship it?

2         A.  No.

3         Q.  So you don't check to see if the

4    switches are set, or anything of that nature?

5         A.  No.

6         Q.  Do you unwrap them at all to visually

7    inspect them before you ship them?

8         A.  Only if -- and this would be for any

9    part -- only if there was obvious damage to the

10   box or obvious -- peanuts are falling out of one

11   end of it, or it's smashed flat or something,

12   would we open it up and inspect it.  Because

13   generally coming from the UK, everything is

14   bubble wrapped and put into a nice box.  It came

15   in, we looked at it, put a new label on it, and

16   forwarded it on.

17        Q.  Am I correct that Bobst/Valmet/Atlas

18   charges more money to Proma for those boards than

19   they pay to Infranor for the boards?

20             MR. KELLEHER:  Objection.

21        A.  I don't know what they pay for the

22   boards.  I don't know.

23        Q.  I guess what I'm trying to decide is,

24   why is it that the purchase of a board goes

25   through your facility?

42

1    you clearly don't have any way to do it with the

2    documents at your facility, correct?

3         A. That's correct.

4         Q. When the boards are sent to Atlas UK for

5    repair, are they returned directly to Proma or do

6    they come back through you again?

7         A. It could have went either way.  It just

8    depends how in dire need the customer was of the

9    drive.  But the usual standard operating

10   procedure would be to bring it in through

11   Charlotte.  There was a reason for that.

12        Q. What was the reason for that?

13        A. We bulk shipped things into Charlotte

14   and broke things down and forwarded them on to

15   various customers.

16        Q. Did you do any inspection of repaired

17   boards when they would arrive in Charlotte?

18        A. No.

19        Q. So they would be sent directly to Proma

20   as you received them?

21        A. Yes.

22        Q. No changes are made to the boards?

23        A. Not in Charlotte.

24        Q. Are any documents provided to you from

25   Atlas with respect to what the repair was?

ATTACHMENT 12

```
 1                                    Volume I
                                     Pages 1 to 121
 2                                   Exhibits (1)

 3              UNITED STATES DISTRICT COURT

 4              DISTRICT OF MASSACHUSETTS

 5      _ _ _ _ _ _ _ _ _ _ _ _ _ _
        CIRIACO PUCILLO,
 6                      Plaintiff(s),

 7         v.                         Civil Action
                                      No. 03-CV-12359MLW
 8      METSO PAPER, INC. AND
        VALMET CONVERTING, INC.,
 9                      Defendant(s).

10      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

11

12         DEPOSITION OF JOHN M. ORLOWSKI, a witness called

13      by counsel for the Defendant Valmet Paper Converting,

14      Inc., taken pursuant to the applicable rules, before

15      Diane L. McElwee, Registered Merit Reporter and

16      Notary Public in and for the Commonwealth of

17      Massachusetts, at the Law Offices of Mark Petersen,

18      490 Shrewsbury Street, Worcester, Massachusetts, on

19      Friday, January 27, 2006, commencing at 9:50 AM.

20

21

22                          _____

23              JAMES GIBBONS AND ASSOCIATES
                        617-438-0402
24
```

1     A     A drive is pretty generic term.  A drive

2  could mean the motor.  It could be the combination of

3  the motor and the electronics.  It could mean, you

4  know, any part of that.  Prior to this case I might

5  have referred to the drive as a drive board or the

6  drive circuit board.  I think it's more definitive.

7     Q     So if we focus on a drive board, then we

8  would be talking about the circuit board?

9     A     Correct.

10    Q     As opposed to the drive system?

11    A     Correct.

12    Q     Is the drive board something that you have

13  had in machinery since you worked for the first

14  company in 1963 in Hudson, New York, or is it a more

15  recent development?

16    A     There have been drives that I have been

17  involved with, for example, variable frequency drives

18  that have drive control boards, DC drives that have

19  drive control boards, probably not early in my

20  career.  We simply had AC motors and motor starter

21  and relays, but as time went on drives became more

22  sophisticated, especially when one wanted a variable

23  speed drive.

24    Q     Looking at your C.V., when would you

1   was trying to ask.  I was trying to ask when you say

2   you look at this picture, if somebody didn't tell you

3   it was a drive board, you wouldn't know it was a

4   drive board, right?

5        A    That's correct.

6        Q    And I guess what my poorly asked question

7   was intending to ask was can anyone tell by looking

8   at this that it's a drive board?

9        A    I am sure the manufacturer could tell.

10       Q    Is there something that distinguishes drive

11  boards from any other piece of circuitry to your

12  knowledge?

13       A    To my knowledge, no.  They all have various

14  components.  It's based on the design and the

15  intended function of the board.

16       Q    Okay.  When you look at this board, how do

17  you know its design and function?

18       A    How do I know its design and function?

19       Q    How does any one know its design and

20  function?

21       A    Well, somebody has represented this is a

22  drive board for an Atlas/Valmet slitter rewinder, and

23  that representation has been carried through in that

24  they used this particular board as a drive board.

1      Q    Okay.  So are you saying that even an

2  electrician or an electrical engineer would just take

3  that on someone's representation that that's a drive

4  board?

5      A    If it was someone who had no familiarity

6  with the product, I think they would have to, yes.  I

7  mean they could compare the board to the electrical

8  circuit diagram and see if the two match.  Again

9  generally that's what one does in the industry when

10  ordering a component, a component such as this.  It's

11  ordered per specification, and one has to presume

12  that the component is as ordered.

13      Q    You said the electrical circuitry.  Is that

14  the same as schematics, which is the term you used

15  earlier?

16      A    Yes.  It's interchangeable, yes.

17      Q    What is the function of the schematics?

18      A    The function of the schematic is to show how

19  the board is constructed, how the board is designed,

20  if -- basically shows how the board should be

21  constructed and used.

22      Q    When you sold machinery during the time

23  period at V & O Press, did you provide customers with

24  schematics for the electrical systems?

42

1      Q      Would that be a good practice?

2      A      Would it be a good practice?  It probably

3  would be a good practice.

4              We sometimes actually withheld as I

5  recall -- we withheld certain information from

6  customers, for example.  We would supply them with a

7  list of recommended spare parts, which are parts that

8  would have to be replaced periodically, and that list

9  would include parts that we actually designed and

10  manufactured, and that list would also include

11  purchase components.  We would assign our own part

12  number to purchase components.  The reason for that

13  is so that the user of our machinery would have to

14  contact us, being the manufacturer, supplier of their

15  machinery, to buy a component.  It was more

16  profitable that way.  We could add our overhead to a

17  purchase component as opposed to having the user go

18  directly to the manufacturer.

19      Q      Good for business?

20      A      Good for business.  So we didn't necessarily

21  pass on everything on a purchase component -- on a

22  machine to a customer.

23      Q      Let's look at Figure 7 again.

24      A      Yes, sir.

58

1     Q    What is the basis for your opinion that the

2    switch needs to be secured in place?  Let's just get

3    on the record what's clear.  You can set the switch

4    by pushing the wire under the hook, correct?

5    A    Correct.

6    Q    That's set.  It's in the right position,

7    right?

8    A    It's either in the right position or the

9    wrong position, yes.

10    Q    But it's set?

11    A    It's set in a position.

12    Q    Your testimony is it needs to be set and

13    secured, correct?

14    A    Sure.

15    Q    By "secured" you mean soldered?

16    A    That's one way of doing it.

17    Q    What other ways are there?

18    A    To have a design so it can't come out, put a

19    latch over it by design.  Soldering is pretty basic.

20    There is always the possibility that during shipment

21    a switch could come loose if it's not secured.

22    Q    So there is the possibility the switch could

23    come loose if it's merely latched, correct?

24    A    Possibly, yes.

1   is used it should be permanently affixed in one

2   position so it cannot come loose?

3        A    There are standards of care that would

4   dictate that certainly.   There are standards of

5   quality control standards that would dictate that.

6        Q    Let's take them one at a time.

7             Are there electronic standards that

8   dictate that a switch be permanently affixed into one

9   position in order to be used?

10       A    I haven't researched that.

11       Q    So you don't know?

12       A    At this point I don't know.   I may research

13  that before trial.

14       Q    What is the benefit of having a switch?

15       A    The benefit of having a switch is so that --

16  in this particular case so that the board can be used

17  in more than one function.   It's basically a cost

18  benefit to the supplier.

19       Q    Now you told me you don't recall whether any

20  of the machines you have worked on as a mechanical

21  engineer contained drive boards specifically, right?

22       A    I think I said that they probably did.

23       Q    Did they probably provide switches as well?

24       A    Possible.

62

```
 1        Q     A switch is a common feature of electronic

 2   circuit boards?

 3        A     They may be.

 4        Q     Do you know?

 5        A     I am not sure what "common" means.  I am

 6   sure they are used.

 7        Q     Are they accepted industry practice?

 8        A     I would say they probably would be, yes,

 9   provided they are properly set.

10        Q     So you are saying that they are not -- it is

11   not proper, acceptable industry practice unless the

12   switch is properly set, is that your position?

13        A     It's not proper to have a supplier furnish a

14   drive board with a switch that's improperly set is my

15   testimony.

16        Q     I am trying to find out about the design of

17   the board first.  We will get to installers later.  I

18   am talking about the design of the board.  Is there

19   anything wrong with the design of the mother board

20   used in the drives for the slitter in this case?

21        A     Is there anything wrong with the design of

22   the board?  I don't know.  That's a pretty general

23   question.

24        Q     The design -- you told me earlier it had
```

1    switches on it.

2        A    It had switches on it.

3        Q    That's an acceptable, proper design as far

4    as you know?

5        A    As far as I know.

6        Q    The drive board has a daughter board?

7        A    Yes.

8        Q    It has also switches?

9        A    Yes.

10       Q    Also has other circuits?

11       A    Yes.

12       Q    As far as you know the design of the

13   daughter board in this case is perfectly acceptable,

14   correct?

15       A    So far as I know.

16       Q    You are not going to testify to the

17   contrary?

18       A    No.

19       Q    On either the mother board or daughter

20   board?

21       A    As I sit here today, no, I would not.

22       Q    You are not going to testify that there is

23   anything wrong with the circuit board using a switch

24   as opposed to a circuit?

1      A      As I sit here today I would not testify to

2    that, right.

3      Q      Do you know what standards apply to the

4    design of a drive board?

5      A      I am not sure there are any.

6      Q      Did you do any investigation or find out?

7      A      Not at this point.

8      Q      Do you know how drive boards are tested

9    before they are shipped?

10     A      They are probably tested by putting them in

11   a drive system.

12     Q      Do you know, or are you saying probably?

13     A      They may have the computer set up that would

14   test them I am sure.

15     Q      Do you know?

16     A      Well, yes.

17     Q      So what do you know?

18     A      I know by inference.  I haven't seen a

19   specific setup to test a drive board.

20     Q      Did you do any research to find out?

21     A      I have worked in the industry for years and

22   years and years.  That's how things are tested.

23     Q      So tell me in the years and years and years

24   in which you worked in the industry how the drive

1   Proma Technologies including the electrical

2   schematics.

3        A    No, I haven't seen that.

4        Q    I show you No. 2 and ask you if you

5   recognize this document as the index to the

6   electrical schematics of Proma Technologies.

7        A    I haven't seen that before either.

8        Q    Let me show you Hagopian Exhibit No. 5 and

9   ask you if you recognize that document.

10       A    No, I don't recognize that document.

11       Q    Have you seen that before?  That's a

12  schematic layout of the M59 drive.

13       A    No.

14       Q    Turn to Hagopian No. 6.  I ask you if you

15  have seen that document before.

16       A    Yes, I have seen a portion of that document.

17       Q    What is this document?

18       A    That apparently is the schematic for the

19  daughter board.

20       Q    Does Hagopian No. 6 call the user's

21  attention to the correct switch location?

22       A    Does it call the user's attention to it?  It

23  shows a switch but doesn't call the user's attention

24  to it.

1      Q     Where does it show the switch?

2      A     (Witness indicated).

3      Q     See the note in the bottom left-hand corner?

4   Could you read that out loud, please.

5      A     OS13 for use with SMVE 2420.  Has M55, M59

6   in parentheses.  It says, Set S-1 to Position 1 for

7   M55, non-SMT; set S-2 to Position 2 for M59.

8      Q     Do you understand S-1 to mean switch?

9      A     Yes.

10      Q     Did that notation in this drawing tell the

11   user to set the switch to Position No. 1 when using

12   the M55 drive?

13      A     It does.

14      Q     And to set to position No. 2 when using the

15   M59 drive?

16      A     It does.

17      Q     So this schematics in fact calls out to the

18   user's attention the correct switch location, does it

19   not?

20      A     It does.

21      Q     That would mean your statement on page 8 of

22   your report is not correct?

23      A     I hadn't seen that before.

24      Q     You hadn't seen the notation on the drawing?

1      A    No.

2      Q    Having seen that notation on Hagopian

3   Exhibit No. 6, is it fair to say this exhibit, this

4   schematic shows the user how to set the switch?

5      A    It informs the user how to set the switch,

6   yes.

7      Q    Let's continue on page 8 and let's look at

8   the summary of findings.

9           There is numbered Part 1, 2, 3, 4, 5.

10  In shorthand are those the five opinions you have in

11  this case?

12     A    As I sit here today, yes.

13     Q    One, Atlas, slash, Valmet -- we are talking

14  about the U.S. company, correct?

15     A    Yes.

16     Q    -- was negligent in failing to inspect the

17  switch on the drive board prior to shipping the board

18  to Proma Technologies.

19          That's your opinion?

20     A    Correct.

21     Q    And am I correct that that opinion is based

22  on your personal experience in the industries that

23  you worked for?

24     A    Yes.

# ATTACHMENT 13

1               Volume I
                Pages 1 to 45
2               Exhibits 1 to 3

3          UNITED STATES DISTRICT COURT

4          DISTRICT OF MASSACHUSETTS

5    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
     CIRIACO PUCILLO,
6               Plaintiff(s),

7        v.                    Civil Action
                               No. 03-CV-12359 MLW
8    METSO PAPER INC. AND
     VALMET CONVERTING, INC.,
9               Defendant(s).

10   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

11

12       DEPOSITION OF ALAN W. PETZOLD, a witness called

13   by counsel for the Plaintiff, taken pursuant to the

14   applicable rules, before Diane L. McElwee, Registered

15   Merit Reporter and Notary Public in and for the

16   Commonwealth of Massachusetts, at the Offices of

17   Vacumet, 24 Forge Park, Franklin, Massachusetts, on

18   Tuesday, April 26, 2005, commencing at 12:57 PM.

19

20

21            _____

22

23        JAMES GIBBONS & ASSOCIATES
               617-428-0402

24

1    Q    Does any of the training involve the repair

2    or replacement of the Infranor drive boards?

3    A    No.

4    Q    Does any of the training involve those drive

5    boards at all?

6    A    No.

7    Q    Do you train the individuals that are

8    responsible for the Infranor drive boards?

9    A    No.

10    Q    Do you know who trains those individuals?

11    A    No.

12    Q    Do you know which individuals are

13    responsible for changing the Infranor drive boards?

14    A    It would be the electricians.  I don't think

15    it would be the machines.  I think that's an

16    electrical component.  Yes, I would say the

17    electricians.

18    Q    Do you oversee the slitting on all three of

19    the slitters?

20    A    Yes.

21    Q    Do any of them get used more than the

22    others?

23    A    No.  I think between the two main slitters

24    they have about equal run time.

ATTACHMENT 14



# FORENSIC ENGINEERS & TECHNOLOGISTS

**John M. Orlowski, P.E., CSP, BCFE, Director**
11 Vanderbilt Avenue, Suite 120
Norwood, Massachusetts 02062-5056

PHONE: (781)762-8377
FAX: (781)762-1862
general@fet-forensics.com
www.fet-forensics.com

January 4, 2006

## TECHNICAL REPORT TO

Maureen Counihan, Esquire
Law Offices of Maureen Counihan, P.C.
67 South Bedford Street – Suite 400 West
Burlington, MA   01803

      RE:  Ciriaco Pucillo
      Vs.:  Metso Paper, Inc. and Valmet Converting, Inc.
           U.S. District Court C.A. No.:  03-CV-12359 ML W
           Date of Injury:   March 22, 2002
           F.E.T. File No.:  2809.1-P

## I.    INTRODUCTION

A.    I was retained to conduct an accident investigation relative to injuries sustained by Ciriaco (Jerry) Pucillo on an Atlas slitter rewinder.  The slitter rewinder was designed to take a large paper roll and slit the paper into two or more narrower paper rolls.  The machine was comprised of the following basic sections:  an unwind stand; a series of rolls through which the paper web is threaded; a slitting assembly; and rewind stations.[1]  Each rewind station essentially consisted of pivoted rewind arms with chucks, with one or both arms driven by pancake motors.  A core is mounted between the rewind arms and secured by the chucks as a prelude to rewinding a slit web.  The paper must be properly aligned prior to engaging the rewinding operation at full speed.  An assistant initially operates the machine in jog mode to facilitate the set-up.  It was during this condition of machine set-up that Mr. Pucillo sustained his injuries.  The paper roll core had been mounted on the rewind arm chucks.  The core was positioned against the winding drum. Jerry Pucillo was standing in proximity to the core.  The

---

[1] Refer to the illustrations in Appendix A of this report and a machine schematic and threading diagram reproduced from the Atlas operating guide included in Appendix F of this report.

F.E.T. FILE NUMBER:  2809.1-P

second operator, Bill Dunne, had engaged the machine in the jog mode. Suddenly, and without warning, the winding core accelerated to a high speed in less than five seconds. As a result of the overspeed of the winding core, the core was ejected, striking Jerry Pucillo in the face, causing serious injury. Mr. Pucillo was employed by Proma Technologies, 24 Forge Park, Franklin, MA, at the time of his accident.

B.    I conducted an inspection of the Atlas slitter rewinder on November 19, 2002. At that time, I met with and conferred with Nancy P. Johnson, Steve Bagley, and others employed by Proma Technologies. In addition to inspecting the basic machine, I examined the drive control boards associated with the operation of the rewind motors. I also looked at, and presently have in my possession, the rewind core that struck Mr. Pucillo in the face.

C.    I performed my assignment in this case by utilizing methods used by other professional engineers engaged in the profession of accident investigation and analysis. Prior to stating my opinions, an outline of my experience, training and education in machine design and safety follows.

## II.    BACKGROUND, QUALIFICATIONS AND METHODOLOGY

A.    Selected illustrations of the machine are provided in Appendix A.

B.    My curriculum vitae is provided as Appendix B.

C.    A list of items, materials and documents I reviewed relating to my investigation and analysis is provided as Appendix C.

D.    My prior four years of trial testimony and deposition testimony is included as Appendix D.

E.    My fee schedule is provided as Appendix E.

F.    Machine schematic and threading diagram is included as Appendix F.

G.    My opinions are based on my background, expertise and experience in the field of management, machine design engineering, and recognized principles of machinery safety relating to specific issues raised by the events in this case.

H.    My expertise includes machine drafting and design of diverse machinery, including web-handling equipment such as winders and slitters, conveyors, machine tools and related controls, safety devices and warnings.

I.    My background and training include:

1.    Utilizing general principles of engineering and safety in the design, operation, and maintenance of machinery and equipment, including basic laws of physics and their application to the design of machines.

2.    Since performing forensic investigations on a full-time basis, I have continued to analyze machine designs with regard to safety and human factors analysis. I co-authored *Engineering Aspects of Guarding of Machinery and Equipment* for "Products Liability," edited by Frumer and Friedman, published by Lexis Nexis Matthew Bender & Co., Inc. I updated this publication in 1994 for inclusion in release 66 of "Products Liability." I authored a further update of this publication in 2005 for inclusion in release 98 of "Products Liability." I also updated *Power Lawn Mowers* for inclusion in release 101 of "Products Liability," published in December of 2005.

J.    My opinions are based on my experience, training, background, and my inspection and analysis of the Atlas slitter rewinder, its component parts and its operations; a review of items, materials and documents listed in Appendix C; and the analysis of the use of the slitter rewinder under foreseeable operator conditions.

## III.  DESCRIPTIVE INFORMATION

A.    Proma Technologies was in the business of manufacturing metallized paper. Manufacturing metallized paper is a multi-stage process that begins with coating the paper with a lacquer. The lacquered paper is dried and moved to the metallizer where aluminum is deposited on the paper in a high vacuum. The metallized paper is then placed in the coating-priming machine where lacquer is placed on top of the aluminum. At the completion of the final coating process, the roll is taken to the slitting machine to be slit into rolls of various widths and diameters.

The Atlas slitter rewinder was purchased in 1992 for the specific purpose of slitting metallized paper. The equipment was designated model CSE1250R, serial number 92036. The slitter rewinder could handle rolls that are ninety-four inches wide and seventy inches in diameter. The machine processed paper at speeds up to 3000 feet per minute (fpm). The machine was designed to accommodate up to five cores on the rewind stations. Each rewind arm chuck was driven by a 4.5 kw pancake motor. In addition, there was one left hand and one right hand non-driven rewind arm. These arms could be paired with a driven arm to rewind narrow width, slit paper.

The rewind arm motors were controlled by a drive board supplied to Proma Technologies by Atlas/Valmet. Each drive consisted of a motherboard and daughterboard. The drive was generic to the extent that the daughterboard was furnished with a switch that could be set in one of two positions depending on the specific application. The switch

consisted of a spring-loaded piece of wire that could be placed under one of two hooks, in position 1 or position 2. Alternatively, the switch could be placed in neither the 1 nor the 2 position, but simply left open.

Ronald Dean Purcell was a senior field service technician with the manufacturer of the slitter rewinder. Mr. Purcell worked with Greg Hagopian, and others from Proma Technologies, post accident, to attempt to determine the cause of the events that led to Jerry Pucillo's injuries. After discounting all other causes, the drive boards were investigated. The following findings were documented: the drive for winding arm 2 left had the switch in neither position; 2 right was in the correct position; 1 left was in neither position; 5 left was in neither position; and the remainder of the drive switches were set properly. It was concluded that an incorrect switch setting on a drive board caused the rewind core to accelerate to high speed, resulting in Mr. Pucillo's accident. Ronald Purcell soldered the switches at Proma Technologies in the proper position.

## IV.    DISCUSSION AND ANALYSIS

A.    It is axiomatic that replacement components for equipment conform to original machinery items and specifications. This is essential to safety and to insure that machinery will function as originally intended. Where a purchased component requires a modification or adjustment by the machine manufacturer, such modification must be specified and identified by a part number assigned by the equipment manufacturer. In a typical machine design engineering/manufacturing environment, all manufactured and purchased components are assigned a part number. A manufactured part must be depicted on an engineering drawing. A purchased component may be illustrated on a drawing showing any specific settings or modifications, or may be identified by description and part number. Again, the description must be specific to insure that the original component and all subsequent replacement parts are essentially identical. It was essential that Atlas/Valmet[2] follow the above procedures when furnishing drive control boards to Proma Technologies. Robert Lyons, former vice president of Atlas/Valmet, testified that Atlas/Valmet did, in fact, assign their own part number to drive boards.[3] However, subsequent testimony by Mr. Lyons, and others, indicated that Atlas/Valmet failed to establish any definitive procedure for insuring that the switches on the drive boards were checked and properly set by Atlas in England or in the Charlotte, NC Atlas/Valmet facility, prior to final shipment to Proma Technologies. Consider the following testimony by Mr. Lyons:[4]

---

[2] Valmet purchased Atlas' NC facility in the year 2000.
[3] Deposition transcript page 71, lines 1 through 4, inclusive.
[4] Deposition transcript page 60, lines 19 through 25, and page 61, lines 1 through 7, inclusive.

F.E.T. FILE NUMBER:  2809.1-P

| 19 | Q. | If Van Leer wanted to purchase a new Infranor drive board for |
|----|----|----|
| 20 | | use in one of their rewind arms, am I correct that one of their |
| 21 | | options would be to contact Atlas or Valmet, whatever you |
| 22 | | were calling yourself at the time, in North Carolina and |
| 23 | | purchase the drive board that way, correct? |
| 24. | A. | Yes. |
| 25 | Q. | And when that order came into Atlas or Valmet, did Van Leer |
| 1 | | specify the setting for the switch? |
| 2 | A. | I don't know. |
| 3 | Q. | Do you know what the procedure was in order to purchase that |
| 4 | | board? |
| 5 | A. | There would not have been any specific procedure.  They |
| 6 | | would have ordered the board.  We would have sent them the |
| 7 | | board. |

Mr. Lyons further testified that he doesn't know if the switches on the drive boards were set prior to the drive boards being shipped by Atlas in England.  This fact notwithstanding, Mr. Lyons testified that no inspections or checks of switch positions were conducted in the NC facility when the boards were received.  The following was extracted from Mr. Lyons' transcript:[5]

| 24 | Q. | So you don't have any information regarding whether or not |
|----|----|----|
| 25 | | that switch was set on a new board before it left England? |
| 1 | A. | I don't specifically, no. |
| 2 | Q. | And Atlas Valmet doesn't do any inspections of the boards |
| 3 | | when they come from England, before they're sent out to |
| 4 | | the customer.  Is that correct? |
| 5 | A. | I'm not aware of any inspections we do on parts we get from |
| 6 | | our parent — you know, from our division in England. |
| 7 | Q. | Well, when a board comes in from England, what happens to |
| 8 | | that board in order to then get it to the customer in the states? |
| 9 | A. | Normally it comes in, in a consolidated shipment, so there will |
| 10 | | be parts in the shipment for other — so it's just segregated and |
| 11 | | repackaged, and sent off to the customer. |

---

[5] Deposition transcript page 71, lines 24 and 25, inclusive, and page 72, lines 1 through 11, inclusive.

JERRY PUCILLO                                    -5-                                    JANUARY 4, 2006

F.E.T. FILE NUMBER:  2809.1-P

Similar testimony about the absence of any definitive procedure to set the drive board switches was elicited from other knowledgeable Atlas/Valmet employees.  The following testimony was given by Atlas/Valmet senior field service technician, Ronald Dean Purcell:[6]

| | | |
|---|---|---|
| 20 | Q. | **Am I correct those are switches that are** |
| 21 | | **spring-loaded wires?  Is that a simple way to** |
| 22 | | **describe them?** |
| 23 | A. | **Yes.** |
| 24 | Q. | **Who sets those switches?** |
| 25 | A. | **I don't know.** |
| 1 | Q. | **Who would know?** |
| 2 | A. | **Someone in the UK.** |

Proma Technologies' personnel testified that they never received any instructions about setting switches on the drive boards.  They had no knowledge of any obligation on their part to adjust or modify any part they purchased from Atlas/Valmet.  Proma Technologies would had every reasonable expectation that any component they purchased from Atlas/Valmet, including the drive boards, would be compatible with their equipment, without modification.  Ronald Dean Purcell testified[7] that Proma Technologies did not change their application from that of the equipment originally supplied.  This would negate any necessity for having an alternate switch position on the drive board from that originally supplied with the Atlas slitter rewinder.

In summary, there has been no testimony or documentation to show that Atlas/Valmet specified the switch position setting when purchasing the drive boards.  There has been no testimony or documentation to show that Atlas in England set the switches on the drive boards prior to shipping the components to the United States.  And there has been no evidence that the Atlas part number assigned to the drives included any specifications for setting the switches.  There has been testimony that Atlas/Valmet in NC did not check or set the switches on the drive boards prior to sending the items to Proma Technologies.

A proper and necessary procedure by Atlas/Valmet would have been to inspect and set the switches and  fix  the  switches  in  position, as, for example, by soldering, prior to

---

[6] Deposition transcript page 66, lines 20 through 25, inclusive, and page 67, lines 1 and 2.
[7] Deposition transcript page 74, lines 3 through 9, inclusive.

F.E.T. FILE NUMBER:  2809.1-P

shipment.  Atlas/Valmet could have, and should have, added an instruction – such as a simple decal with the package – to inspect the switch for proper location.  This procedure would have averted Jerry Pucillo's injuries.

B.    Robert Lyons testified that Atlas/Valmet provided extensive training to operators and maintenance personnel in conjunction with installing a machine.[8]  When queried specifically about setting the switch on the drive boards, the following was transcribed:[9]

| 22 | Q. | **Do you go through the electrical schematics with them?** |
|----|----|-----------|
| 23 | A. | **Yes.** |
| 24 | Q. | **And do you go through all the potential switch settings?** |
| 25 | A. | **I don't know.** |

Ronald Dean Purcell also testified that he was unaware of anyone from Atlas/Valmet providing any training or instructions to Proma employees with respect to setting the switch on the Infranor drive boards.[10]

In addition to providing training during equipment installation, Atlas/Valmet technicians were on site at Proma Technologies for service calls on at least three occasions, and possibly more.  The Atlas/Valmet technicians again failed to avail themselves of the opportunity to instruct Proma employees about an item that was crucial to machine operation and operator safety.  When asked about this subject, Ronald Dean Purcell responded as follows:[11]

| 25 | Q. | **Prior to March of 2002, with this** |
|----|----|-----------|
| 1 |   | **accident, do you have any memory of ever telling** |
| 2 |   | **anyone at Van Leer or Proma that the switch** |
| 3 |   | **needed to be checked before a new board was** |
| 4 |   | **installed?** |
| 5 | A. | **No.** |

Furthermore, there were no instructions in the Atlas Operating Guide about the necessity for properly setting the drive switches.  Nor were there warnings about the potential devastating consequences should the switches be improperly set.  There were no

---

[8] Deposition transcript page 64.
[9] Deposition transcript page 64, lines 22 through 25, inclusive.
[10] Deposition transcript page 113, lines 22 through 25, inclusive.
[11] Deposition transcript page 119, line 25, and page 120, lines 1 through 5, inclusive.

F.E.T. FILE NUMBER: 2809.1-P

instructions included with the drive boards about proper setting of the switches. Nor were there specific notations on the electrical schematics calling the users attention to the correct switch location shown on the drawings.

The purpose of instructions and warnings is to control or modify the reasonably foreseeable behavior of individuals in order to prevent personal injury. In order to accomplish its intended purpose, a warning must be designed and located to immediately rivet one's attention. This is done in several ways. A warning must be of sufficient size to be conspicuous. Also, a warning crucial to safety, as was necessary in this case, should be placed in more than one location on the machine to ensure that it will be seen and read. The warning must contain an appropriate signal word alerting one of a hazard. The two most effective signal words are Danger and Warning. An additional way of grabbing one's attention is through the use of colors. Red, yellow and orange are common. The warning must be forceful enough to alter a user's behavior. The warning must be intense and communicate a sense of urgency. A warning that lacks intensity will tend to minimize the potential for danger.

The absence of instructions and warnings on the machine, in the manual, and with the drive boards, contributed to the cause of Jerry Pucillo's injuries. Instructions and warnings must not, however, be used in lieu of, but as an adjunct to, safe quality control procedures. In this case, a safe quality control procedure would have included permanently securing the drive switches in position. Atlas/Valmet had opportunity to inspect and secure the switches prior to shipping the drive boards to Proma Technologies.

## V.   SUMMARY OF FINDINGS

A.   It is my professional opinion, to a reasonable degree of certainty, subject to supplementation should additional relevant information become available, that:

1.   Atlas/Valmet was negligent in failing to inspect the switch on the drive board prior to shipping the board to Proma Technologies;.

2.   Atlas/Valmet was negligent in failing to set and secure the switch on the drive board prior to shipping the board to Proma Technologies;

3.   Atlas/Valmet was negligent in failing to instruct Proma Technologies to check the drive board switch for proper location;

F.E.T. FILE NUMBER: 2809.1-P

4.    the negligence of Atlas/Valmet caused the Atlas model CSE1250R slitter rewinder to operate in an unreasonably dangerous manner; and

5.    the negligence of Atlas/Valmet, and the unreasonably dangerous operation of the Atlas model CSE1250R slitter rewinder, as described in this report and outlined above, was a direct and proximate cause of Jerry Pucillo's accident and consequent injuries.

Submitted by:

John M. Orlowski, P.E., CSP, BCFE
Director

2809rpt




F. E. T. FILE NO.: 2809.1-P



**Fig. 1**



**Fig. 2**

**Fig.'s 1 & 2:   Depicts the Atlas model CSE1250R slitter rewinder that caused Jerry
              Pucillo's injuries.**

JERRY PUCILLO                    APPENDIX A-1

F. E. T. FILE NO.:  2809.1-P



**Fig. 3:   View of the metallized paper web.**



**Fig. 4:   Illustration of two rewind stations with partially rewound rolls.**

F. E. T. FILE NO.:  2809.1-P



**Fig. 5:   View of rewind arm, partially rewound roll, and winding drum.**



**Fig. 6:   Depicts a core chuck on a rewind arm.**

F. E. T. FILE NO.: 2809.1-P



**Fig. 7**



**Fig. 8**

**Fig.'s 7 & 8:   Depicts a drive board with switch.**

JERRY PUCILLO                    APPENDIX A-4

# Appendix  B



# FORENSIC ENGINEERS & TECHNOLOGISTS

**John M. Orlowski, P.E., CSP, BCFE, Director**
11 Vanderbilt Avenue, Suite 120
Norwood, Massachusetts 02062-5056

PHONE: (781)762-8377
FAX: (781)762-1862
general@fet-forensics.com
www.fet-forensics.com

### JOHN M. ORLOWSKI, P.E., CSP, BCFE
*Curriculum Vitae*

## EXPERIENCE SYNOPSIS

Background encompasses over 45 years of diversified drafting, design engineering and consulting experience. Has been in responsible charge of significant engineering work in such diverse project areas as chemical processing machinery, material handling equipment, paper roll systems, and predominantly, machine tools. Provides consulting services to attorneys and the insurance industry in products liability cases, fall down incidents, vehicular accident reconstruction, and other personal injury cases, as well as damage assessment to high technology equipment.

## FIELDS OF EXPERTISE

Accident Investigation/Reconstruction
Machine Guarding/Safety
Product Safety Evaluation
Ladders and Scaffolds

Automobile Accidents
Safety Standards/Regulations
Building Codes
Premises Liability

## PROFESSIONAL LICENSES

Licensed Professional Engineer in Massachusetts, License #29341
Licensed Professional Engineer in New York State, License #55671
Licensed Professional Engineer in Maine, License #6208

## PROFESSIONAL CERTIFICATION

Board Certified Safety Professional in Engineering Aspects, Certification #9231
Board Certified Forensic Examiner, Certification #3784

## PROFESSIONAL AFFILIATIONS

Executive Committee Member of the Automotive, Metals and Power Press Section of the National Safety Council
Diplomate: American College of Forensic Examiners International
Member of the ASTM International F-13 Committee on Pedestrian/Walkway Safety and Footwear
Member of the American Society of Safety Engineers
Member of the American Society of Mechanical Engineers
Member of the Society of Automotive Engineers

## EDUCATION

Bachelor of Science in Mechanical Engineering, LaSalle University, Mandeville, LA. Additional short courses and seminars including, but not limited to, *vehicle dynamics for passenger cars and light trucks, air bag sensor design, vehicular accident reconstruction, fluidic circuitry design* and *machinery safeguarding.*

## PRINCIPAL PUBLICATIONS

Mr. Orlowski has co-authored *Engineering Aspects of Guarding of Machinery and Equipment* for release 39 of "Products Liability," edited by Frumer and Friedman, published by Lexis Nexis Matthew Bender & Co., Inc. This publication was updated by Mr. Orlowski in 1994 for inclusion in release 66 of "Products Liability." This publication was again updated by Mr. Orlowski in 2005, for inclusion in release 98 of "Products Liability." Mr. Orlowski has updated Chapter 100 of Frumer and Friedman's "Products Liability" entitled *Power Lawn Mowers*. *Power Lawn Mowers* was published by Lexis Nexis Matthew Bender & Col., Inc. in 2005. Mr. Orlowski is also a contributing author to "Forensic Accident Investigation: Motor Vehicles," edited by Dr. Thomas L. Bohan and Dr. Arthur Damask, published by the Lexis Nexis Matthew Bender & Co., Inc. in 1995. Mr. Orlowski authored Chapter 5 entitled *The Effects of Payload on Large Truck Rollover*. He also authored the "2001 Cumulative Supplement Volume I" to Chapter 5, which addresses the issue of SUV rollover threshold. Submitted materials for inclusion in "The Comprehensive Forensic Services Manual" by Steven Babitsky, JD, et als, published by SEAK, Inc., in 2000. Contributed to "Cross Examination: The Comprehensive Guide for Experts" by Steven Babitsky, JD, et al, published by SEAK, Inc., in 2003.

## BUSINESS EXPERIENCE

*03/88-present*:                    **DIRECTOR**
                                    Forensic Engineers & Technologists
                                    Norwood, Massachusetts

Is the owner and director of Forensic Engineers & Technologists. Functions primarily as a forensic consulting engineer. Also assigns, interfaces with, and directs activities of engineers and technical personnel in diverse consulting case investigations. Provides expert witness testimony as needed.

*01/82-06/94*                       **DIRECTOR**
                                    Orlowski & Associates
                                    Norwood, Massachusetts

Functioned primarily as a forensic consulting engineer. Provided assistance to the legal sector in products liability and damage assessment cases. Also provided design-engineering services to industry on a consulting basis.

*01/79-01/82*                       **MANAGER, APPLICATIONS ENGINEERING**
                                    (Transferred from the Waltham, Massachusetts facility)
                                    Nichols DeHoff Division, Cranston, Rhode Island
                                    a W. H. Nichols Co.
                                    Waltham, Massachusetts

Developed conceptual designs for machinery, fixtures and tooling needed to machine work pieces to specific dimensions and tolerances. Directly interfaced with, and aided the product design group. Worked with the Machinery Remanufacturing Department to assist in determining extent of wear and damages, and provided design assistance necessary to rebuild equipment. Was the designated 30(b)6 expert.

12/77-12/78                              **CHIEF ENGINEER**
                                         Nichols Machine Tool Group
                                         a W. H. Nichols Co.
                                         Waltham, Massachusetts


Supervised, directed and trained mechanical and electrical design engineering personnel in the design of milling machines and ancillary equipment. Spearheaded the standardization of a milling machine anti-tie down, two-hand machine control in the interests of operator safety. Also added, as standard equipment, a dynamic brake to the milling arbor to prevent excessive cutter rotation on equipment shutdown.

02/77-12/77                              **PROJECT ENGINEER**
                                         Lenox Machine Co., Inc.
                                         Lenox, Massachusetts


Engineered and designed complete systems necessary to the "dry" end processing of paper, such as winders, slitters and paper roll conveyor systems.

12/72-02/77                              **PROJECT ENGINEER**
                                         V & O Press Co., Inc.
                                         Hudson, New York


Performed mechanical and electro-mechanical design necessary to manufacture presses and related equipment to customer specifications, or in conjunction with research and development. Engineered a 500-ton capacity, 30-foot stroke swaging machine for a United States Government arsenal. Also designed and developed an ultra high-speed mechanical punch press, and engineered a 150 ton and 200 ton capacity straight-sided mechanical punch press.

07/72-12/72                              **PROJECT ENGINEER**
                                         W. B. McGuire Inc.
                                         Hudson, New York


Developed a sequential hydraulic valve required for the successful operation of a truck "dock leveler," and engineered, designed and supervised the drafting and the actual construction of a prototype spring-actuated mechanical dock leveler.

02/63-06/72                              **CHIEF PRODUCT ENGINEER**
                                         (Initially hired in capacity of design draftsman and
                                         promoted through the "ranks" to above position)
                                         Gifford Wood Co., Inc.
                                         Hudson, New York

Provided overall engineering service for the chemical processing equipment line, and supervised all engineering activities associated with in-house or field problems. Was charged with conducting laboratory experiments to determine the feasibility of processing a prospective customer's product. Authored technical instruction manuals. Tested and approved final set-up of special machines with interest toward safety of operation, functionability, reliability and agreement with customer specifications. (Began engineering studies in 1964.)

*08/60-02/63*                          **DETAIL/DESIGN DRAFTSMAN**

Worked in various areas of drafting/design. Initial assignments were to generate detailed parts drawings from engineering layouts, with rapidly increasing level of responsibilities , including assembly and layout work. Worked both direct for V & O Press Co., Inc., Hudson, New York, and on contract for Allstates Design Co., Colonie, New York (assigned to Xerox Corp., Rochester, New York), and Northern Industrial Services, Colonie, New York (assigned to both the home office and Beloit Jones - formerly E. D. Jones, Pittsfield, Massachusetts).

## CONSULTING EXPERIENCE SUMMARY
*Accident Investigations* including, but not limited to: Slip/Trip and Fall Cases, including slip resistance index measurements where necessary, and determination of conformance to Building Codes, Scaffolds, Ladders, Vehicular Accident Reconstruction, Mechanical Punch Presses, Milling Machines, Woodworking Machinery, Printing Machinery, Exercise Machines; Bicycles, Garden Equipment, Wallpaper Steamers, Construction Incidents, Electric Stove Accidents, Dumbwaiters, Pallet Trucks, Fork Lift Trucks.

*Damage Assessment* (damage due to fire, water and/or shipment) including, but not limited to: Textile Machinery, Offset Printing Presses, Food Processing Machinery, Chemical Processing Machinery, Photocopying Machines, Conveying Equipment, EDM Machines, Metrology Instrumentation, Robots, Tablet Making Machinery.

*Failure Analysis* including, but not limited to: Refuse Trucks, Oil Tankers, Heat Exchangers, Structural Shelves, Relief Valves, Construction Vehicles, Elevating Lifts, Air Conditioners, Injection Molding Machinery, Bottled Gas Containers.

*Mechanical Engineering Design* including, but not limited to: Intricate positioning mechanisms utilizing ballscrews and piezoelectric crystals, laser film plotting and scanning equipment, a desiccation chamber, created a quality assurance program in conformance to FDA regulations for a manufacturer of medical products, the "safe load" certification of lifting devices.

## EXPERT WITNESS TESTIMONY
Has testified as an expert witness in court for both plaintiffs and defendants. Testimony has been in both civil and criminal cases. Has been qualified in diverse subject areas such as: slip index measurements of a floor; table saw accidents; milling machine injuries; structural failures; falls on stairs; slip and falls on snow and ice; machine guarding; punch press accidents; food equipment injuries; and vehicular accident reconstruction.

**PARTIAL LIST OF COURTS IN WHICH TESTIMONY WAS PROVIDED**

- United States District Court, Boston, MA
- United States District Court, Central Islip, NY
- United States District Court, Concord, NH
- United States District Court, New York, NY
- United States District Court, Portland, ME
- United States District Court, Springfield, MA
- Barnstable Superior Court, Barnstable, MA
- Bristol Superior Court, Attleboro, MA
- Bristol Superior Court, Fall River, MA
- Dukes Superior Court, Edgartown, MA
- Essex Superior Court, Lawrence, MA
- Essex Superior Court, Salem, MA
- Hampden Superior Court, Springfield, MA
- Middlesex Superior Court, Cambridge, MA
- Norfolk Superior Court, Dedham, MA
- Plymouth Superior Court, Brockton, MA
- Suffolk Superior Court, Boston, MA
- Worcester Superior Court, Worcester, MA
- Providence Superior Court, Providence, RI
- Washington Superior Court, Kingston, RI
- Norwich Superior Court, New London, CT
- Cheshire Superior Court, Keene, NH
- Hillsboro Superior Court, Nashua, NH
- Merrimack Superior Court, Claremont, NH
- Superior Court of the State of New York, Bronx, NY
- Superior Court of the State of New York, Goshen, NY
- Superior Court of the State of New York, Mt. Kisco, NY
- York Superior Court, Alfred, ME



# FORENSIC ENGINEERS & TECHNOLOGISTS

**John M. Orlowski, P.E., CSP, BCFE, Director**
11 Vanderbilt Avenue, Suite 120
Norwood, Massachusetts 02062-5056

PHONE: (781)762-8377
FAX: (781)762-1862
general@fet-forensics.com
www.fet-forensics.com

## Items Reviewed Relative to the Case Investigation

1. A report from TM Seger Claim Service, Inc., dated April 11, 2002

2. Thirty-five laser copies of photographs submitted by TM Seger Claim Service, Inc.

3. A five-page report of the post accident investigation, by Harold Isherwood, Greg Hagopian and David Peavey

4. Copy of an e-mail from Harold Isherwood to John Brook

5. Copy of an e-mail from Harold Isherwood to Greg Hagopian, et als.

6. Atlas Model CSE1250R Slitter Rewinder Operating Guide

7. The deposition transcript of Harold Isherwood

8. The deposition transcript of Greg Hagopian

9. The deposition transcript of David G. Peavey

10. The deposition transcript of Frank H. Sereno

11. The deposition transcript of Alan W. Petzold

12. The deposition transcript of Robert Paul Langley

13. The deposition transcript of Ronald Dean Purcell

14. The deposition transcript of Ricky K. Howe

15. The deposition transcript of Robert Lyons

16. Telecopy transmitted from George Rice of Van Leer Metallized Products to Martin Phillips of Atlas Converting, dated June 10, 1996

17. A visit report from Ron Purcell to Bob Lyons, dated April 15, 2002

18. A wiring diagram showing the drive board switch location

19. Memorandum in Support of Plaintiff's Motion to Amend the Complaint

APPENDIX  C

# Appendix  D



# FORENSIC ENGINEERS & TECHNOLOGISTS

**John M. Orlowski, P.E., CSP, BCFE, Director**
11 Vanderbilt Avenue, Suite 120
Norwood, Massachusetts 02062-5056

PHONE: (781)762-8377
FAX: (781)762-1862
general@fet-forensics.com
www.fet-forensics.com

### Trial and Deposition Testimony
### of
### John M. Orlowski, P.E., CSP, BCFE

**Case Caption:**   Pauline Spirito v. Divi Resorts, et. al.
<u>Jury Trial, December 8, 2005</u>:  Essex Superior Court, Lawrence, MA
Plaintiff Case: Wade M. Welch, Esq., of Welch & Donohoe, LLP, Boston, MA

**Case Caption:**   Jean F. Fenelon, et al v. Liberty Mutual Insurance Co.
<u>Arbitration, December 5, 2005</u>
Plaintiff Case: Paul B. Shagoury, Esq., of Shagoury & Tominey, Hyde
                Park, MA

**Case Caption:**   Theodore J. Vlachos v. Charles River Park, et als.
<u>Jury Trial, November 29 and 30, 2005</u>:  Middlesex Superior Court,
                Cambridge, MA.
Plaintiff Case: Harry J. Vlachos, Esq., of Law Offices of Harry J.
                Vlachos, Waltham, MA

**Case Caption:**   Justin Joyce v. Minuteman Trucks, Inc., et al.
<u>Deposition, September 16, 2005</u>
Plaintiff Case: Martin Kantrovitz, Esq., of The Law Offices of Martin
                Kantrovitz, Boston, MA

**Case Caption:**   Commonwealth of Massachusetts v. William Wilson
<u>Jury Trial, September 15, 2005</u>: Hampden Superior Court, Springfield, MA
Defense Case:   Joseph M. Kenneally, Esq., Three Rivers, MA

**Case Caption:**   YCN Transportation, Inc., v. Edward A. Michienzie
<u>Bench Trial, August 11, 2005</u>:  Dedham District Court, Dedham, MA
Plaintiff Case: Elliot Savitz, Esq., of Law Office of Elliot Savitz,
                Dedham, MA

**Case Caption:**   Josephine Galvin v. Donna Corcoran, et als.
<u>Jury Trial, July 29, 2005</u>:  Norfolk Superior Court, Dedham, MA
Plaintiff Case: Barbara M. Garrity, Esq., Quincy, MA

**Case Caption:**      Robert G. Hooper, Jr., et al. v. Davis-Standard
                       Corporation, et als.
Deposition, July 22, 2005
Plaintiff Case: Benjamin R. Zimmerman, Esq., of Sugarman and Sugarman,
                P.C., Boston, MA


**Case Caption:**      Victoria E. Jacob v. Kevin G. Polvani, et al.
Jury Trial, July 7, 2005:  New Haven Superior Court, Meriden, CT
Defense Case:      Jonathan A. Beatty, Esq., of Esty & Buckmir, LLC,
                   New Haven, CT


**Case Caption:**      Victoria E. Jacob v. Kevin G. Polvani, et al.
Deposition, June 13, 2005
Defense Case:      Jonathan A. Beatty, Esq., of Esty & Buckmir, LLC,
                   New Haven, CT


**Case Caption:**      Vittorio Spera v. Pfizer, Inc.
Deposition, June 10, 2005
Plaintiff Case: Michael R. Denison, Esq., of Stratton Faxon,
                New Haven, CT


**Case Caption:**      Commonwealth of Massachusetts v. Sheryl Clarke
Bench Trial, May 23, 2005:  Brockton District Court, Brockton, MA
Defense Case:      Gregory G. Nazarian, Esq., of Law Offices of Gregory
                   Nazarian, Brockton, MA


**Case Caption:**      YCN Transportation, Inc., v. Francis A. Fisher
Bench Trial, May 19, 2005:  Dedham District Court, Dedham, MA
Plaintiff Case: Elliot Savitz, Esq., of Law Office of Elliot Savitz,
                Dedham, MA


**Case Caption:**      Victoria E. Jacob v. Kevin G. Polvani, et al.
Deposition, May 4, 2005
Defense Case:      Jonathan A. Beatty, Esq., of Esty & Buckmir, LLC,
                   New Haven, CT


**Case Caption:**      Catherine G. Monaco v. Hallmark Health System, Inc.
Jury Trial, February 15, 2005:  Woburn District Court, Cambridge, MA
Defense Case:      Kurt M. Schmidt, Jr., Esq., of Foster & Eldridge, LLP,
                   Cambridge, MA


**Case Caption:**      Joel Sekeres, et al. v. Greater Providence YMCA
Jury Trial, January 27, 2005: Providence Superior Court, Providence, RI
Plaintiff Case: Jeffrey S. Michaelson, Esq., of Michaelson & Michael-
                son, North Kingstown, RI

Case Caption:    Robert R. Crawford, et al. v. Peter W. Downey
Deposition, January 4, 2005
Plaintiff Case: Brett D. Baber, Esq., of Law Office of Brett D. Baber,
                PA, Bangor, ME


Case Caption:    Christopher Blakey, et al. v. Ogden Projects of Wall-
                 ingford, L.P., et al.
Deposition, September 29, 2004
Defense Case:    William P. Antonoff, Esq., of Gibson & Behman, P.C.,
                 Burlington, MA


Case Caption:    Charles Jordan v. Arthur Lindelof
Jury Trial, September 13, 2004:  Norfolk Superior Court, Dedham, MA
Plaintiff Case: Mark R. Karsner, Esq., of Karsner & Meehan, P.C.,
                Taunton, MA


Case Caption:    Mark W. Fortier, et al. v. Giddings & Lewis Machine
                 Tools, LLC
Deposition, July 28, 2004
Plaintiff Case: Michael R. Palmieri, Esq., of Donovan & O'Connor, LLP,
                North Adams, MA


Case Caption:    Edward J. Peters v. Crawford Truck Sales, et als.
Deposition, July 21, 2004
Plaintiff Case: Andrew W. Pasquina, Esq., of Law Offices of Andrew W.
                Pasquina, Boston, MA


Case Caption:    Jacqueline Langlais v. Daniel R. Desjardins
Deposition, June 24, 2004
Plaintiff Case: Alexei J. Plocharczyk, Esq., of Halloran & Sage, LLP,
                Hartford, CT


Case Caption:    Cara Campbell v. H.C. Duke & Sons, Inc.
Deposition, June 17, 2004
Plaintiff Case: Jennifer L. Booker, Esq., of the Reardon Law Firm,
                P.C., New London, CT


Case Caption:    Marion Douglas Isenhour v. Summerwood Condominium
                 Trust of Mashpee
Jury Trial, June 14, 2004:  Barnstable Superior Court, Barnstable, MA
Plaintiff Case: David G. Sullivan, Esq., of the Law Office of David G.
                Sullivan, Milton, MA

Case Caption:    Juan Carlos Mejia, et al., v. Worthington Communities
                 Inc., et als.
Deposition, January 26, 2004
Plaintiff Case: John R. Sutton, Esq., of Sutton & Montoto, P.A., South
                Miami, FL


Case Caption:    Mark Van Culin, et al. v. Haines Equipment, Inc.
Jury Trial, December 11, 2003:  Supreme Court of the State of New York,
                 County of Orange, Goshen, NY
Defense Case:    Steven M. Sold, Esq., of Pilkington & Leggett, P.C.,
                 White Plains, NY


Case Caption:    Raimondo Terrasi, et al. v. SCM Group S.p.A., et als.
Jury Trial, November 17, 2003:  Middlesex Superior Court, Cambridge, MA
Plaintiff Case: Timothy G. Lynch, Esq., of Swartz, McKenna & Lynch LLP
                Boston, MA


Case Caption:    Kenneth Gagnon, et al. v. Steego Corp., et al.
Deposition, October 20, 2003
Plaintiff Case: Francis J. Lynch, III, Esq., of Lynch & Lynch, South
                Easton, MA


Case Caption:    Claudia J. Aiken v. Worcester State College
Jury Trial, September 16, 2003: Worcester Superior Court, Worcester, MA
Plaintiff Case: Sonja Anastasi, Esq., of Law Offices of Anastasi &
                Associates, P.C., Oxford, MA


Case Caption:    Walter Whitbeck, et al. v. Jones Mfg. Co., et al.
Deposition, August 8, 2003
Plaintiff Case: Craig T. Dickinson, Esq., of Madsen, Prestley & Par-
                enteau, LLC, New London, CT


Case Caption:    Paul Richard v. Delta International Machinery Corp.,
                 et al.
Deposition, June 26, 2003
Plaintiff Case: Andrew W. Pasquina, Esq., Boston, MA


Case Caption:    Carlos Perez v. Northeast, et al.
Deposition, June 25, 2003
Plaintiff Case: John R. Seebold, Esq., of Capasso & Massaroni, LLP,
                Schnectady, NY


Case Caption:    James Gillespie, et al. v. Sears, Roebuck and Company,
                 et. al.
Jury Trial, June 9, 2003:  U.S. District Court, Boston, MA
Plaintiff Case: Michael B. Flynn, Esq., of Flynn & Associates, P.C.,
                Boston, MA

-4-

**Case Caption:**   Raimondo Terrasi, et al. v. SCM International, S.p.A., et al.
<u>Deposition, June 6, 2003</u>
Plaintiff Case: Fredric A. Swartz, Esq., of Swartz, McKenna & Lynch, Boston, MA

**Case Caption:**   Albert Shay v. Pacific Press & Shear, Inc.
<u>Deposition, May 30, 2003</u>
Plaintiff Case: Paul F. Leavis, Esq., of Leavis and Rest, P.C., Boston, MA

**Case Caption:**   Luis E. Bonta v. Ward Machinery Company
<u>Deposition, May 28, 2003</u>
Plaintiff Case: Mary B. Buonanno, Esq., Takoma Park, MD

**Case Caption:**   Nancy Boutcher et al v. Sunoco, Inc., et al
<u>Jury Trial, May 21, 2003</u>: U.S. District Court, Concord, NH
Plaintiff Case: Edwinna C. Vanderzanden, Esq. of Getman, Stacey, Tamposi, Schulthess & Steere, P.A., Bedford, NH

**Case Caption:**   Commonwealth of Massachusetts v. William Powers
<u>Jury Trial, March 18, 2003</u>: Suffolk County Superior Court, Boston, MA
Defense Case: John G. Tardif, Esq., Winthrop, MA

**Case Caption:**   Rebekha J. Abreu v. Ann & Hope, Inc.
<u>Jury Trial, March, 12, 2003</u>: U.S. District Court, Boston, MA
Defense Case: Scott R. Behman, Esq., of Gibson & Behman, P.C., Burlington, MA

**Case Caption:**   Barry Funfar et als. v. Falmouth Supply Company
<u>Deposition, March 5, 2003</u>
Defense Case: James T. Buchanan, Esq., of Clark, Hunt and Embry, Cambridge, MA

**Case Caption:**   Nancy Boutcher et al v. Sunoco, Inc., et al
<u>Deposition, February 27, 2003</u>
Plaintiff Case: Edwinna C. Vanderzanden, Esq. of Getman, Stacey, Tamposi, Schulthess & Steere, P.A., Bedford, NH

**Case Caption:**   James Gillespie et al. v. Sears, Roebuck & Company, et al.
<u>Deposition, February 14, 2003</u>
Plaintiff Case: Lori A. McCarthy, Esq., of Flynn & Associates, P.C., Boston, MA

**Case Caption:**   Sung Jin Fasteners, LTD, v. Northstar Equipment Corp.,
                    et als.
<u>Bench Trial, February 5, 2003</u>:  U.S. District Court, Eastern District,
                    Central Islip, NY
Plaintiff Case: Mark Sternick, Esq., of Forest Hills, NY

**Case Caption:**   Sandra L. Freilich, et al. v. Home Depot, et al.
<u>Deposition, January 28, 2003</u>
Plaintiff Case: Stacey Forget, Esq., of Shannon & Peters, Worcester, MA

**Case Caption:**   Timothy Joyce, et al. v. Intex Recreational Corp.
<u>Jury Trial, January 14, 2003</u>:  Hillsborough Superior Court, Southern
                    District, Nashua, NH
Plaintiff Case: David Gottesman, Esq., of Gottesman & Hollis, Nashua, NH

**Case Caption:**   John Wesley and Betty Wesley v. Ariens Company, et al.
<u>Jury Trial, January 8, 9 and 13, 2003:</u>  Supreme Court of the State of
                    NY, County of Bronx, Bronx, NY
Plaintiff Case: Douglas Emanuel, Esq., of Bloom & Mintz, New York, NY

**Case Caption:**   Estate of Elizabeth Ann Nell v. Trustees of the Sandbar
                    Village Condominium Trust
<u>Deposition, November 13, 2002</u>
Plaintiff Case: Daniel M. Kelly, Esq., of Fratar, Kern & Kelly, LLP,
                    Springfield, MA

**Case Caption:**   Cindi Fagan v. Country Estates Condominium, et al.
<u>Jury Trial, November 8, 2002</u>:  Worcester Superior Court, Worcester, MA
Defense Case:   James J. Higham, Jr., Esq., of Faille, Higham &
                    Daniels, Springfield, MA

**Case Caption:**   Joseph Fahy v. Boston Edison Company
<u>Deposition, October 29, 2002</u>
Plaintiff Case: Kevin G. Kenneally, Esq., of Donovan Hatem, LLP,
                    Boston, MA

**Case Caption:**   John Burnham v. NAACO Materials Handling Group, et al.
<u>Deposition, October 9, 2002</u>
Plaintiff Case: Richard J. Sullivan, Esq., of Sullivan & Sullivan,
                    LLP, Wellesley, MA

**Case Caption:**   Orphesus McCloud v. Pro-Eco Limited, et als.
<u>Deposition, September 6, 2002</u>
Plaintiff Case: Scott B. Gibson, Esq., of Gibson & Kopsick, Ltd., Wau-
                    kegan, IL

**Case Caption:**    Sean Patrick Stack v. Milacron, Inc.
<u>Deposition, July 30, 2002</u>
Plaintiff Case: Fredric Bremseth, Esq., of Doshan & Bremseth, Wayzata, MN

**Case Caption:**    Deborah S. Collamati, et al. v. 4 Seasons Rental Centers, Inc., et al.
<u>Deposition, July 9, 2002</u>
Plaintiff Case: Robert H. Furbish, Esq., of Smith, Elliott, Smith & Garmey, P.A., Portland, ME

**Case Caption:**    Wayne J. Hebert v. Brian W. Augustine, et al.
<u>Arbitration, June 25, 2002</u>
Plaintiff Case: William A. Curry, Esq., of the Law Offices of William A. Curry, P.C., Somerville, MA

**Case Caption:**    Bill Williams v. Knudson Mfg., Inc.
<u>Deposition, June 11, 2002</u>
Plaintiff Case: Peter W. Schroeter, Esq., of Smith, Elliott, Smith & Garmey, P.A., Saco, ME

**Case Caption:**    Beatriz Rubianogroot, Administratix of the Estate of Jamie A. Rubianogroot, et als. v. William E. Swanson, et als.
<u>Deposition, May 21, 2002</u>
Plaintiff Case: Daniel R. Brooks, Esq., Brooks Associates, Boston, MA

**Case Caption:**    Commonwealth of Massachusetts v. Daryl Pottinger
<u>Jury Trial, March 26, 2002</u>:    Bristol Superior Court, Attleboro, MA
Defense Case:    James M. Caramanica, Esq., of the Law Offices of John C. Carleen, P.C., Saugus, MA

**Case Caption:**    Thomas Kirker, Jr. v. Melroe Company, et als.
<u>Deposition, March 25, 2002</u>
Plaintiff Case: Dina S. Fisher, Esq., of Robinson & Cole, LLP, Hartford, CT

**Case Caption:**    Thomas Kirker, Jr. v. Melroe Company, et als.
<u>Jury Trial, March 19 and March 28, 2002</u>:  Norwich Superior Court, New London, CT
Plaintiff Case: James A. Wade, Esq., of Robinson & Cole, LLP, Hartford, CT

**Case Caption:**    Raymond Mayo, Jr., v. Electri-Cable Assemblies, Inc.
<u>Deposition, March 8, 2002</u>
Defense Case:    Anne Kelly Zovas, Esq., of Pomeranz, Drayton, & Stabnick, LLC, Glastonbury, CT

**Case Caption:**     Theodore P. Stelmack v. U.S.S. Industrial Park
                      Associates, L.L.C., et al.
<u>Deposition, March 1, 2002</u>
Plaintiff Case: Frederic N. Halstrom, Esq., of Halstrom Law Offices,
                P.C., Boston, MA


**Case Caption:**     Geraldine F. Stanton v. Stop & Shop Supermarket Co.
<u>Jury Trial, January 29, 2002:</u>  Middlesex Superior Court, Cambridge, MA
Plaintiff Case: James R. Burke, Esq., West Newton, MA


**Case Caption:**     Thomas Kirker, Jr. v. Melroe Company, et als.
<u>Deposition, January 22 and March 25, 2002</u>
Plaintiff Case: Dina S. Fisher, Esq., of Robinson & Cole, LLP,
                Hartford, CT


**Case Caption:**     Barbara Greene v. Star Markets Company, Inc. et al.
<u>Deposition, January 10, 2002</u>
Plaintiff Case: Francis E. Jenney, Esq., of Harnish, Jenney, Mitchell
                & Resh, Waltham, MA




Test4yr



# FORENSIC ENGINEERS & TECHNOLOGISTS

**John M. Orlowski, P.E., CSP, BCFE, Director**
11 Vanderbilt Avenue, Suite 120
Norwood, Massachusetts 02062-5056

PHONE: (781)762-8377
FAX: (781)762-1862
general@fet-forensics.com
www.fet-forensics.com

## FEE SCHEDULE

**FORENSIC CONSULTING** (excluding legal testimony):

- Senior Forensic Engineer / Specialist      $190.00  per hour
- Forensic Engineer / Specialist      $170.00  per hour
- Staff Consultant      $150.00  per hour
- Technician      $130.00  per hour
- Consultants with unique qualifications may be
  invoiced at rates other than those noted above.

**(1)**    Travel time is invoiced from office or home to site (or lodging), and return, at the above rates.

**(2)**    Legal testimony is invoiced at 1.5 times the above rates.

**(3)**    Legal testimony is invoiced at a four-hour per day minimum.

**(4)**    Expenses such as photoprocessing, meals, car rental, lodging and airfare, will be invoiced at cost.

**(5)**    Automobile mileage is invoiced at the current IRS allowance.

## TERMS:

**(1)**    F.E.T. requires a $1,500.00 retainer prior to beginning work on new case assignments. We bill against the retainer. We will invoice additionally depending on the time and cost expended. We will refund the unused retainer on request if we have not been named as an expert witness(s). Subsequent to naming F.E.T. as expert witnesses, no refunds will be granted.

**(2)**    F.E.T. requires a retainer prior to appearing for court testimony, depositions and other legal testimony. The amount of the retainer will be based on estimated time and expenses. We bill against the retainer. We will invoice additionally depending on the time and cost expended. Please note that should the case settle, or be otherwise concluded prior to trial or deposition, F.E.T. will retain $1,500.00 and refund the unused balance, if any.

**(3)**    No deposition will be scheduled until after receipt of retainer. Trial retainers must be received 10 days prior to trial to allow sufficient time for preparation.

APPENDIX E

**Threading diagram**



1.      CANTING DRIVEN CHROME ROLL
2.      DRIVEN CHROME ROLL
3.      DRIVEN DANCER ROLL
4.      DRIVEN CHROME ROLL
5.      SCRAP WINDER NIP ROLL
6. - 9.  DRIVEN CHROME ROLLS
10.     DRIVEN BOWED ROLL
11.     DRIVEN CHROME ROLL
12.     DRIVEN CHROME ROLL
13.     PACER NIP ROLL
14.     DRIVEN CHROME ROLL
15.     FEMALE KNIFE SHAFT
16.     MALE KNIFE TRUNNION
17.     DRIVEN CHROME ROLL
18. & 19. WINDING DRUM
20. & 21. WINDING DRUM NIP ROLL

ATLAS CONVERTING EQUIPMENT

APPENDIX  F