UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                   )
**CIRIACO PUCILLO,**               )
                    Plaintiff,     )
                                   )
     v.                            )   Case No. 03-CV-12359 MLW
                                   )
**METSO PAPER, INC. AND**          )
**VALMET CONVERTING, INC.**        )
                    Defendants.    )
_____)

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendant Valmet Converting, Inc. ("Valmet Converting"), by counsel, submits this memorandum of points and authorities in support of its motion for summary judgment. As demonstrated in this memorandum, plaintiff's claim against Valmet Converting fails in its entirety for a lack of proof.[1]

### Introduction

This action arises from an accident at Proma Technologies in Franklin, Massachusetts ("Proma"). At the time of the accident, plaintiff was an employee of Proma and was working at a machine known as a Slitter. The Slitter malfunctioned and a cardboard core was released from the machine striking plaintiff.

Plaintiff attributes the malfunction to an improperly positioned switch on an electronic circuit board, a component part in the Slitter. Plaintiff *assumes* that Valmet Converting supplied the circuit board at issue and contends that, as the supplier of the board, Valmet Converting was responsible for the improperly positioned switch. As demonstrated in this memorandum, the

---

[1] Filed separately with this memorandum in accordance with Local Rule 56.1 is Valmet Converting's Statement Of Material Facts Of Record To Which There Is No Genuine Issue ("SMF" and cited as "SMF ¶ __").

evidence does not support plaintiff's assumption, and the law does not support plaintiff's contention.

There is no evidence to show who supplied the circuit board at issue. Prior to the malfunction, Proma obtained circuit boards from multiple sources and treated the boards as fungible -- commingling the boards, both in storage and in the Slitter, without regard to supplier. At the time of the malfunction, Proma made no record to identify the board involved. After the malfunction, Proma continued to commingle the boards without regard to supplier. Thus, there is no evidence upon which a jury can identify the board at issue, or its supplier.

Even if the circuit board at issue could be identified as supplied by Valmet Converting, plaintiff's theories of liability fail as a matter of law. There is no contention in this case that the component part, *i.e.* the circuit board, was defectively designed or manufactured. Plaintiff's contention is that the circuit board, which had different settings for different applications, was not properly set at the time of the malfunction. Under Massachusetts law, there can be no claim against a supplier of a non-defective component part for a hazard that arises from the manner in which the component part is integrated into another product.

## Factual Background

**A.    Proma Technologies**

At the time of his accident, plaintiff was employed by Proma Technologies ("Proma") in Franklin, Massachusetts. (SMF ¶ 1.) Prior to 2000, the Proma Technologies business was owned by a Dutch conglomerate known as Royal Packaging – Van Leer ("RP-VL"), and was operated through a U.S. subsidiary known as Van Leer Metalized Products ("Van Leer"). (SMF ¶ 2.) Van Leer owned and operated the business until January 2000, when RP-VL was acquired by the Finnish company Huhtaimka; and Huhtaimka, in turn, sold the business to Proma Technologies. (*Id.*) In 2005, Proma Technologies sold the business and it is now known as

Vacumet. (*Id.*)  For purpose of this motion, the business operations in Franklin since 1993 are referred to as "Proma."

**B.    Valmet Converting**

Valmet Converting was a company located in Charlotte, North Carolina.  (SMF ¶¶ 56-57.)  Prior to 1997, Valmet Converting consisted of several independent companies; one of which, and the only one relevant to this action, was known as Atlas Group, Americas, previously known as Atlas Converting Equipment, USA.  (SMF ¶ 56.)  In 2004, Valmet Converting was sold to a company known as Bobst and became known as Bobst Group USA.  (SMF ¶ 59.)  For the purpose of this motion, these business operations are referred to as "Valmet Converting."

**C.    The Slitter**

In 1992, RP-VL, utilizing a French subsidiary, purchased the Slitter involved in plaintiff's accident from a company in England known as Atlas ("Atlas-UK").  (SMF ¶ 3.)  The Slitter was manufactured by Atlas-UK and was delivered to Proma in 1993.  (*Id.*; SMF ¶ 52.)  Valmet Converting was not involved in the manufacture, design or sale of the Slitter.  (*Id.;* SMF ¶¶ 52-53.)

The Slitter was one of three slitters used by Proma in the production of metalized paper.  (SMF ¶ 4.)  The Slitter's function was to reduce large sheets of paper into multiple smaller sheets, and to wind the smaller sheets onto up to five cardboard cores.  (SMF ¶¶ 4-5.)  The switch that is the focus of plaintiff's claim was located on one of ten electronic circuit boards in the Slitter, each approximately 2-inches by 4-inches in size and referred to as a daughter board.  (SMF ¶ 9.)  Each daughter board was mounted to another electronic circuit board referred to as a mother board.  (SMF ¶ 9.)

More specifically, each cardboard core in the Slitter was held between two mechanical arms, referred to as rewind arms.  (SMF ¶ 5.)  Each rewind arm had a motor to rotate the core.

(SMF ¶¶ 6, 8.) Each motor was controlled by an electronic "drive," or drive board. (SMF ¶ 9.)[2] Each drive consisted of two electronic circuit boards mounted together, a mother board and a daughter board. (SMF ¶¶ 5, 9.) The daughter board, *inter alia*, controlled the speed of the electric motor in the rewind arm to which the board was assigned. (SMF ¶ 13.)

At all relevant times, the drive boards – both mother boards and daughter boards – were manufactured by a company in Germany known as Infranor. The boards were labeled Infranor and had model numbers and serial numbers affixed to them for identification. (SMF ¶ 7.) The Infranor daughter board could be used with either of two models of Infranor mother boards, the M55 or the M59. (SMF ¶ 16.)

The switch on the daughter board could be set in either of two positions depending on its application. (SMF ¶¶ 12-13, 16.) When the drive received its speed control data by armature voltage feedback, the switch was to be set in one position, and when the drive received its speed control data from tachometer feedback, the switch was to be set in the opposite position (SMF ¶ 13.) The electrical schematics for the Slitter provided to and maintained by Proma expressly instructed Proma on the proper switch settings for both the M55 and M59 models, providing:

>       SET S1 TO POS. 1 FOR M55 [NON SMT]
>
>       SET S1 TO POS. 2 FOR M59

(SMF ¶¶ 16, 17, 18, 50.) The reference to "S1" was a reference to the switch at issue. (SMF ¶ 50.)

At the time of the malfunction, the Slitter was winding only one core. (SMF ¶ 10.) Plaintiff was positioned at Slitter Rewind Station No. 2, and the core was positioned between Rewind Arm 2Left and Rewind Arm 2Right. (*Id.*) The core came free of its position between

---

[2] The Slitter also contained other drives for other machine functions, some of which also were manufactured by Infranor. (SMF ¶ 8.) Only the drives assigned to the rewind arms are relevant to this action.

the rewind arms and struck plaintiff. An investigation determined that the core released because of the combination of two independent conditions: (1) the rewind arms at Rewind Station 2 lifted the core from the Slitter's drum, at the same time that (2) the electronic switch on the daughter board assigned to Rewind Arm 2Left was not properly set. (SMF ¶ 11.) The switch on the daughter board was not set to either Position 1 or Position 2 – it was, in essence, in neutral. (*Id.*; SMF ¶ 19.) Both conditions were required for the malfunction to occur, (*id.*; SMF ¶ 11), but plaintiff's claim focuses only on the improperly positioned switch on the daughter board.

### D.     The Daughter Board Assigned to Rewind Arm 2Left

There is no evidence to identify, in terms of supplier or time of supply, the daughter board assigned to Rewind Arm 2Left at the time of the malfunction or to determine when the switch on the daughter board became improperly positioned.

At the time of plaintiff's accident, no record was made of the serial number or of any other identifying characteristic of the daughter board assigned to Rewind Arm 2Left. (SMF ¶¶ 20-21.) Nor is there any basis to reconstruct the history of Proma's purchases and use of daughter boards to determine the supplier of the daughter board at issue. (SMF ¶¶ 22, 34-36.)

When the Slitter was delivered to Proma in 1993, its was equipped with an initial set of drive boards, including daughter boards. (SMF ¶ 23.) These boards were installed before the Slitter was delivered to the U.S. (*Id.*) Valmet Converting was not involved in the delivery or start-up of the Slitter (*Id.*), and as such had nothing to do with these daughter boards.

It is not possible for anyone at Proma to state how many spare drives (new or repaired) were purchased in the years after the Slitter was installed, or when. (SMF ¶¶ 22, 25.) Proma did not maintain a record of the serial numbers, or any other identifying characteristics, of its new or repaired drives. (SMF ¶ 31.) Proma's business practice was to retain records of its purchases only for a limited time. (SMF ¶¶ 26-27.) Generally, Proma maintained records of its purchases

only until the time of the next purchase.  (*Id.*)  With each new purchase, the prior records were discarded.  (SMF ¶ 27.)

The anecdotal testimony of Proma's President, Frank Serino, and Maintenance Manager, Paul Langley, show that spare drives – sometimes new drives and sometimes repaired drives -- were acquired in at least two ways.[3]  Until the mid-1990's, during the period that Proma was owned by RP-VL, some spare drives were purchased for Proma by affiliated companies of RP-VL.  (SMF ¶ 28.)  Other spare drives were purchased through Valmet Converting.  (SMF ¶ 29.)  There is no basis to identify which spare drives were purchased through RP-VL affiliated companies and which spare drives were purchased from Valmet Charlotte, as Proma maintained no documentation for drives obtained through affiliated companies and maintained only temporarily and then discarded records of direct purchases.  (SMF ¶¶27-29.)  Proma estimates that it acquired, on average, one new or one repaired drive per year.  (SMF ¶ 29.)

When new drives were purchased from Valmet Converting, Proma generally telephoned Valmet Converting and Valmet Converting obtained the slitter's model number and serial number.  (SMF ¶ 76.)  Valmet Converting passed this information to Atlas-UK, and Atlas-UK obtained the drive from Infranor.  (*Id.*)  When repaired drives were purchased, Proma sent a malfunctioning drive to Valmet Converting, and, in turn, Valmet Converting sent it to Atlas-UK.  (SMF ¶ 79.)  The repaired drive was then returned to Proma by Atlas-UK directly, or through Valmet Converting.  (SMF ¶ 80.)

In addition to purchasing complete drives, Proma sometimes purchased daughter boards separately from other boards.  (SMF ¶ 30.)  When daughter boards were purchased separately, the daughter boards were mounted to existing mother boards by Proma's technicians.  (*Id.*)

---

[3] Proma's President, Frank Serino, testified as the corporate designee pursuant to Fed. R. Civ. P. 30(b)(6).

Proma maintained no record of which daughter boards were purchased separately, and no record of which daughter boards were mounted to which mother boards, or when. (*Id.*)

The drives in the Slitter did not have predictable service lives; some drives lasted only a few months or years. (SMF ¶ 24.) Other drives in the Slitter, even after the accident, were still the original drives included with the Slitter when RP-VL purchased it. (*Id.*) Proma maintained no record of when drives, or daughter boards, were replaced during the nine-year period before the accident or in the years since. (SMF ¶ 25.)

When drives in the Slitter were replaced, Proma's electricians employed at least two methods of replacement: (1) some drives that were suspected of not working properly were removed from the Slitter and replaced with drives from Proma's storeroom, (SMF ¶ 40), and (2) some suspect drives were "swapped" with properly functioning drives from other rewind arms that were not in use. (*Id.*)[4] Proma made no record of what drives, or daughter boards, were replaced from storage and what drives, or daughter boards, were swapped with others in the Slitter. (SMF ¶¶ 33, 41-43.)

The drives were also commingled in Proma's storeroom. Upon delivery to Proma, new drives and repaired drives were handled in the same manner. (SMF ¶ 31.) The boxes were opened, the drives were removed from the boxes and placed on a shelf. (*Id.*) No record of the serial number made. (*Id.*) No inspection of the drive was conducted. (*Id.*) When Proma's maintenance staff needed a spare drive for the Slitter, a drive was taken from storage. (SMF ¶ 33.)

Thus, at the time of the malfunction, the daughter board assigned to Rewind Arm 2Left could have been supplied in any number of ways: (1) it could have been supplied by Atlas-UK

---

[4] At all times, Proma maintained on-site electricians and electrical engineers. (SMF ¶ 38.) Proma's electricians were responsible for installing the drive boards. (SMF ¶ 39.) At no time did Proma have a service contract for maintenance, repair or inspection of the Slitter or its drives. (SMF ¶ 44.)

in 1993, and never removed from the Slitter; (2) it could have been supplied by an RP-VL affiliate and installed by Proma; (3) it could have been supplied by Valmet Converting and installed by Proma; (4) it could have been supplied by Atlas-UK, an RP-VL affiliate or Valmet Converting, removed from the Slitter by Proma, sent for repair, returned to Proma through Valmet Converting, and reinstalled by Proma; (5) it could have been supplied by Atlas-UK, an RP-VL affiliate or Valmet Converting, removed from the Slitter by Proma, sent for repair, and returned to Proma without passing through Valmet Converting; and (6) it could have been purchased or sent for repairs separately from the mother board in any of the manners described above, and upon receipt by Proma attached to an existing mother board previously supplied in any of the manners described above, and then installed in the Slitter by Proma.

     Nor is there evidence to show whether the switch on the daughter board was properly or improperly set at the time of its supply, regardless of the identity of its supplier. At no time did Proma inspect or record the position of the switches on the daughter boards. (SMF ¶¶ 31, 37.) When new drives, or newly repaired drives, were received by Proma, no inspection of the drive was conducted and no record was made of the position of the switch on the daughter board. (SMF ¶ 31.) Nor was an inspection made, or a record of the switch position created, at the time the drives were installed in the Slitter. (SMF ¶ 37.) Thus, the switch could have been properly set when the board was supplied, by whomever supplied it, and improperly reset by a Proma electrician. Or, the switch could have been inadvertently moved by Proma during receipt, handling, storage or installation, including the times that Proma mounted daughter boards to mother boards, or swapped boards within the Slitter from rewind arm to rewind arm.

     Thus, there is no evidence to identify the daughter board assigned to Rewind Arm 2Left at the time of the accident, no evidence to establish who sold the daughter board, no evidence to

establish when it was sold, no evidence to establish the position of the switch at the time of sale, and no evidence to establish how or when the switch became wrongly positioned. Because the malfunction of the Slitter could only occur when two events occurred simultaneously – *i.e.*, the core lifting off the drum with the switch on the daughter board in the wrong position – the switch on the daughter board could have been wrongly positioned for weeks, months or years prior to the malfunction. (SMF ¶ 11.)

**E.    Plaintiff's Claim**

Plaintiff *assumes* that the daughter board at issue was supplied by Valmet Converting and seeks to assert a claim based on the opinion testimony of John Orlowski. Significantly, Orlowski does not contend that the daughter board, as manufactured and designed by Infranor, was defective in any way. Orlowski described the board as "generic to the extent that the daughter board was furnished with a switch that could be set in one of two positions depending on the specific application,"( SMF ¶ 68) and testified that it was **not** his opinion that the daughter board, including its use of the switch, was defective, stating as follows:

> Q:   I am trying to find out about the design of the board. . . . Is there anything wrong with the design of the mother board used in the drives for the slitter in this case?
>
> A:   Is there anything wrong with the design of the board? I don't know. That's a pretty general question.
>
> Q:   The design – you told me earlier it had switches on it.
>
> A:   It had switches on it.
>
> Q:   That's an acceptable, proper design as far as you know?
>
> A:   As far as I know.
>
> Q:   The drive board has a daughter board?
>
> A:   Yes.
>
> Q:   It has also switches?

> A: Yes.
>
> Q: Also has other circuits?
>
> A: Yes.
>
> Q: As far as you know the design of the daughter board in this case is perfectly acceptable, correct?
>
> A: As far as I know.
>
> Q: You are not going to testify to the contrary?
>
> A: No.
>
> Q: On either the mother board or daughter board?
>
> A: As I sit here today, no, I would not.
>
> Q: You are not going to testify that there is anything wrong with the circuit board using a switch as opposed to a circuit?
>
> A: As I sit here today I would not testify to that, right.

(SMF ¶ 69.)  Thus, there is no claimed defect in the Infranor daughter board.

Instead, Orlowski opines that Valmet Converting, as the alleged intermediate distributor of the daughter board, was obligated to **modify** the daughter board before delivering it to Proma. Specifically, Orlowski opines that Valmet Converting was obligated to modify the board, to make it suitable for only a single application, by "soldering" the switch into one position, by "put[ting] a latch over it by design," or by some other method before shipping it to Proma. (SMF ¶ 70.)  In other words, plaintiff contends that Valmet Converting, as a intermediate link in the chain of distribution, was obligated to **redesign** and **remanufacture** a non-defective component part prior to supplying the part to Proma.  Alternatively, Orlowski opines that Valmet Converting had an obligation to instruct Proma to check the switch position during its assembly of the daughter board into the Slitter. (SMF ¶ 71.)

As demonstrated in Valmet Converting's accompanying motion in limine, Orlowski's opinions are without basis in any reliable principles or methods and should be excluded in their entirety. As demonstrated in this memorandum, even if Orlowski's testimony is not excluded under Fed. R. Evid. 702, plaintiff's claim fails because of a lack of proof and because plaintiff's theories of liability are contrary to Massachusetts law.

## **Summary Judgment Standard**

The standard for summary judgment is well established. Rule 56(c), Fed. R. Civ. P., provides in relevant part that judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

A "*genuine* issue" exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis in original). A fact is "material" only if it "might affect the outcome of the suit . . . ." *Id.* When deciding whether a genuine issue of material facts exists, the Court must limit its consideration to admissible evidence. *See* Fed. R. Civ. P. 56(e).

Once the moving party has met the initial burden to show a lack of genuine issue, the non-moving party, in this case the plaintiff, must produce specific evidence in the record showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). This evidence cannot consist merely of conjectural or conclusory evidence, or be based on improbable inferences or unsupported speculation. *See Rossy v. Roche Products, Inc.*, 880 F.2d 621, 624 (1st Cir. 1989); *Mack v. Great Atlantic and Pacific Tea Co.*, 871 F.2d 179, 181 (1st Cir. 1989); *Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 109-10 (1st Cir. 1988). If the non-moving party cannot prove

an element essential to his case and on which he will bear the burden of proof at trial, then summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## Discussion

**A.    There Is No Evidence That Valmet Converting Sold the Daughter Board That Was Assigned To Rewind Arm 2Left At The Time Of The Accident**

It is axiomatic that in a product liability action, the plaintiff must establish that the product at issue was actually provided by the defendant. The Supreme Judicial Court of Massachusetts, in *Payton v. Abbott Labs.*, 437 N.E.2d 171 (Mass. 1982), explained the principle as follows:

> Identification of the party responsible for causing injury to another is a longstanding prerequisite to a successful negligence action. This requirement serves two purposes: it separates wrongdoers from innocent actors, and also ensures that wrongdoers are held liable only for the harm that they have caused.

437 N.E.2d at 188 (internal citation omitted). Here, plaintiff's claim fails because there is no evidence that the daughter board assigned to Rewind Arm 2Left at the time of the accident was supplied by Valmet Converting.

A plaintiff's inability to identify the supplier of the product at issue has resulted in the dismissal of claims time and time again. In *Mathers v. Midland-Ross Corp.*, 532 N.E.2d 46 (Mass. 1989), an accident occurred on a slitter-rewinder. The plaintiff sued Midland, a manufacturer of slitter-rewinders. The plaintiff pointed to purchase and sale orders indicating that Midland had sold parts to plaintiff's employer. However, plaintiff was not able to establish that Midland supplied the slitter. The trial court granted Midland summary judgment and the Supreme Judicial Court affirmed explaining, "[a] plaintiff who sues a particular manufacturer for product liability generally must be able to prove that the item which is claimed caused the injury can be traced to that specific manufacturer." *Mathers*, 523 N.E.2d at 49.

In *Carrier v. Riddell, Inc.*, 721 F.2d 867 (1st Cir. 1983), the First Circuit affirmed summary judgment in a product liability action against the manufacturer of football helmets, when plaintiff could not establish that the defendant was the manufacturer of the football helmet at issue. Judge Breyer, now Justice Breyer, explained that a necessary predicate for any negligence claim is a duty of care owed by the defendant, and there is no duty of care owed by a defendant with respect to products manufactured and sold by others. Thus, claims must be dismissed in the absence of evidence tying the specific product at issue to a particular supplier. *Carrier*, 721 F.2d at 870.

In *Garcia v. Kusan, Inc.*, 655 N.E.2d 1290 (Mass. App. Ct. 1995), the Massachusetts Court of Appeals affirmed summary judgment in a product liability action against a manufacturer of hockey sticks when plaintiff could not establish that the defendant was the manufacturer of the hockey stick that caused plaintiff's injury. *Garcia* is very similar to the instant action. In *Garcia*, hockey sticks had been obtained from different suppliers at different times, stored in a central repository before the accident, and commingled after the accident without any record of what stick caused the injury. The court held that in the absence of evidence to identify the supplier of the specific hockey stick that caused the injury, summary judgment was warranted. *Id.* at 1295.

In the instant case, there is *no* testimony that the daughter board assigned to Rewind Arm 2Left at the time of the accident was supplied by Valmet Converting; nor, because Proma's business practices was to treat all boards as fungible, is such evidence even possible. The Slitter was originally equipped with a full set of drive boards. (SMF ¶ 23.) Thereafter, replacement drive boards were purchased, some from unknown suppliers through RP-VL affiliated companies and some from Valmet Converting. (SMF ¶¶ 28-29.) Some replacement purchases consisted of

only daughter boards, and some consisted of daughter boards and mother boards. (SMF ¶ 34.) Some boards were sent out for repair and returned for subsequent use. (SMF ¶ 29.) When boards were replaced, no record was made of the source of the replacement boards. (SMF ¶¶ 25, 33, 41-43.) The boards were commingled within the Slitter and commingled in Proma's storeroom without regard to supplier, both before and after the accident. (SMF ¶¶ 31, 40.) There was no system for rotating the stock in the storeroom, and there was no record made of which drives were removed from or returned to storage, or when. (SMF ¶¶ 33, 41-43.) At the time of the accident, no record was made of the board at issue. (SMF ¶¶ 20-21.) More than two and one-half years after plaintiff's accident, some original boards remained in the Slitter. (SMF ¶ 24.)

Thus, like *Garcia*, where the hockey stick at issue was not identified and was commingled with other hockey sticks after the accident, here the daughter board assigned to Rewind Arm 2Left was not identified and was commingled with daughter boards after the accident. As explained in *Carrier v. Riddell*, only the supplier of the product at issue owes any legal duty with respect to the product, and in the absence of a legal duty, a negligence action cannot survive. *Carrier*, 721 F.2d at 870. Here, plaintiff cannot establish that Valmet Converting was the supplier of the daughter board involved in the malfunction that resulted in plaintiff's injuries. Accordingly, plaintiff's claim against Valmet Converting must be dismissed for a lack of proof.

**B.    Plaintiff's Claim Fails For Lack Of Expert Testimony**

Valmet Converting has filed a motion in limine to exclude the opinion testimony of John Orlowski, plaintiff's proffered liability expert. Plaintiff offers Orlowski's testimony to show that Valmet Converting had a duty to *modify* the daughter board prior to its sale to Proma and a duty to instruct Proma to check the daughter board's switch location. Whether a defendant has a duty

of care is a question of law for the court. *Davis v. Westwood Group*, 652 N.E.2d 567, 569 (Mass. 1995). As demonstrated in Section III, *infra*, Massachusetts courts already have defined the limited duties of a supplier of a non-defective component part – and they have done so contrary to Orlowski's conclusions. Nonetheless, as established in the accompanying motion in limine, even if Orlowski's opinion testimony might otherwise be admissible, Fed. R. Evid. 702 precludes its admission because it is rank speculation, not based on reliable principles and methods. In the absence of proper expert testimony, plaintiff's claim cannot survive.

C.  **Plaintiff's Theories Of Liability Against Valmet Converting Fail As A Matter Of Law**

Plaintiff's claims that Valmet Converting had an obligation to modify the daughter board prior to its alleged sale to Proma and to warn Proma to check the switch for proper positioning when installing the board in the Slitter are contrary to Massachusetts law.

The Supreme Judicial Court, in *Mitchell v. Sky Climber, Inc.*, 487 N.E.2d 1374 (Mass. 1986), squarely addressed the potential negligence liability of a component part supplier when, like here, there is no claim of a defect in the component part. In *Sky Climber*, the defendant sold motors to a scaffolding equipment manufacturer, where they were incorporated into an electrically powered scaffold in such a way that the plaintiff was electrocuted by a wire leading to the motors. There was no claim that the motors were defective. Instead, there was a claim that the defendant "violated a duty to give instructions concerning the safe and proper rigging and use of the scaffolding." *Sky Climber*, 487 N.E.2d at 1375. The Supreme Judicial Court unambiguously rejected the claim, stating:

> We have never held a manufacturer liable, however, for failure to warn of risks created solely in the use or misuse of the product of another manufacturer. **The prevailing view is that a supplier of a component part containing no latent defect has no duty to warn the subsequent assembler or its customers of any danger that may arise after the components are assembled.**

*Sky Climber*, 487 N.E.2d at 1376 (citations omitted) (emphasis added).

The First Circuit Court of Appeals rejected a similar claim in *Cipollone v. Yale Industrial Products, Inc.*, 202 F.3d 376, 379 (1st Cir. 2000). In *Cipollone*, the defendant manufactured a dock lift that was incorporated into a material handing system. There was no claim that the dock lift itself was defective, but as incorporated into the material handling system a pinch point was created. The First Circuit rejected claims of negligence explaining, in relevant part as follows:

> When a component of an integrated product is not itself defective, the maker of the component is not liable for injury that results from a defect in the integrated product.

*Cipollone*, 202 F.3d at 379 (citations omitted.). This rule applies even when the supplier knows its parts are going to be incorporated into a specific machine. *Freitas v. Emhart Corp.*, 715 F. Supp. 1149, 1152 (D. Mass. 1989).

*Sky Climber* and *Cipollone* applied Massachusetts law to manufacturers of component parts. When the parts are supplied by someone other than the manufacturer, Massachusetts law is even more restrictive. In *Enrich v. Windmere Corp.*, 616 N.E.2d 1081, 1084 (Mass. 1993), the Supreme Judicial Court, citing a string of authorities, declared:

> A seller of a product manufactured by another is not liable in an action for negligence unless it knew or had reason to know of the dangerous condition that caused the accident.

*Enrich*, 616 N.E.2d at 1084 (citations omitted). In *Enrich*, the defendant was a distributor of an allegedly defective electric fan. The fan was distributed in a box. When removed from the box by the ultimate user, the fan appeared new, clean and fresh. *Enrich*, 616 N.E.2d at 1084. The Supreme Judicial Court concluded that under these circumstances there was no evidence of any knowledge attributable to the defendant of a potential defect in the fan and absent such knowledge there could be no liability under Massachusetts law. *See id*.

Here, there is no claim that Valmet Converting is the manufacturer of the daughter board. The board was manufactured by Infranor. (SMF ¶ 7.) Valmet Converting was an intermediate distributor. (SMF ¶¶ 74-80.) Thus, under Massachusetts law, a claim against Valmet Converting for supplying a daughter board manufactured by Infranor requires proof of a defect in the daughter board *and* proof that the Valmet Converting knew, or had reason to know, of the defect. Plaintiff can not meet this threshold requirement because there is no contention, and no expert testimony, that the Infranor daughter board was itself defective.

Moreover, like in *Sky Climber* and in *Cipollone*, it is clear that the hazard complained of by plaintiff in the instant case arose because of the improper assembly of the daughter board into the machine at Proma. The proper switch setting was expressly set forth in the electrical schematics that accompanied delivery of the Slitter to Proma in 1993 and that were maintained by Proma next to the Slitter as reference material. (SMF ¶ 50.) The electrical schematics for the daughter boards stated:

> SET S1 TO POS 1 FOR M55
> SET S1 TO POS 2 FOR M59

(*Id.*) "S1" was a reference to the switch at issue. (*Id.*) "M55" and "M59" were references to the two generations of mother boards to which the daughter board could be mounted. (*Id.*) The schematics were available to Proma's electrical maintenance staff; the same people who checked and replaced the drives. (SMF ¶ 47.) Indeed, David Peavey, a Proma electrician, testified that he was familiar with the schematics and that he looked at them many times, and Greg Hagopian, Proma's electrical engineer, testified that he used the schematics as reference. (SMF ¶¶ 47-49.)

When Proma elected to purchase and assemble spare drives in-house, it assumed the obligation to do so properly. When Proma attached daughter boards to mother boards, it assumed the obligation to do so properly. When Proma installed replacement drives, it assumed

the obligation to do so properly. Like in *Sky Climber* and *Cipollone*, Valmet Converting as a non-defective component part supplier is not responsible for "any danger that may arise after the components are assembled." *Sky Climber*, 487 N.E.2d at 1376.

Even if a hazardous condition could be claimed with respect to the board prior to its delivery to Proma, there is no basis to show that Valmet Converting knew or had reason to know of the condition. When Proma called to order a new board, Valmet Converting obtained the machine model number and serial number from Proma. (SMF ¶ 76.) Valmet Converting conveyed this information to Atlas-UK with the order. (*Id.*) In turn, Atlas-UK obtained the drive from Infranor. (*Id.*) The drive was shipped to Valmet Converting from Atlas-UK. (SMF ¶ 77.) The board arrived at Valmet Converting wrapped in bubble wrap and in a box. (SMF ¶ 78.) Unless the box was obviously damaged, the box was not opened. (*Id.*) The boxed and wrapped drive was forwarded to Proma. (*Id.*)

A similar procedure was followed for drives that needed repairs. Proma shipped the damaged drive to Valmet Converting, and Valmet Converting sent the drive to Atlas-UK. (SMF ¶ 75.) The repaired drive was then returned to Valmet Converting for delivery to Proma, or if time was of the essence it would be shipped directly by Atlas-UK to Proma. (SMF ¶ 80.)

Massachusetts law is clear. A component part distributor has no duty to insure that the integrated product is free of hazards that might arrive from the use of the component. Instead, Massachusetts law limits the liability of a component part supplier, of a product manufactured by another, to instances where there is a demonstrable hazard in the component and the distributor knew or had reason to know of that hazard. Here, like *Enrich*, there are no facts to show that Valmet Converting knew or had reason to know of any alleged defect in the condition of any

drive board. Indeed, plaintiff's expert concedes that no such defect or dangerous condition exists in the product.

## Conclusion

For the reasons set forth herein, Valmet Converting respectfully requests that the Court grant its motion for summary judgment and enter judgment in favor of the defendant in all respects.

Date: June 30, 2006                                      Respectfully submitted,

/s/ David L. Kelleher
David L. Kelleher, Esq. (B.B.O. #543912)
Thelen Reid & Priest, LLP
701 Eighth Street, N.W., Suite 800
Washington, DC 20004
(202) 508-4000

Mark Petersen, Esq. (B.B.O. #396840)
Michelle Hansen, Esq. (B.B.O. #561477)
Law Offices of Mark Petersen
490 Shrewsbury Street
Worcester, MA  01604
(508) 791-0300

*Attorneys for Defendant Valmet Converting, Inc.*