# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHSUETTS

| | | |
|---|---|---|
| **CIRIACO PUCILLO** | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **C.A. NO. 03-CV-12359 MLW** |
| | ) | |
| **VALMET CONVERTING, INC.** | ) | |
| **Defendant** | ) | |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION
## TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I. INTRODUCTION

This memorandum is submitted in opposition to the Defendant, Valmet Converting, Inc.'s Motion for Summary Judgment. As grounds therefore, the Plaintiff states that the Defendant has failed to present a compelling reason for this Court to grant such a request.

The Defendant contends that evidence does not support the Plaintiff's contention that Valmet Converting supplied the drive board at issue. As set forth herein, there is ample evidence to show who supplied the drive board. The Defendant seeks to characterize the drive board as a generic product, when in fact, it was a unique piece of equipment, designed and manufactured for Proma's specific application.

The Defendant then states that even of the Plaintiff can establish that Valmet Converting supplied the board, his claim fails. The Defendants apply Massachusetts case law that has no application to the facts of this case. The Defendant has offered no case law to support its argument that the supplier of a component part specifically modified for the customers unique application has no duty to verify that the modification is done before the part is supplied to the customer.

Moreover, the Defendant completely ignores that the Plaintiff has a legitimate claim of negligence in the performance of modifications, repairs and other procedures on the Slitter. *See, Slate v. Bethlehem Steel Corporation,* 400 Mass. 378, 510 N.E. 2d 249 (1987).    Valmet Converting had ample opportunity to inspect the Slitter and correct the problem remedy the improper switch position.


## II.  FACTUAL BACKGROUND

The Plaintiff does not dispute the background information pertaining to **Proma Technologies**.  Accordingly, for purposes of this Memorandum, the business operations in Franklin, Massachusetts, from 1993 to the present are referred to as "Proma".

The Plaintiff does not dispute the background information pertaining to **Valmet Converting.**  Accordingly, for purposes of this Memorandum, the business operations in Charlotte, North Carolina are referred to as "Valmet Converting".

As indicated in the Defendants memorandum, Proma purchased the Atlas Slitter from Atlas UK in 1992. (Defendants SMF ¶3). The slitter was a model CSE1250R, which was assigned the contract number 92036.  That contract number is unique to that piece of equipment. (SMF¶1).  The contract number distinguishes Proma's Atlas slitter from any other Atlas slitter in America.  Since the slitters are custom built, no two machines are alike. (SMF¶2).

For Proma, the slitter's function was to reduce large sheets of paper into multiple smaller sheets and wind the smaller sheets onto cardboard cores.   (Defendants SMF ¶¶ 4-5).  The slitter can accommodate up to five cardboard cores, each of which is held between two mechanical arms known as rewind arms (Defendants SMF ¶5). Each rewind arm is has a motor which is controlled by a drive board. (Defendants SMF ¶9).  As used herein, "drive" is synonymous with

"drive board". Each drive consisted of a mother board and a daughter card, which controlled the speed of the motor in the rewind arm. (Defendants SMF ¶13).

There is a switch on the daughter board that determines whether the drive operates in tachometer feedback or armature feedback for speed detection. There are no applications at Proma that would use the tachometer feedback. (SMF ¶18). The Atlas UK engineer that originally set the controls on the Slitter in 1993 would have decided that position's setting. (SMF ¶19).

It is undisputed that the setting would not have changed since original design. (Id.). Therefore, from the time of the slitter's installation up until the present, there would be no reason for Proma to ever change that switch. (SMF ¶20).

Once the Atlas Slitter was delivered to Framingham, Massachusetts, Robert Lyons , Valmet's president, became the primary contact for Proma. (SMF ¶4). According to Robert Lyons, "if the machine is built in England and running here, we want them to look to us (Valmet Converting) for spares and service. I would introduce myself and convince them to deal directly with us rather than going back to England for everything." (SMF ¶5).

There are no other facilities in the US, besides Valmet Converting, service Atlas slitters. (SMF ¶38). Valmet Converting does not perform sales or service for any other slitters, other than Atlas slitters. (Id.). Therefore, if the owner of an Atlas Slitter in the US has a problem with their slitter, they call Valmet Converting. (Id.). Further, customers in the US that had Atlas slitters, including Proma, would order spare parts through the customer service department at Valmet Converting who would deal with Atlas UK. (SMF ¶¶ 6-7).

Paul Langley orders the spare drives for Proma. (SMF ¶13). The different drives purchased by Proma all come from Valmet Converting. (Id.). At one time, Mr. Langley

attempted to purchase the drives directly from Infranor, but was unable to do so because he was informed that Infranor produces generic boards that are set up by Atlas. (SMF ¶ 15).

US customers that order drives through Valmet Converting, pay Valmet Converting for the drives; they are not billed by Atlas UK. (SMF ¶ 16).  Under some circumstances the cost to the customer includes any modifications that need to be made to the board to make the board suitable for their particular application. (SMF ¶ 17).  The charge for setting up the boards is in the price of the board. (Id.)

When Proma calls Valmet Converting, the salesperson gets the serial number, then calls Atlas UK and gives them serial number and orders the board. (SMF ¶¶ 8,12).  The records pertaining to that serial number are kept in England. (SMF ¶8).  The unique serial number on the slitter would be used to determine whether there was any special setup on any of the drives. (SMF¶11).  The serial number would identify the setting for the switch.

It is undisputed that Atlas in England absolutely knew the correct position of the switches. (SMF ¶¶ 8, 22).  Valmet Converting also has a copy of the most of the electrical schematics for the Slitters in the US. (SMF ¶9).

Operating guides are provided to customers such as Proma with the equipment.  The operating guides pertain specifically to that individual piece of equipment, and there is a different guide for each piece of equipment. (SMF ¶3).  There is no reference in Proma's operating manual, provided for this piece of equipment, as to the proper position of the switch. (SMF ¶26).  In fact, there are no written materials that indicate that a visual inspection should be done. (SMF ¶25)

Further, the Proma technicians received no training regarding the removal of the drives, the installation of the drives, or the repair of the drives. (SMF ¶27).  No one from Atlas UK or

Valmet Converting ever told David Peavy, the Proma technician, that the switches should be checked when the drives are installed. (SMF ¶28). There has been no testimony that anyone from Valmet Converting ever instructed anyone from Proma to inspect the switch on the daughter card before installing the board. Harold Isherwood, Proma's operations manager, testified that Proma was not provided with any training regarding inspection of the boards. (SMF ¶ 23).

Ron Purcell was responsible for installation, commissioning, operator training, maintenance training and field service and repair of Atlas machines. His training from Atlas consisted of going to England and receiving training on the machines there. (SMF ¶ 30). He acknowledged that Proma would probably not know the specific settings for the boards. (SMF ¶ 31). Nor would the operator of the Slitter know that there was a problem with the drive board. (Id.).

When asked to describe the procedure to change a drive, neither Ron Purcell, the Valmet Converting service manager, nor Robert Lyons, Valtmet Converting's president mentioned any need to inspect the drive when changing it, (SMF ¶24). Not surprisingly, Proma did not check the switches (SMF ¶23). Proma's normal practice was limited to compare a drive that was taken out with that is being put in to assure that they had the right drive. (SMF ¶ 29)

All of the Proma employees that were deposed in connection with this matter, testified that they relied on Valmet Converting to set the switch, and believed that the boards were ready for installation as received. (SMF ¶ 14). Ron Purcell agreed that the drives would be modified before they get to Proma. Specifically, he believed that the switches were set in the correct position before they were sent to Proma. (SMF ¶ 22). Further, he believed that when repaired boards are returned to Proma the switches would not be set. (Id.).

Ron Purcell also provided no training as far as repairing any components on Proma's slitter. Normally if a component part fails the customers are instructed on how to remove the defective one and how to install the new one. (SMF ¶ 38). Not surprisingly, the Proma technicians did not do repairs on the drives or daughter cards (SMF ¶ 37). Instead, when a technician needs to change a drive board they get one from inventory. (Id.).

According to Rick Howe, Valmet's customer service representative, the standard operating procedure for boards that needed to be repaired would be to send the boards to Atlas UK, who would in turn, bulk ship things to Valmet Converting. In North Carolina, Valmet Converting employees would break them down, segregate them, repackage them and ship them to the various customers. (SMF ¶ 39).

If customers had a problem with the Atlas Slitter that their own people cannot solve, they would call in Valmet technicians because the technicians have superior knowledge with respect to those pieces of equipment. (SMF ¶ 40). The Valmet Converting technicians were trained with respect to the proper switch position. They would have been shown specifically. (SMF ¶ 10)

Valmet Converting's service representatives did do service calls at the Proma facility prior to the subject incident. An Atlas (Valmet Converting) engineer visited the Proma facility on January 4th and 5th ,2000. The number one objective was to make "overall check of the machines". After number 1, handwritten note indicates "drive problems". (SMF ¶ 41).

On January 27, 2000, Proma sent an Infranor drive board M59 to Valmet Converting for repair. (SMF ¶ 42). Robert Lyons acknowledged that given that a service technician was there in beginning of January, and 2-3 weeks later Proma sent in a board, it is reasonable to assume that it relates to particular inspection. (SMF ¶ 43). On February 9, 2000, another Infranor drive board M59 was sent by Proma to Valmet Converting to be tested and repaired. (SMF ¶ 44)

From August 2-4[th], 2000, Valmet was at the Proma facility for a service call. (SMF ¶ 45). As part of the service call Valmet may have done a routine inspection of the entire machine. (Id.).

From September 18th-21st, 2000, Valmet was at the Proma facility to "trouble shoot and calibrate drive system on Atlas Slitter". (SMF ¶ 46) This service call may have dealt with the Infranor drive boards. (Id.).

Robert Lyons acknowledged that "trouble shoot and calibrate drive system on Atlas Slitter", means tune it up, get it running properly." (SMF ¶ 46). Robert Lyons further acknowledged that Valmet's service technicians would be expected to know a particular machine's settings. (SMF ¶ 47). It is important to note that there is no way of knowing if a switch is unhooked other than looking at it. (SMF ¶ 21).

On October 24, 2000, Proma sent in an Infranor drive M59 with daughter card for repair. (SMF ¶ 48). Robert Lyons acknowledged that it is possible that one of the problems the technician found on his visit pertained to this particular Infranor drive board. (Id.).

From November 14th-16[th], 2001, Valmet was at the Proma facility for a service call on this Slitter. The service technician was to trouble shoot drives on Atlas Slitter (SMF ¶ 51). In the interval, Proma had continued to order drive boards and send in drive boards for repair. On May 2, 2000, Proma ordered a new Infranor drive board M59 from Valmet Converting. (SMF ¶ 49). On February 6, 2001, Proma sent in an Infranor drive M59 with daughter card to be tested and calibrated. (SMF ¶ 50). On May 18, 2001, Proma sent in two Infranor drives (both M59) for repair. (SMF ¶ 51).

Again, according to Robert Lyons the examination could have involved all of the drives and it is not possible to trouble shoot the drives without doing a physical or visual inspection of

the drives. (SMF ¶ 52).

The Plaintiff's accident occurred on March 22, 2002. After the accident, the Proma technicians first checked the electrical connections and then tested the core and arms. (SMF ¶ 32). The Proma technicians were not able to understand the cause of the accident, and requested service from Valmet Converting. (SMF ¶ 33). The Proma technicians did not remove any of the drive boards from the rewind arms. The drive boards were removed when Ron Purcell came. (SMF ¶ 34)

As of March 2002 David Peavy, a Proma technician, clearly did not have an understanding as to the correct position of the switch, (SMF ¶ 35), since he did not even know enough to check the switch. Ron Purcell's investigation determined that the drive for controlling arm 2 left had the switch in the neither the armature voltage feedback nor tachometer feedback position. Also, arm 2 right was in the correct position, 1 left was in the wrong position, 4 right was in the neither position, and 5 left was in the neither position. (SMF ¶ 36) Further, some drives in the inventory were found to require the latch to be set. (Id.)

After the accident, David Peavy identified the schematic detailing the board in the machine at the time of the accident. (SMF ¶ 56) The document identified by Mr. Peavy has a circle around #2 and a line to note on bottom of page, note says set S-1 to position M55, set S-1 to position 2, M59. (Id.). David Peavy believes that Ron Purcell circled the number 2 after the accident, when Mr. Purcell was explaining to him that he had found the switch unhooked. (SMF ¶ 57). Clearly, by circling the 2 position, Mr. Purcell identified the board that was the subject of the malfunction as an M59. Ron Purcell testified that he had visited Proma on a number of occasions and does not recall seeing any M55s. (SMF ¶ 55).

Ron Purcell soldered the switches on Proma's other boards while he was at Proma conducting his investigation.. (SMF ¶ 58). According to Mr. Purcell, soldering the hooks is not expensive or time consuming. (Id.). Further, hooking the switch permanently does not compromise the operation of the machine. (SMF ¶ 59). In fact, Ron Purcell does not know why the switches were not soldered prior to the accident. (SMF ¶ 60). Robert Lyons agreed that if the switch was hooked permanently prior to this accident it may not have happened. (SMF ¶ 61).

It is undisputed that if the speed control switch had been set properly, the core would not have been ejected. (SMF ¶ 62). If the speed control switch had been set correctly, the fact that the arms lifted off would not have caused the core to eject. (Id.).

### III. SUMMARY JUDGMENT STANDARD

The party moving for summary judgment has the "burden of affirmatively demonstrating that there is no genuine issue of fact on every relevant issue raised by the pleadings". *Attorney General v. Bailey*, 386 Mass. 367, 371, *cert. denied*, 459 U.S. 970 (1982), quoting *Mack v. Cape Elizabeth School Board*, 553 F.2d 720, 722 (1st Cir. 1977), Mass.R.Civ.P. 56c), 365 Mass. 824 (1974). The determination of which facts are material is based on the substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*, at 248. A dispute about a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party. Rivera-Muriente v. Agosto Alicea, 959 F.2d 349, 352 (1st Cir. 1992).

## IV. DISCUSSION

The Plaintiff disagrees that there is no evidence to identify, in terms of supplier or time of supply, the daughter board assigned to Rewind Arm 2Left at the time of the malfunction or to determine when the switch became improperly positioned.

The Defendants contention that the Plaintiffs cannot demonstrate that the board was supplied by Valmet is without merit. After the accident, Ron Purcell, the Valmet service technician conducted an investigation to identify the cause of the accident. He identified the improperly positioned switch on the daughter board assigned to Rewind Arm 2Left. He testified that he had never seen any M55 drives at Proma in the times that he had been at Proma for service calls. Further, according to David Peavy, a Proma technician, after the accident, Mr. Purcell showed him in the proper positioning of the switch as identified in the electrical schematics. Mr. Purcell circled position number 2, which is the correct position for the **M59s.** At least by 1995, the M55s had been discontinued and replaced by M59s. Thereafter, all boards supplied were M59s. The Defendant's contention that the board involved in this litigation may have been an M55, supplied with the original slitter in 1993, is clearly erroneous.

Further, it is undisputed that Proma purchased all of their drive boards from Valmet. Proma has produced records identifying the purchase of drive boards from 1997 to 2002. Further, Proma has records identifying boards returned to Valmet for repair during that period. These documents clearly show that a number of boards have passed through Valmet. Neither Proma nor Valmet has produced any document indicating any other source.

The fact that Valmet purchased the drives from their supplier, Atlas UK, is insignificant. Once they were received by Valmet, they were repackaged and relabeled before being shipped to Proma. Proma paid Valmet for the drive boards, not Atlas UK.

This is of the Defendants own doing. Valmet set themselves up as the sole supplier of new boards to customers with Atlas Slitters in the US. They met with customers as soon as the machine was installed to encourage them to use Valmet Converting for their sales and services.

Contrary to the Defendants assertion these drives are not fungible, generic goods. There is a specific serial number for the Proma Slitter that corresponded to a specific schematic that identified the correct switch position. Even the Defendant's witnesses testified that the switch would have been set before the drive was sent to Proma. Again, this was by the Defendants own doing, to prevent Proma from purchasing the drives elsewhere.

The nature of the product, being a unique product not available from any other supplier, guaranteed that Proma would do business with Valmet Converting. Since the sale of new boards and repair of used boards necessarily went through Valmet Converting, there are no other sources for the supply of boards at the Proma facility.

If you accept as true, the Defendants identification of Valmet Converting, that prior to 1997, Valmet Converting consisted of several independent companies including Atlas Group, Americas, f/k/a Atlas Converting Equipment, USA, then there is indeed sufficient evidence that Valmet Converting supplied the daughter board.

Further, Valmet had ample opportunity to inspect the drives when they repackaged them in North Carolina to determine whether the switch had been set properly. Valmet had superior knowledge regarding the function of the switch and the correct setting. Ron Purcell and Ricky Howe both testified that they believed that the switch was set in England. No one trained the Proma employee's regarding any inspection to be done prior to putting in new board.

Finally, Valmet Converting had yet another opportunity to inspect the drives and correct any incorrectly positioned switches when they were at the Proma facility for service calls.

11

During the two years prior to this accident, Valmet service technicians were at the Proma facility at least four times, January 2000, August 2000, September 2000, and November 2001. Throughout that period at least six boards were sent in wither to be repaired or replaced and Proma purchased a new board. Given the spatial relationship between the service calls and the shipment of the boards to Valmet, even Robert Lyons conceded it was likely that the service calls pertained to the drive boards.

The post accident investigation revealed that three other boards, including some in inventory, did not have switch in proper position. Valmet Converting had ample opportunity to discover this prior to the accident and failed to do so. The improper switch position resulted in the malfunction on March 22, 2002.

John Orlowski, P.E., CSP, BCFE, has been identified as an expert to testify on behalf of the Plaintiff. As is demonstrated in the Plaintiff's Opposition to the Defendant's Motion in Limine to Exclude Expert Testimony[1], John Orlowski has opined that he believes this accident was caused because the switch was not properly set, such that if the torque was reduced, had the switch been properly set, it would have prevented an overspeed of the motors. According to Mr. Orlowski, Valmet was obligated to supply the specific part that was ordered. The part that was ordered was a unique part that went into a unique piece of equipment. Orlowski's testimony was simply that as a supplier of the drive board, which they knew was a unique piece of equipment, they had an obligation to ensure that the product supplied was the product ordered. Therefore, it is not proper for a supplier such as Valmet Converting to furnish a drive board with a switch that

---

[1] The Plaintiffs Opposition to the Defendant's Motion in Limine to Exclude Expert Testimony has been filed separately with this Memorandum and contains a full discussion of the qualifications of John Orlowski and the subject matter to which he is expected to testify. Accordingly, for the convenience of the Court, the Plaintiff will not repeat that discussion here, but incorporates by reference, as if fully set forth herein, Plaintiffs Opposition.

is not set. If a supplier cannot ensure the switch will remain in its proper position then it should not be a switch. In that case it could be permanently latched or soldered.

Mr. Orlowski therefore opined that Valmet Converting was negligent in failing to inspect the switch on the drive board prior to shipping the board to Proma and in failing to set and secure the switch on the drive board prior to shipping the board to Proma. Valmet does not need to redesign or remanufacture the part to ensure it is the part ordered. Ron Purcell testified that the switch could be soldered easily, inexpensively, and without compromising the integrity of the drive.

Alternatively, Mr. Orlowski opined that Valmet Converting was negligent in failing to instruct Proma to check the drive board switch for proper location. Mr. Orlowski opined that Valmet Converting technicians were on site at Proma for service calls and failed to avail themselves of the opportunity to instruct the Proma employees about the switch setting.

## V. ARGUMENT

A.    THERE IS EVIDENCE THAT VALMET CONVERTING SOLD THE DAUGHTER BOARD THAT WAS ASSIGNED TO REWIND ARM 2LEFT AT THE TIME OF THE ACCIDENT

The Defendant has made the preposterous statement that there is no evidence that the daughter board assigned to Rewind Arm 2Left at the time of the accident was supplied by Valmet Converting. They are, however, unable to state how Proma would obtain a drive, that has to be special ordered from Valmet Converting, without getting it from Valmet Converting. Even the Valmet Converting witnesses agreed that they were the only game in town.

The Defendant then goes on to refer this Court to cases that have little in common with the instant action.    In *Mathers v. Midland-Ross Corporation*, 532 N.E. 2d 46 (1989), the Plaintiff could not offer any facts which would show or least raise a factual issue as to whether Midland manufactured the machine involved in his accident. To contrary, the Plaintiff in this

case has sufficient evidence to support a finding that Valmet Converting supplied the drive board. A supplier of a component part has been held liable for failure to test the part before delivery. *Jennett v. Colorado Fuel & Iron Corp.*, et al, 9 Mass.App.Ct. 823, 398 N.E.2d 755 (1980).

In *Carrier v. Riddell*, 721 F.2d 867 (1st Cir. 1983), the Plaintiff sued the manufacturer of football helmets, but not necessarily the manufacturer of the football helmet involved in the accident. The Plaintiff made no claim that Riddell manufactured the helmet that caused the injury. That case is completely different from the facts in this matter.

Further, the Defendant relies on *Garcia v. Kusan*, 655 N.E.2d 1290 (Mass. App. Ct.1995), which involves a case against the manufacturers of a game, as opposed to a hockey stick. In that case the court held that liability can not be imposed based on the Defendants dissemination of product literature of rules of the game in the absence of evidence that the Plaintiff's injury was caused by any equipment made or supplied by the Defendant. *Id.* at 1295. That case is not at all similar to the instant action.

The Defendant has offered no case law to support its argument that the supplier of a component part specifically modified for the customers unique application has no duty to verify that the modification is done before the part is supplied to the customer.

In the instant action there is ample testimony that the daughter board assigned to Rewind Arm 2Left at the time of the accident was supplied by Valmet Converting. There is no evidence that boards were ever purchased from unknown suppliers, and it is difficult to imagine how they could have been. Further, one would think that Ron Purcell would have pointed out that it was not one of the boards that Valmet Converting had supplied at the time of his investigation.

The Plaintiff has shown by the weight of the evidence that Valmet Converting was the supplier of the board involved in the malfunction that resulted in the Plaintiff's injuries. Accordingly, Plaintiff's claim cannot be dismissed for a lack of proof.

B.    PLAINTIFF'S CLAIMS DO NOT FAIL FOR LACK OF EXPERT TESTIMONY

As addressed in the Plaintiff's Memorandum in Opposition to the Defendants Motion in Limine to Exclude, John Orlowski P.E., CSP, BCFE, has opined that he believes this accident was caused because the switch was not properly set, such that if the torque was reduced, had the switch been properly set, it would have prevented an overspeed of the motors. According to Mr. Orlowski, Valmet was obligated to supply the specific part that was ordered. The part that was ordered was a unique part that went into a unique piece of equipment. Orlowski's testimony was simply that as a supplier of the drive board, which they knew was a unique piece of equipment, they had an obligation to ensure that the product supplied was the product ordered. Therefore, it is not proper for a supplier such as Valmet Converting to furnish a drive board with a switch that is not set. If a supplier cannot ensure the switch will remain in its proper position then it should not be a switch. In that case it could be permanently latched or soldered.

Mr. Orlowski therefore opined that Valmet Converting was negligent in failing to inspect the switch on the drive board prior to shipping the board to Proma and in failing to set and secure the switch on the drive board prior to shipping the board to Proma. Valmet does not need to redesign or remanufacture the part to ensure it is the part ordered. Ron Purcell testified that the switch could be soldered easily, inexpensively, and without compromising the integrity of the drive.

Alternatively, Mr. Orlowski opined that Valmet Converting was negligent in failing to instruct Proma to check the drive board switch for proper location. Mr. Orlowski opined that Valmet Converting technicians were on site at Proma for service calls and failed to avail themselves of the opportunity to instruct the Proma employees about the switch setting.

Mr. Orlowski's opinions are based on his background, expertise and years of experience in the field of management and machine design engineering, and recognized principles of machinery safety relating to specific issues raised by the events in this case. Mr. Orlowski's expertise includes drafting and design of diverse machinery, including web-handling equipment such as winders and slitters, conveyors, machine tools and related controls, safety devices and warnings and experience with the distribution of component parts.

The Plaintiff submits that the testimony of John Orlowski meets the prerequisites of admissibility under Fed. R. Evid. 702 and that the Defendant's motion should thereby be denied.

## C.    PLAINTIFFS THEORIES OF LIABILITY AGAINST VALMET CONVERTING DO NOT FAIL AS A MATTER OF LAW

The Defendants final argument is that Valmet Converting had no obligation to modify the daughter board prior to the sale to Proma and to warn Proma to check the switch for proper positioning prior to installing the board. This argument is without merit as it is based on case law completely irrelevant to the instant action.

The Defendant relies on *Mitchell v. Sky Climber, Inc.* 487 N.E.2d 1374 (Mass. 1986) and *Cipollone v. Yale Industrial Products, Inc.* 202 F.2d 376 (1st Cir. 2000) to support its contention that they are relieved for liability for negligence since they are the suppliers of a non-defective component part. However, unlike the products in *Mitchell* and *Cipollone,* the drive board at issue in the instant case cannot be considered a "component part" in the sense that that term is used in *Mitchell* and *Cipollone.* Those cases clearly involved generic parts. The Infranor drive was generic only as it was purchased by Infranor. As soon as it passed through Atlas UK to

16

Valmet Converting it was not generic. It was, therefore, not strictly a component part. There was no evidence in *Mitchell* and *Cipollone* that the parts were modified in any way for their use by the purchaser.

Further, *Freitas v. Emhart Corp.*, 715 F.Supp. 1149 (D. Mass. 1989), involves the supplier of parts that were not involved in the Plaintiff's accident. *Enrich v. Windmere Corporation*, 616 N.E. 2d 1081 (Mass. 1993), involves a claim against a Defendant that may have been a distributor only of a fan manufactured by another entity. Further, no evidence that fan caused fire.

Clearly, in the instant case Atlas UK and Valmet Converting have a relationship other than simply the distribution of parts. Atlas USA had originally been a subsidiary of Atlas UK. All service of Atlas Slitters in the US went through Valmet Converting to Atlas UK. The purchase of parts for the Atlas Slitters in the US went through Valmet Converting to Atlas UK. The evidence clearly points to the contention that Valmet Converting is more than simply a distributor of Atlas UK's parts. To suggest otherwise is absurd.

Valmet Converting held out the drive boards as their own product. They repackaged them upon receipt of the bulk shipment from Atlas UK and billed Proma as if it was their product. The Massachusetts Appeals Court has accepted that "one who puts out as his own product **a** chattel manufactured by another is subject to the same liability as though he were its manufacturer." *Fahey v. Rockwell Graphic System*, 20 Mass.App.Ct. 642, at 650, quoting Restatement (Second) of Torts § 400 (1965). There is sufficient evidence in the record to establish that a genuine issue for trial exists as to Valmet Converting's liability as apparent manufacturer.

It is well settled that one who supplies a product is under the same duty to warn and to use reasonable care to make a safe product as the manufacturer. Restatement, Second, Torts, §389, imposes liability for physical harm on one who supplies a product directly. A supplier can be liable for a failure to provide adequate warning or instructions with product. MacDonald v. Ortho Pharmaeutical Corp. 394 Mass. 131 (1985). There is sufficient evidence that Valmet

17

Converting did not provide sufficient instructions when the boards were sent to Proma and failed to provide instructions while at Proma for service calls.

Although there was no written service agreement, the facts support a finding that both Proma and Valmet considered Valmet to be the service provider. Robert Lyons testified that he wanted Proma to believe that Valmet was their service provider and encouraged Proma to rely on Valmet. Massachusetts recognizes that "a duty voluntarily assumed must be performed with due care, and… has approved the principles pertaining to voluntary assumption of a duty as set forth in the Restatement (Second) of Torts §323 (1965). *Cottan v. CVS Pharmacy*, 764 N.E.2d 814, 821-822 (Mass. 2000), quoting *Mullins v. Pine Manor College*, 449 N.E. 2d 331, 336 (Mass. 1983.

Valmet did respond to service calls placed by Proma on several occasions prior to this accident. On at least two such occasions, the problems related to the Atlas drives. Further, purchase orders generated after the sales calls provide support for the fact that the service calls directly pertained to the Atlas Slitter drives and/or the Infranor drives.

The Defendant fails to discuss at all that Valmet Converting performed repair services at the Proma facility. In the instant action, liability can be predicated on the negligent performance of modifications, repairs and other procedures on the Slitter. *See, Slate v. Bethlehem Steel Corporation,* 400 Mass. 378, 510 N.E. 2d 249 (1987).

VI. CONCLUSION

The facts of the instant case, in the light most favorable to the Plaintiff, indicate that there are genuine issues of material fact which preclude entry of summary judgment in favor of any of the defendants.

Wherefore, for all of the reasons set forth above, the Plaintiff respectfully requests that this Honorable Court deny the Defendants' Motion for Summary Judgment on Counts III and VII of the Plaintiffs' Amended Complaint.

Respectfully Submitted,

/s/_____Maureen Counihan_____
Maureen Counihan, Esq. (B.B.O. #549098)
Law Offices of Maureen Counihan, P.C.
67 South Bedford Street
Suite 400 West
Burlington, MA  01803
(781) 229-5884

*Attorney For Plaintiff Ciriaco Pucillo*

Dated: July 31, 2006