

# FORENSIC ENGINEERS & TECHNOLOGISTS

John M. Orlowski, P.E., CSP, BCFE, Director
11 Vanderbilt Avenue, Suite 120
Norwood, Massachusetts 02062-5056

PHONE: (781)762-8377
FAX: (781)762-1862
general@fet-forensics.com
www.fet-forensics.com

January 4, 2006

TECHNICAL REPORT TO
    Maureen Counihan, Esquire
    Law Offices of Maureen Counihan, P.C.
    67 South Bedford Street – Suite 400 West
    Burlington, MA   01803

      RE:  Ciriaco Pucillo
      Vs.:  Metso Paper, Inc. and Valmet Converting, Inc.
          U.S. District Court C.A. No.:  03-CV-12359 ML W
          Date of Injury:   March 22, 2002
          F.E.T. File No.:  2809.1-P

## I.   INTRODUCTION

A.  I was retained to conduct an accident investigation relative to injuries sustained by Ciriaco (Jerry) Pucillo on an Atlas slitter rewinder. The slitter rewinder was designed to take a large paper roll and slit the paper into two or more narrower paper rolls. The machine was comprised of the following basic sections: an unwind stand; a series of rolls through which the paper web is threaded; a slitting assembly; and rewind stations.[1] Each rewind station essentially consisted of pivoted rewind arms with chucks, with one or both arms driven by pancake motors. A core is mounted between the rewind arms and secured by the chucks as a prelude to rewinding a slit web. The paper must be properly aligned prior to engaging the rewinding operation at full speed. An assistant initially operates the machine in jog mode to facilitate the set-up. It was during this condition of machine set-up that Mr. Pucillo sustained his injuries. The paper roll core had been mounted on the rewind arm chucks. The core was positioned against the winding drum. Jerry Pucillo was standing in proximity to the core. The

---

[1] Refer to the illustrations in Appendix A of this report and a machine schematic and threading diagram reproduced from the Atlas operating guide included in Appendix F of this report.

second operator, Bill Dunne, had engaged the machine in the jog mode. Suddenly, and without warning, the winding core accelerated to a high speed in less than five seconds. As a result of the overspeed of the winding core, the core was ejected, striking Jerry Pucillo in the face, causing serious injury. Mr. Pucillo was employed by Proma Technologies, 24 Forge Park, Franklin, MA, at the time of his accident.

B.   I conducted an inspection of the Atlas slitter rewinder on November 19, 2002. At that time, I met with and conferred with Nancy P. Johnson, Steve Bagley, and others employed by Proma Technologies. In addition to inspecting the basic machine, I examined the drive control boards associated with the operation of the rewind motors. I also looked at, and presently have in my possession, the rewind core that struck Mr. Pucillo in the face.

C.   I performed my assignment in this case by utilizing methods used by other professional engineers engaged in the profession of accident investigation and analysis. Prior to stating my opinions, an outline of my experience, training and education in machine design and safety follows.


II.   **BACKGROUND, QUALIFICATIONS AND METHODOLOGY**
A.   Selected illustrations of the machine are provided in Appendix A.
B.   My curriculum vitae is provided as Appendix B.
C.   A list of items, materials and documents I reviewed relating to my investigation and analysis is provided as Appendix C.
D.   My prior four years of trial testimony and deposition testimony is included as Appendix D.
E.   My fee schedule is provided as Appendix E.
F.   Machine schematic and threading diagram is included as Appendix F.
G.   My opinions are based on my background, expertise and experience in the field of management, machine design engineering, and recognized principles of machinery safety relating to specific issues raised by the events in this case.
H.   My expertise includes machine drafting and design of diverse machinery, including web-handling equipment such as winders and slitters, conveyors, machine tools and related controls, safety devices and warnings.
I.   My background and training include:

1.   Utilizing general principles of engineering and safety in the design, operation, and maintenance of machinery and equipment, including basic laws of physics and their application to the design of machines.

2.    Since performing forensic investigations on a full-time basis, I have continued to analyze machine designs with regard to safety and human factors analysis. I co-authored *Engineering Aspects of Guarding of Machinery and Equipment* for "Products Liability," edited by Frumer and Friedman, published by Lexis Nexis Matthew Bender & Co., Inc. I updated this publication in 1994 for inclusion in release 66 of "Products Liability." I authored a further update of this publication in 2005 for inclusion in release 98 of "Products Liability." I also updated *Power Lawn Mowers* for inclusion in release 101 of "Products Liability," published in December of 2005.

J.    My opinions are based on my experience, training, background, and my inspection and analysis of the Atlas slitter rewinder, its component parts and its operations; a review of items, materials and documents listed in Appendix C; and the analysis of the use of the slitter rewinder under foreseeable operator conditions.

## III.  DESCRIPTIVE INFORMATION

A.    Proma Technologies was in the business of manufacturing metallized paper. Manufacturing metallized paper is a multi-stage process that begins with coating the paper with a lacquer. The lacquered paper is dried and moved to the metallizer where aluminum is deposited on the paper in a high vacuum. The metallized paper is then placed in the coating-priming machine where lacquer is placed on top of the aluminum. At the completion of the final coating process, the roll is taken to the slitting machine to be slit into rolls of various widths and diameters.

The Atlas slitter rewinder was purchased in 1992 for the specific purpose of slitting metallized paper. The equipment was designated model CSE1250R, serial number 92036. The slitter rewinder could handle rolls that are ninety-four inches wide and seventy inches in diameter. The machine processed paper at speeds up to 3000 feet per minute (fpm). The machine was designed to accommodate up to five cores on the rewind stations. Each rewind arm chuck was driven by a 4.5 kw pancake motor. In addition, there was one left hand and one right hand non-driven rewind arm. These arms could be paired with a driven arm to rewind narrow width, slit paper.

The rewind arm motors were controlled by a drive board supplied to Proma Technologies by Atlas/Valmet. Each drive consisted of a motherboard and daughterboard. The drive was generic to the extent that the daughterboard was furnished with a switch that could be set in one of two positions depending on the specific application. The switch

F.E.T. FILE NUMBER: 2809.1-P

consisted of a spring-loaded piece of wire that could be placed under one of two hooks, in position 1 or position 2. Alternatively, the switch could be placed in neither the 1 nor the 2 position, but simply left open.

Ronald Dean Purcell was a senior field service technician with the manufacturer of the slitter rewinder. Mr. Purcell worked with Greg Hagopian, and others from Proma Technologies, post accident, to attempt to determine the cause of the events that led to Jerry Pucillo's injuries. After discounting all other causes, the drive boards were investigated. The following findings were documented: the drive for winding arm 2 left had the switch in neither position; 2 right was in the correct position; 1 left was in neither position; 5 left was in neither position; and the remainder of the drive switches were set properly. It was concluded that an incorrect switch setting on a drive board caused the rewind core to accelerate to high speed, resulting in Mr. Pucillo's accident. Ronald Purcell soldered the switches at Proma Technologies in the proper position.

## IV. DISCUSSION AND ANALYSIS

A. It is axiomatic that replacement components for equipment conform to original machinery items and specifications. This is essential to safety and to insure that machinery will function as originally intended. Where a purchased component requires a modification or adjustment by the machine manufacturer, such modification must be specified and identified by a part number assigned by the equipment manufacturer. In a typical machine design engineering/manufacturing environment, all manufactured and purchased components are assigned a part number. A manufactured part must be depicted on an engineering drawing. A purchased component may be illustrated on a drawing showing any specific settings or modifications, or may be identified by description and part number. Again, the description must be specific to insure that the original component and all subsequent replacement parts are essentially identical. It was essential that Atlas/Valmet[2] follow the above procedures when furnishing drive control boards to Proma Technologies. Robert Lyons, former vice president of Atlas/Valmet, testified that Atlas/Valmet did, in fact, assign their own part number to drive boards.[3] However, subsequent testimony by Mr. Lyons, and others, indicated that Atlas/Valmet failed to establish any definitive procedure for insuring that the switches on the drive boards were checked and properly set by Atlas in England or in the Charlotte, NC Atlas/Valmet facility, prior to final shipment to Proma Technologies. Consider the following testimony by Mr. Lyons:[4]

---

[2] Valmet purchased Atlas' NC facility in the year 2000.
[3] Deposition transcript page 71, lines 1 through 4, inclusive.
[4] Deposition transcript page 60, lines 19 through 25, and page 61, lines 1 through 7, inclusive.

F.E.T. FILE NUMBER: 2809.1-P

| | | |
|---|---|---|
| 19 | Q. | If Van Leer wanted to purchase a new Infranor drive board for |
| 20 | | use in one of their rewind arms, am I correct that one of their |
| 21 | | options would be to contact Atlas or Valmet, whatever you |
| 22 | | were calling yourself at the time, in North Carolina and |
| 23 | | purchase the drive board that way, correct? |
| 24 | A. | Yes. |
| 25 | Q. | And when that order came into Atlas or Valmet, did Van Leer |
| 1 | | specify the setting for the switch? |
| 2 | A. | I don't know. |
| 3 | Q. | Do you know what the procedure was in order to purchase that |
| 4 | | board? |
| 5 | A. | There would not have been any specific procedure. They |
| 6 | | would have ordered the board. We would have sent them the |
| 7 | | board. |

Mr. Lyons further testified that he doesn't know if the switches on the drive boards were set prior to the drive boards being shipped by Atlas in England. This fact notwithstanding, Mr. Lyons testified that no inspections or checks of switch positions were conducted in the NC facility when the boards were received. The following was extracted from Mr. Lyons' transcript:[5]

| | | |
|---|---|---|
| 24 | Q. | So you don't have any information regarding whether or not |
| 25 | | that switch was set on a new board before it left England? |
| 1 | A. | I don't specifically, no. |
| 2 | Q. | And Atlas Valmet doesn't do any inspections of the boards |
| 3 | | when they come from England, before they're sent out to |
| 4 | | the customer. Is that correct? |
| 5 | A. | I'm not aware of any inspections we do on parts we get from |
| 6 | | our parent – you know, from our division in England. |
| 7 | Q. | Well, when a board comes in from England, what happens to |
| 8 | | that board in order to then get it to the customer in the states? |
| 9 | A. | Normally it comes in, in a consolidated shipment, so there will |
| 10 | | be parts in the shipment for other – so it's just segregated and |
| 11 | | repackaged, and sent off to the customer. |

---

[5] Deposition transcript page 71, lines 24 and 25, inclusive, and page 72, lines 1 through 11, inclusive.

F.E.T. FILE NUMBER: 2809.1-P

Similar testimony about the absence of any definitive procedure to set the drive board switches was elicited from other knowledgeable Atlas/Valmet employees. The following testimony was given by Atlas/Valmet senior field service technician, Ronald Dean Purcell:[6]

| | | |
|---|---|---|
| 20 | Q. | Am I correct those are switches that are |
| 21 | | spring-loaded wires?  Is that a simple way to |
| 22 | | describe them? |
| 23 | A. | Yes. |
| 24 | Q. | Who sets those switches? |
| 25 | A. | I don't know. |
| 1 | Q. | Who would know? |
| 2 | A. | Someone in the UK. |

Proma Technologies' personnel testified that they never received any instructions about setting switches on the drive boards.  They had no knowledge of any obligation on their part to adjust or modify any part they purchased from Atlas/Valmet.  Proma Technologies would had every reasonable expectation that any component they purchased from Atlas/Valmet, including the drive boards, would be compatible with their equipment, without modification.  Ronald Dean Purcell testified[7] that Proma Technologies did not change their application from that of the equipment originally supplied.  This would negate any necessity for having an alternate switch position on the drive board from that originally supplied with the Atlas slitter rewinder.

In summary, there has been no testimony or documentation to show that Atlas/Valmet specified the switch position setting when purchasing the drive boards.  There has been no testimony or documentation to show that Atlas in England set the switches on the drive boards prior to shipping the components to the United States.  And there has been no evidence that the Atlas part number assigned to the drives included any specifications for setting the switches.  There has been testimony that Atlas/Valmet in NC did not check or set the switches on the drive boards prior to sending the items to Proma Technologies.

A proper and necessary procedure by Atlas/Valmet would have been to inspect and set the switches and fix the switches in position, as, for example, by soldering, prior to

---

[6] Deposition transcript page 66, lines 20 through 25, inclusive, and page 67, lines 1 and 2.
[7] Deposition transcript page 74, lines 3 through 9, inclusive.

F.E.T. FILE NUMBER: 2809.1-P

shipment. Atlas/Valmet could have, and should have, added an instruction – such as a simple decal with the package – to inspect the switch for proper location. This procedure would have averted Jerry Pucillo's injuries.

B.  Robert Lyons testified that Atlas/Valmet provided extensive training to operators and maintenance personnel in conjunction with installing a machine.[8]  When queried specifically about setting the switch on the drive boards, the following was transcribed:[9]

| 22 | Q. | Do you go through the electrical schematics with them? |
|----|----|--------------------------------------------------------|
| 23 | A. | Yes. |
| 24 | Q. | And do you go through all the potential switch settings? |
| 25 | A. | I don't know. |

Ronald Dean Purcell also testified that he was unaware of anyone from Atlas/Valmet providing any training or instructions to Proma employees with respect to setting the switch on the Infranor drive boards.[10]

In addition to providing training during equipment installation, Atlas/Valmet technicians were on site at Proma Technologies for service calls on at least three occasions, and possibly more.  The Atlas/Valmet technicians again failed to avail themselves of the opportunity to instruct Proma employees about an item that was crucial to machine operation and operator safety.  When asked about this subject, Ronald Dean Purcell responded as follows:[11]

| 25 | Q. | Prior to March of 2002, with this |
|----|----|-----------------------------------|
| 1  |    | accident, do you have any memory of ever telling |
| 2  |    | anyone at Van Leer or Proma that the switch |
| 3  |    | needed to be checked before a new board was |
| 4  |    | installed? |
| 5  | A. | No. |

Furthermore, there were no instructions in the Atlas Operating Guide about the necessity for properly setting the drive switches.  Nor were there warnings about the potential devastating consequences should the switches be improperly set.  There were no

---

[8] Deposition transcript page 64.
[9] Deposition transcript page 64, lines 22 through 25, inclusive.
[10] Deposition transcript page 113, lines 22 through 25, inclusive.
[11] Deposition transcript page 119, line 25, and page 120, lines 1 through 5, inclusive.

F.E.T. FILE NUMBER:  2809.1-P

instructions included with the drive boards about proper setting of the switches. Nor were there specific notations on the electrical schematics calling the users attention to the correct switch location shown on the drawings.

The purpose of instructions and warnings is to control or modify the reasonably fore-seeable behavior of individuals in order to prevent personal injury. In order to accom-plish its intended purpose, a warning must be designed and located to immediately rivet one's attention. This is done in several ways. A warning must be of sufficient size to be conspicuous. Also, a warning crucial to safety, as was necessary in this case, should be placed in more than one location on the machine to ensure that it will be seen and read. The warning must contain an appropriate signal word alerting one of a hazard. The two most effective signal words are Danger and Warning. An addi-tional way of grabbing one's attention is through the use of colors. Red, yellow and orange are common. The warning must be forceful enough to alter a user's behavior. The warning must be intense and communicate a sense of urgency. A warning that lacks intensity will tend to minimize the potential for danger.

The absence of instructions and warnings on the machine, in the manual, and with the drive boards, contributed to the cause of Jerry Pucillo's injuries. Instructions and warnings must not, however, be used in lieu of, but as an adjunct to, safe quality con-trol procedures. In this case, a safe quality control procedure would have included permanently securing the drive switches in position. Atlas/Valmet had opportunity to inspect and secure the switches prior to shipping the drive boards to Proma Technolo-gies.

## V.   SUMMARY OF FINDINGS

A.   It is my professional opinion, to a reasonable degree of certainty, subject to supple-mentation should additional relevant information become available, that:

1.   Atlas/Valmet was negligent in failing to inspect the switch on the drive board prior to shipping the board to Proma Technologies;.

2.   Atlas/Valmet was negligent in failing to set and secure the switch on the drive board prior to shipping the board to Proma Technologies;

3.   Atlas/Valmet was negligent in failing to instruct Proma Technologies to check the drive board switch for proper location;

F.E.T. FILE NUMBER:  2809.1-P

4.  the negligence of Atlas/Valmet caused the Atlas model CSE1250R slitter re-winder to operate in an unreasonably dangerous manner; and

5.  the negligence of Atlas/Valmet, and the unreasonably dangerous operation of the Atlas model CSE1250R slitter rewinder, as described in this report and outlined above, was a direct and proximate cause of Jerry Pucillo's accident and consequent injuries.

Submitted by:

John M. Orlowski, P.E., CSP, BCFE
Director

2809rpt





# Appendix  B



## FORENSIC ENGINEERS & TECHNOLOGISTS

John M. Orlowski, P.E., CSP, BCFE, Director
11 Vanderbilt Avenue, Suite 120
Norwood, Massachusetts 02062-5056

PHONE: (781)762-8377
FAX: (781)762-1862
general@fet-forensics.com
www.fet-forensics.com

### JOHN M. ORLOWSKI, P.E., CSP, BCFE
*Curriculum Vitae*

**EXPERIENCE SYNOPSIS**

Background encompasses over 45 years of diversified drafting, design engineering and consulting experience. Has been in responsible charge of significant engineering work in such diverse project areas as chemical processing machinery, material handling equipment, paper roll systems, and predominantly, machine tools. Provides consulting services to attorneys and the insurance industry in products liability cases, fall down incidents, vehicular accident reconstruction, and other personal injury cases, as well as damage assessment to high technology equipment.

**FIELDS OF EXPERTISE**

Accident Investigation/Reconstruction
Machine Guarding/Safety
Product Safety Evaluation
Ladders and Scaffolds

Automobile Accidents
Safety Standards/Regulations
Building Codes
Premises Liability

**PROFESSIONAL LICENSES**

Licensed Professional Engineer in Massachusetts, License #29341
Licensed Professional Engineer in New York State, License #55671
Licensed Professional Engineer in Maine, License #6208

**PROFESSIONAL CERTIFICATION**

Board Certified Safety Professional in Engineering Aspects, Certification #9231
Board Certified Forensic Examiner, Certification #3784

**PROFESSIONAL AFFILIATIONS**

Executive Committee Member of the Automotive, Metals and Power Press Section
    of the National Safety Council
Diplomate: American College of Forensic Examiners International
Member of the ASTM International F-13 Committee on Pedestrian/Walkway Safety
    and Footwear
Member of the American Society of Safety Engineers
Member of the American Society of Mechanical Engineers
Member of the Society of Automotive Engineers

## EDUCATION

Bachelor of Science in Mechanical Engineering, LaSalle University, Mandeville, LA. Additional short courses and seminars including, but not limited to, *vehicle dynamics for passenger cars and light trucks, air bag sensor design, vehicular accident reconstruction, fluidic circuitry design* and *machinery safeguarding.*

## PRINCIPAL PUBLICATIONS

Mr. Orlowski has co-authored *Engineering Aspects of Guarding of Machinery and Equipment* for release 39 of "Products Liability," edited by Frumer and Friedman, published by Lexis Nexis Matthew Bender & Co., Inc. This publication was updated by Mr. Orlowski in 1994 for inclusion in release 66 of "Products Liability." This publication was again updated by Mr. Orlowski in 2005, for inclusion in release 98 of "Products Liability." Mr. Orlowski has updated Chapter 100 of Frumer and Friedman's "Products Liability" entitled *Power Lawn Mowers. Power Lawn Mowers* was published by Lexis Nexis Matthew Bender & Col., Inc. in 2005. Mr. Orlowski is also a contributing author to "Forensic Accident Investigation: Motor Vehicles," edited by Dr. Thomas L. Bohan and Dr. Arthur Damask, published by the Lexis Nexis Matthew Bender & Co., Inc. in 1995. Mr. Orlowski authored Chapter 5 entitled *The Effects of Payload on Large Truck Rollover.* He also authored the "2001 Cumulative Supplement Volume I" to Chapter 5, which addresses the issue of SUV rollover threshold. Submitted materials for inclusion in "The Comprehensive Forensic Services Manual" by Steven Babitsky, JD, et als, published by SEAK, Inc., in 2000. Contributed to "Cross Examination: The Comprehensive Guide for Experts" by Steven Babitsky, JD, et al, published by SEAK, Inc., in 2003.

## BUSINESS EXPERIENCE

*03/88-present*:         **DIRECTOR**
                        Forensic Engineers & Technologists
                        Norwood, Massachusetts

Is the owner and director of Forensic Engineers & Technologists. Functions primarily as a forensic consulting engineer. Also assigns, interfaces with, and directs activities of engineers and technical personnel in diverse consulting case investigations. Provides expert witness testimony as needed.

*01/82-06/94*            **DIRECTOR**
                        Orlowski & Associates
                        Norwood, Massachusetts

Functioned primarily as a forensic consulting engineer. Provided assistance to the legal sector in products liability and damage assessment cases. Also provided design-engineering services to industry on a consulting basis.

*01/79-01/82*            **MANAGER, APPLICATIONS ENGINEERING**
                        (Transferred from the Waltham, Massachusetts facility)
                        Nichols DeHoff Division, Cranston, Rhode Island
                        a W. H. Nichols Co.
                        Waltham, Massachusetts

Developed conceptual designs for machinery, fixtures and tooling needed to machine work pieces to specific dimensions and tolerances. Directly interfaced with, and aided the product design group. Worked with the Machinery Remanufacturing Department to assist in determining extent of wear and damages, and provided design assistance necessary to rebuild equipment. Was the designated 30(b)6 expert.

12/77-12/78                          **CHIEF ENGINEER**
                                     Nichols Machine Tool Group
                                     a W. H. Nichols Co.
                                     Waltham, Massachusetts

Supervised, directed and trained mechanical and electrical design engineering personnel in the design of milling machines and ancillary equipment. Spearheaded the standardization of a milling machine anti-tie down, two-hand machine control in the interests of operator safety. Also added, as standard equipment, a dynamic brake to the milling arbor to prevent excessive cutter rotation on equipment shutdown.

02/77-12/77                          **PROJECT ENGINEER**
                                     Lenox Machine Co., Inc.
                                     Lenox, Massachusetts

Engineered and designed complete systems necessary to the "dry" end processing of paper, such as winders, slitters and paper roll conveyor systems.

12/72-02/77                          **PROJECT ENGINEER**
                                     V & O Press Co., Inc.
                                     Hudson, New York

Performed mechanical and electro-mechanical design necessary to manufacture presses and related equipment to customer specifications, or in conjunction with research and development. Engineered a 500-ton capacity, 30-foot stroke swaging machine for a United States Government arsenal. Also designed and developed an ultra high-speed mechanical punch press, and engineered a 150 ton and 200 ton capacity straight-sided mechanical punch press.

07/72-12/72                          **PROJECT ENGINEER**
                                     W. B. McGuire Inc.
                                     Hudson, New York

Developed a sequential hydraulic valve required for the successful operation of a truck "dock leveler," and engineered, designed and supervised the drafting and the actual construction of a prototype spring-actuated mechanical dock leveler.

02/63-06/72                          **CHIEF PRODUCT ENGINEER**
                                     (Initially hired in capacity of design draftsman and
                                     promoted through the "ranks" to above position)
                                     Gifford Wood Co., Inc.
                                     Hudson, New York

Provided overall engineering service for the chemical processing equipment line, and supervised all engineering activities associated with in-house or field problems. Was charged with conducting laboratory experiments to determine the feasibility of processing a prospective customer's product. Authored technical instruction manuals. Tested and approved final set-up of special machines with interest toward safety of operation, functionability, reliability and agreement with customer specifications. (Began engineering studies in 1964.)

08/60-02/63                    DETAIL/DESIGN DRAFTSMAN

Worked in various areas of drafting/design. Initial assignments were to generate detailed parts drawings from engineering layouts, with rapidly increasing level of responsibilities , including assembly and layout work. Worked both direct for V & O Press Co., Inc., Hudson, New York, and on contract for Allstates Design Co., Colonie, New York (assigned to Xerox Corp., Rochester, New York), and Northern Industrial Services, Colonie, New York (assigned to both the home office and Beloit Jones - formerly E. D. Jones, Pittsfield, Massachusetts).

## CONSULTING EXPERIENCE SUMMARY

*Accident Investigations* including, but not limited to: Slip/Trip and Fall Cases, including slip resistance index measurements where necessary, and determination of conformance to Building Codes, Scaffolds, Ladders, Vehicular Accident Reconstruction, Mechanical Punch Presses, Milling Machines, Woodworking Machinery, Printing Machinery, Exercise Machines; Bicycles, Garden Equipment, Wallpaper Steamers, Construction Incidents, Electric Stove Accidents, Dumbwaiters, Pallet Trucks, Fork Lift Trucks.

*Damage Assessment* (damage due to fire, water and/or shipment) including, but not limited to: Textile Machinery, Offset Printing Presses, Food Processing Machinery, Chemical Processing Machinery, Photocopying Machines, Conveying Equipment, EDM Machines, Metrology Instrumentation, Robots, Tablet Making Machinery.

*Failure Analysis* including, but not limited to: Refuse Trucks, Oil Tankers, Heat Exchangers, Structural Shelves, Relief Valves, Construction Vehicles, Elevating Lifts, Air Conditioners, Injection Molding Machinery, Bottled Gas Containers.

*Mechanical Engineering Design* including, but not limited to: Intricate positioning mechanisms utilizing ballscrews and piezoelectric crystals, laser film plotting and scanning equipment, a desiccation chamber, created a quality assurance program in conformance to FDA regulations for a manufacturer of medical products, the "safe load" certification of lifting devices.

## EXPERT WITNESS TESTIMONY

Has testified as an expert witness in court for both plaintiffs and defendants. Testimony has been in both civil and criminal cases. Has been qualified in diverse subject areas such as: slip index measurements of a floor; table saw accidents; milling machine injuries; structural failures; falls on stairs; slip and falls on snow and ice; machine guarding; punch press accidents; food equipment injuries; and vehicular accident reconstruction.

**PARTIAL LIST OF COURTS IN WHICH TESTIMONY WAS PROVIDED**

- United States District Court, Boston, MA
- United States District Court, Central Islip, NY
- United States District Court, Concord, NH
- United States District Court, New York, NY
- United States District Court, Portland, ME
- United States District Court, Springfield, MA
- Barnstable Superior Court, Barnstable, MA
- Bristol Superior Court, Attleboro, MA
- Bristol Superior Court, Fall River, MA
- Dukes Superior Court, Edgartown, MA
- Essex Superior Court, Lawrence, MA
- Essex Superior Court, Salem, MA
- Hampden Superior Court, Springfield, MA
- Middlesex Superior Court, Cambridge, MA
- Norfolk Superior Court, Dedham, MA
- Plymouth Superior Court, Brockton, MA
- Suffolk Superior Court, Boston, MA
- Worcester Superior Court, Worcester, MA
- Providence Superior Court, Providence, RI
- Washington Superior Court, Kingston, RI
- Norwich Superior Court, New London, CT
- Cheshire Superior Court, Keene, NH
- Hillsboro Superior Court, Nashua, NH
- Merrimack Superior Court, Claremont, NH
- Superior Court of the State of New York, Bronx, NY
- Superior Court of the State of New York, Goshen, NY
- Superior Court of the State of New York, Mt. Kisco, NY
- York Superior Court, Alfred, ME



## FORENSIC ENGINEERS & TECHNOLOGISTS

John M. Orlowski, P.E., CSP, BCFE, Director
11 Vanderbilt Avenue, Suite 120
Norwood, Massachusetts 02062-5056

PHONE: (781)762-8377
FAX: (781)762-1862
general@fet-forensics.com
www.fet-forensics.com

### Items Reviewed Relative to the Case Investigation

1.  A report from TM Seger Claim Service, Inc., dated April 11, 2002

2.  Thirty-five laser copies of photographs submitted by TM Seger Claim Service, Inc.

3.  A five-page report of the post accident investigation, by Harold Isherwood, Greg Hagopian and David Peavey

4.  Copy of an e-mail from Harold Isherwood to John Brook

5.  Copy of an e-mail from Harold Isherwood to Greg Hagopian, et als.

6.  Atlas Model CSE1250R Slitter Rewinder Operating Guide

7.  The deposition transcript of Harold Isherwood

8.  The deposition transcript of Greg Hagopian

9.  The deposition transcript of David G. Peavey

10. The deposition transcript of Frank H. Sereno

11. The deposition transcript of Alan W. Petzold

12. The deposition transcript of Robert Paul Langley

13. The deposition transcript of Ronald Dean Purcell

14. The deposition transcript of Ricky K. Howe

15. The deposition transcript of Robert Lyons

16. Telecopy transmitted from George Rice of Van Leer Metallized Products to Martin Phillips of Atlas Converting, dated June 10, 1996

17. A visit report from Ron Purcell to Bob Lyons, dated April 15, 2002

18. A wiring diagram showing the drive board switch location

19. Memorandum in Support of Plaintiff's Motion to Amend the Complaint

APPENDIX  C