UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                    )
**CIRIACO PUCILLO,**                )
                **Plaintiff,**   )
                                    )
v.                                  )   Case No. 03-CV-12359 MLW
                                    )
**METSO PAPER, INC. AND**           )
**VALMET CONVERTING, INC.**         )
                **Defendants.**  )
_____)

### DEFENDANT'S REPLY MEMORANDUM IN SUPPORT
### OF ITS MOTION FOR SUMMARY JUDGMENT

Plaintiff has failed to demonstrate a genuine issue for trial and, as such, Valmet Converting, Inc. ("Valmet Converting") is entitled to judgment as a matter of law.

The First Circuit explained the burden on plaintiff when opposing summary judgment as follows:

> The nonmovant must then document some factual disagreement sufficient to deflect brevis disposition. Not every discrepancy in the proof is enough to forestall a properly supported summary judgment motion. . . . *Genuine issues of material fact are not the stuff of an opposing party's dreams. On issues where the nonmovant bears the ultimate burden of proof, he must present definite, competent evidence to rebut the motion; it must have substance.* . . .

*Mesnick v. General Electric Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (emphasis added). Here, plaintiff's opposition lacks the definite, competent evidence required to prevent the entry of summary judgment. Indeed, in lieu of definite, competent evidence, plaintiff's opposition is replete with unsubstantiated speculations, and the First Circuit has made clear that such speculations are never sufficient to defeat summary judgment. *Nieves-Luciano v. Hernandez-Torres*, 397 F.3d 1, 5 (1st Cir. 2005); *Poulis-Minott v. Smith*, 388 F.3d 354, 366 (1st Cir. 2004).

**I.      Plaintiff has failed to establish that Valmet Converting was the supplier of the daughter board at issue.**

   **A.      Plaintiff Disregards the Record Evidence**

Valmet Converting's motion for summary judgment proves that the record evidence in this case identifies no less than three possible suppliers of the daughter board at issue and that there is no evidence upon which any jury can determine the supplier of the daughter board assigned to Rewind Arm 2Left in the Slitter at the time of plaintiff's accident. Plaintiff's opposition fails to produce any competent evidence to the contrary.

First and foremost, it is uncontroverted by plaintiff that there is no direct evidence to establish the identity of the supplier of the daughter board at issue. Plaintiff does not dispute that the Slitter was originally delivered in 1993 with ten daughter boards already installed. (SMF 5, 23.)[1] Plaintiff does not dispute that, between the time the Slitter was delivered in 1993 and the time of plaintiff's accident in 2002, some of these boards were 'swapped' with others in the Slitter and some of these boards were replaced with new ones purchased after 1993. (SMF 39-41.) Plaintiff does not dispute that no record exists of which boards were removed from the Slitter before the accident (SMF 43), or how many (SMF 35), or when (SMF 34.) Plaintiff does not dispute that no record was made at the time of the accident that identifies the daughter board at issue, (SMF 20), and plaintiff does not dispute that even if Proma was provided the serial numbers for a list of possible boards, Proma cannot determine whether any particular board was in the Slitter, in storage, or previously disposed of at the time of the accident. (SMF 36.)

---

[1] As used in this memorandum, the term "SMF" refers to Valmet Converting's Statement of Material Facts of Record As to Which There Is No Genuine Issue, filed with its Motion for Summary Judgment as required by Local Rule 56.1. The term "Plaintiff's Counter-SMF" refers to plaintiff's Opposing Statement of Material Facts Not In Dispute, filed with plaintiff's opposition memorandum. The term "Plaintiff's Additional Fact" refers to the Additional Facts, filed by plaintiff with plaintiff's opposition memorandum. The term "Reply Fact" refers to Valmet Converting's Reply to plaintiff's Counter to SMFs and Additional Facts.

In an effort to avoid this compelling record of uncontroverted evidence, plaintiff *hypothesizes* that Valmet Converting was the only supplier of daughter boards to Proma and, based on this assumption, Valmet Converting must have provided the daughter board at issue; but this theory, and the assumption upon which it rests, disregards the uncontroverted factual record and replaces it with unsupported speculations. Specifically, the uncontroverted record shows that the daughter board could have been supplied by no less than three suppliers.

The evidence shows that one possible supplier of the daughter board was Atlas-UK. Plaintiff does dispute that the Slitter was sold by Atlas-UK and delivered to Proma in 1993, fully equipped with an initial set of ten daughter boards. (SMF 5, 23.) Nor does plaintiff dispute that Valmet Converting had nothing to do with the original supply. (SMF 23.) Thus, because there is no evidence of which of the ten boards supplied by Atlas-UK were swapped or replaced before the accident and which of the boards were not, there is no evidentiary basis to conclude anything other than that Atlas-UK *could* have supplied the board at issue; but there is also more direct evidence to this point.

Paul Langley, Proma's maintenance manager, testified that the Slitter's drives had varied service lives, with some drives lasting only months, but that other drives in the Slitter, even as late as December 2004–more than two and one-half years after the accident–were originals. (SMF 24.) Langley testified: "I'm sure that there is drives in there that haven't been changed yet." (Attachment 5 to Valmet Converting's Statement of Material Facts at 39.) Langley's testimony was unequivocal. And plaintiff presents no testimony to the contrary. Thus, the uncontroverted evidence shows that *some* of the ten original drives were still in the Slitter at the time of plaintiff's accident.

Plaintiff tries to spin Langley's importance, arguing Langley had "no involvement with the changing of the boards." (Plaintiff's Counter-SMF 24.) But plaintiff's own Statement of Material Facts belies this claim, stating that "Paul Langley orders the spare drives for Proma." (Plaintiff's Additional Fact 13.) Thus, who better to know the life of drives than the person who orders new ones.

Plaintiff's effort to diminish Langley's importance does not amount to "definite, competent evidence" needed to rebut summary judgment. *Mesnick*, 950 F.2d at 822. Nor does plaintiff's argument change the factual record of this case, showing that there is no basis for a jury to include or exclude the ten original daughter boards provided by Atlas-UK from the list of possible boards assigned to Rewind Arm 2Left at the time of plaintiff's accident.

The uncontroverted record evidence also shows that, until the mid-1990's, some replacement drives for the Slitter were purchased for Proma by affiliated corporate entities, and Proma has no record relating to these purchases. (SMF 28.) Plaintiff does not dispute this fact and, indeed, "adopts" it, (Plaintiff's Counter-SMF 28), but after adopting this fact adds the *argument*: "regardless of who purchased the drives, they were purchased from the Defendant." (Plaintiff's Counter-SMF 28.) This argument, however, is baseless speculation. The record testimony, cited in support of SMF 28 by Valmet Converting, shows that, until approximately 1995, replacement boards were purchased for Proma by one or more affiliated companies. (Attachment 1 to Valmet Converting's Statement of Material Facts at 46.) The records relating to these purchases were retained by whatever corporate entity made the purchase, and not by Proma. (*Id.* at 45-46.) There is no evidence that any of these records still exist, (*id.* at 44), and there is no evidence that anyone involved in this case knows the supplier or suppliers used by these affiliated corporations.

Significantly, plaintiff provides no citation to the record for the supposed "fact" that the purchases through these affiliated companies were purchases from Valmet Converting. Thus, under Local Rule 56.1, this argument is insufficient to establish a genuine issue. Nor does it amount to "definite, competent evidence" needed to rebut summary judgment. *Mesnick*, 950 F.2d at 822. Moreover, it is not consistent with the evidentiary record, which shows that these purchases could have been direct purchases from Infranor and/or Atlas-UK.

Plaintiff's brief, when addressing the issue of possible sources of drive boards, is misleading. Plaintiff's brief argues that "[t]he different drives purchased by Proma all come from Valmet Converting" and that "Proma purchased all of their drives from Valmet." (Plaintiff's Memorandum at 3, 10.) These statements are misleading because the Slitter was purchased, not *by* Proma, but *for* Proma *by* RP-VL, through a subsidiary in France. (SMF 3.) Similarly, during the early to mid-1990's, replacement drives were purchased, not *by* Proma, but *for* Proma through affiliated Van Leer companies. (SMF 28.) Thus, plaintiff's argument that the drive boards purchased *by* Proma came from Valmet Converting, even if intended to be literally correct, is misleading because drive boards for the Slitter were purchased elsewhere as well; and there is *no* evidence that the affiliated companies purchased any parts from Valmet Converting.

It also is misleading, and contrary to the evidence, for plaintiff to argue that "Valmet set themselves up as the sole supplier of new boards to customers with Atlas Slitters in the U.S." and that Valmet Converting is "unable to state how Proma would obtain a drive, that has to be special ordered from Valmet Converting . . . Valmet Converting . . . [was] the only game in town." (Plaintiff's Memorandum at 11, 13.) Tellingly, plaintiff does *not* cite to the record for these assertions.

Contrary to plaintiff's arguments, the evidence shows that Valmet Converting was *not* the only source of replacement drives. Customers, such as Proma and its affiliates, could call Atlas-UK and Infranor directly for their supplies. Specifically, counsel for plaintiff asked Ron Purcell, Valmet Converting's field engineer, the following:

> Q. Can a customer call Atlas UK themselves and order a board?
>
> A. Sure.
>
> Q. Can they call Infranor?
>
> A. Sure.

(Attachment 2 to Valmet Converting's Reply Statement of Material Facts at 50.) Plaintiff's counsel similarly inquired of Rick Howe, Valmet Converting's customer service manager:

> Q. Can a customer call Infranor directly and give them the serial number and get the same board?
>
> A. They could.
>
> * * * *
>
> Q. Could you [a customer] call Atlas-UK and give them your [the customer's] serial number from your Atlas slitter and get the drive board?
>
> * * * *
>
> A. Sure.
>
> Q. I'm just trying to understand where the pieces fit together on buying a new drive. *So Proma isn't required to call you to get a drive?*
>
> A. *No.*

(Attachment 4 to Valmet Converting's Reply Statement of Material Facts at 34-35) (emphasis added). Thus, notwithstanding plaintiff's *argument* that there was no other source of drives, the record *evidence* shows not only that other sources were available, but that those other sources

were utilized.  Specifically, RP-VL's French subsidiary purchased the original Slitter, complete with drives, directly from Atlas-UK.  The same subsidiary, or another RP-VL subsidiary, purchased replacement drives for Proma from unidentified sources.  There is zero evidence that these RP-VL subsidiaries purchased anything from Valmet Converting.

### B.  Plaintiff Engages in Pure Speculation

After disregarding the actual record evidence, plaintiff constructs a *theory*, based on a pyramid of speculation, as to why the daughter board in Rewind Arm 2Left at the time of the accident had to be supplied by Valmet Converting.  Plaintiff theorizes as follows:  (1) after the accident, a Valmet Converting technician marked the daughter board's electrical schematic; (2) the mark was a circle around the depiction of switch position 2 on the schematic; (3) by circling position 2 on the drawing, plaintiff theorizes:  the technician must have been indicating that the drive board at issue was an M59 model board; and (4) because–plaintiff argues, contrary to the evidence–all M59 boards were supplied by Valmet Converting, Valmet Converting must have supplied the board at issue.  Plaintiff's theory, however, is not supported by the factual record.

First and foremost, there is no evidentiary support for plaintiff's contention–upon which this entire pyramid of speculation is based–that the sole source of M59 mother boards was Valmet Converting.  As demonstrated above, the original boards were purchased with the Slitter directly from Atlas-UK by RP-VL's French subsidiary.  Thereafter, replacement boards were purchased by RP-VL subsidiaries from sources unknown.  Thus, Valmet Converting was not the sole supplier, and plaintiff's theory fails.

Whether the mother board was an M55 model or an M59 model is a red-herring.  Plaintiff's own Additional Fact No. 53 represents that the Proma Slitter used only M59 model mother boards.  (Plaintiff's Additional Fact 53.)  Because the Slitter only used M59 model mother boards, then <u>all</u> of the suppliers that supplied mother boards necessarily supplied M59s.

Second, even assuming that the markings on the schematic were made by Valmet Converting's technician, divining the meaning of these markings beyond what is shown on the schematic is analogous to reading tea leaves. Plaintiff examined Purcell in his deposition, and could have asked Purcell if he made those markings and, if so, what the markings mean; but plaintiff did not. To now argue that a circle around position 2 on the schematic is anything more than an example, is pure guesswork.

Third, even if the markings on the schematic could be construed as an indication that Proma was using M59 *mother* boards at the time, and even if all suppliers did not supply M59 mother boards, it tells us nothing about the source of the *daughter* board, and it is the *daughter* board that is at issue in this case. It is undisputed that each daughter board was designed to be used with either M55 or M59 model mother board (SMF 16) and that each daughter board had to be mounted to the mother board. (SMF 9.) The schematic referenced in plaintiff's theory describes the daughter board's setting in relation to the mother board; it tells nothing about the identification of daughter boards. Thus, even plaintiff's speculative theory, at best only identifies the *mother* board as an M59 model, it does nothing to identify the *daughter* board at issue, or its supplier.

Theories, especially theories contrary to the uncontroverted record evidence, do not constitute "definite, competent evidence." *Mesnick*, 950 F.2d at 822. Here, the uncontroverted record demonstrates the existence of multiple suppliers and sources for the Slitter's drive boards with no way for anyone to determine which of the suppliers or sources provided the daughter board assigned to Rewind Arm 2Left. Accordingly, plaintiff cannot establish an element essential to the claim, and summary judgment is appropriate.

## II. Plaintiff cannot establish that the switch on the daughter board was incorrectly positioned at the time of sale.

The uncontested facts demonstrate that there is no evidence that the switch on the daughter board was incorrectly positioned at the time of its sale, regardless of who supplied the daughter board.

The uncontested factual record establishes the following: the Slitter was delivered to Proma in 1993. (SMF 23.) At the time of delivery, the Slitter was equipped with ten daughter boards. (SMF 5, 23.) From time to time during the years following the delivery of the Slitter and prior to plaintiff's accident, drives boards were changed by Proma. (SMF 38-43.) Sometimes the boards were swapped with boards assigned to other rewind arms in the Slitter. (SMF 40.) Sometimes the boards were replaced with boards from Proma's supply room. (SMF 40.) Proma's technical staff was responsible for swapping or replacing the boards. (SMF 39.) Sometimes Proma's technical staff assembled the mother board and daughter board prior to installation. (SMF 30.) In 2002, after plaintiff's accident and after nine years of machine operations, it was determined that the switch on the daughter board assigned to Rewind Arm 2Left was incorrectly positioned–specifically it was not set to either Position #1 or Position #2. (SMF 11.) Because the accident required two conditions to exist simultaneously, and the incorrectly set switch was only one of the two conditions, there is no way to determine how long this switch had been incorrectly positioned. (SMF 11.)

The possibilities on when and how the switch became incorrectly postponed are nearly endless–but more importantly the record is devoid of evidence on this issue. The switch could have been incorrectly set when it was shipped by Infranor. Or, the switch could have become incorrectly positioned in 1993, at the time the original boards were installed by Atlas-UK. Or, the switch could have been properly set and properly installed by Atlas-UK, but then become

improperly positioned when Proma's technicians swapped it from one rewind arm to another. Or, the switch could have been properly set on a replacement board, and become incorrectly set by Proma's technicians during storage, handling, installation, or swapping. Or it could have been properly set and become improperly set by Proma's technical staff when the daughter board was mounted to a mother board by Proma's technicians. There simply is a dearth of evidence on this issue. Because Proma did not inspect the switch position on the replacement drives at the time of delivery and did not inspect the switch position at the time of installation of any drives the record is open only for raw speculation and conjecture. (SMF 31, 39.)

Plaintiff's only response to this dearth of evidence is to claim "[t]here is no reason for Proma to ever change the switch." (Plaintiff's SMF 20.) This response fails to address the issue. There is no evidence that *anyone* needed to change the switch setting. Plaintiff's own brief cites to the testimony of Ron Purcell, of Valmet Converting, for the proposition that the switch on the boards were set by either Infranor or Atlas-UK. (Plaintiff's Attachment 1 at 140.) Nonetheless, it is apparent that, at some point during the nine-year period before the accident, the switch became improperly positioned. The questions are when and how–but on these questions there is no evidence.

In the absence of evidence that the switch was improperly positioned at the time of sale, this action cannot proceed on a theory that Valmet Converting failed to inspect the switch. Even assuming Valmet Converting was the supplier of the board, there is no evidence that an inspection would have uncovered an improperly positioned switch because there is no evidence that the switch was improperly positioned at that time. In other words, plaintiff argues Valmet Converting had a duty to discover that the switch was improperly positioned, even though there is no evidence that the switch was improperly positioned at the time Valmet Converting had

possession of the board (assuming, of course, Valmet Converting ever had possession of the board).

Massachusetts law is clear that, in negligence actions, where the product has been outside of the control of the defendant, a plaintiff must prove the existence of the condition and that the condition did not arise because of the conduct of intermediate handlers. Specifically, the Supreme Judicial Court explained, where "the accident occurs after the defendant has surrendered control of the instrumentality involved, it is incumbent on the plaintiff to show that that instrumentality has not been improperly handled by himself or by intermediate handlers." *Coyne v. John S. Tilley Co.*, 331 N.E.2d 541, 546 (Mass. 1975) (citations omitted); *see also Price v. General Motors Corp.*, 931 F.2d 162, 165 (1st Cir. 1991). Plaintiff has failed to meet this burden.

Here, there is no dispute that the drive boards, regardless of the supplier, were outside the control of Valmet Converting. Depending on when the boards were purchased, the boards could have been outside Valmet Converting's control for many years. During this time, the boards were within the exclusive control of Proma. When Proma received drives, Proma removed the drives from their boxes and put them on a shelf in the storeroom. (SMF 31.) When a replacement drive was needed for the Slitter, it was installed by Proma's staff. (SMF 39, 40.) When Proma purchased daughter boards and mother boards separately, Proma's staff mounted them. (SMF 30.) Proma's staff retrieved replacement drives from storage and swapped drives within the slitter. (SMF 40.) All of these activities occurred after the drive boards were outside the control of Valmet Converting. Plaintiff has offered zero evidence to show that the boards were not improperly handled or installed by Proma. Thus, plaintiff's claim fails as a matter of law.

Moreover, in the throw-in-everything-but-the-kitchen sink approach to litigation, plaintiff concludes his Opposition Memorandum by suggesting that Valmet Converting might be liable as a volunteer or as a provider of negligent services. (Plaintiff's Memorandum at 18.) There simply is no evidence of either. There is no evidence that Valmet Converting ever agreed to service, volunteered to service, serviced, inspected, or adjusted the daughter board at issue–and plaintiff cites none. And, because plaintiff cannot establish when the switch became improperly positioned, there is no way to prove that the switch was wrongly positioned at any time that Valmet Converting was present at Proma. Thus, both of these claims fail as well for a lack of evidence.

### III. Plaintiff fails to distinguish Massachusetts authorities.

Plaintiff argues that the Massachusetts authorities cited in Valmet Converting's motion are inapplicable and that Valmet Converting must cite cases for the proposition that "the supplier of a component part specifically modified for the customer's unique application has no duty to verify that the modification was done. . . ." (Plaintiff's Memorandum at 1, 14.) Plaintiff's argument is predicated on a demonstrably erroneous factual assumption and is contrary to Massachusetts law.

First, the record does not support plaintiff's claim that the daughter board was "specifically modified for [Proma's] unique application. . . ." (Plaintiff's Memorandum at 1, 14.) Rick Howe, the individual who placed Valmet Converting's orders with Atlas-UK, testified that he did not know whether modifications were made to Infranor's drive boards to suit Proma's application. (Attachment 4 to Valmet Converting's Reply Statement of Material Facts at 26, 28-29.) Howe testified as follows:

> Q. Do you know whether there were any modifications made to the Infranor drive boards specifically for Proma's application?
>
> A. No.

> \* \* \* \*
>
> Q. But at some point, modifications are made to the board that are unique to that particular serial number, correct.
>
> A. I don't know that for certain.
>
> \* \* \* \*
>
> Q. So if somebody from Proma calls you, you get the serial number, you call Atlas UK, and you say: I need an Infranor drive board for that serial number, correct?
>
> A. That's correct.
>
> Q. You don't say anything about modifications, correct?
>
> \* \* \* \*
>
> A. No.
>
> Q. So somewhere in England then, Atlas UK sends you back a board, correct?
>
> A. Sure.
>
> Q. Do you assume that that board that has come to you has any modifications done to it that needed to be done to it?
>
> \* \* \* \*
>
> A. I don't have to assume anything at that point in time. There wouldn't be a reason to assume anything. I have done what we've portrayed needed to be done correctly. So there's not an assumption one way or the other. That's the reason I went to England to buy it in the first place. I don't assume the drive is modified. I don't assume anything. I go there and buy that drive because it's the place to go and get it.

(*Id.* at 26, 28-29.)

Ron Purcell, Valmet Converting's field technician, testified that he too was unaware of any modifications to the daughter board–the board at issue in this case. He was aware only of the possibility of modifications to the *mother* board, and he did not know whether those modifications were appropriate for Proma. Purcell explained:

> Q. I'm going to get a little bit ahead of myself, but am I correct that the method by which you would set the speed or torque is on the daughter card?
>
> A. No.
>
> Q. How would you set them to either torque or speed?
>
> A. I don't know the specifics. There are some modifications that are done to the drive, but I don't know the specifics.
>
> \* \* \* \*
>
> Q. Who modifies them?
>
> A. I don't know.
>
> \* \* \* \*
>
> Q. Getting back to the modifications made to a drive board prior to it being sent to Proma, you do have an understanding that some modifications are made to the boards, correct?
>
> A. I don't know which way the modification works. I don't know if it's a modification to take a standard board, being speed control, and convert it to torque control, or whether the standard board is torque control and it has to be modified to become speed control. I don't know which way that works.
>
> Q. So it's possible that the boards that Proma orders are not modified; it's the people that order for the speed control that get their boards modified?
>
> A. That's correct.
>
> Q. Are there also modifications made to the daughter card before the board is shipped to Proma?
>
> A. Not that I'm aware of.

(Attachment 2 to Valmet Converting's Reply Statement of Material Facts at 42-43, 49-50.) Thus, the record does not support plaintiff's claim that the daughter boards were modified for Proma's application.

Even if the daughter boards were, or should have been, modified by someone–i.e. the switch should have been moved from one position to another–plaintiff's attempt to distinguish Valmet Converting's legal authorities on this basis fails. Plaintiff argues that, because the switch needs to be set by someone, the drive was "generic only as it was purchased by Infranor. As soon as it passed through Atlas-UK to Valmet Converting it was not generic. It was, therefore, not strictly a component part." (Plaintiff's Memorandum at 16-17.) Plaintiff cites no legal authority for this supposed transformation and the argument is contrary to the law.

The Restatement (Third) of Torts: Product Liability §5, cited by the First Circuit in *Cipollone v. Yale Ind. Products, Inc.*, 202 F.3d 376, 379 (1st Cir. 2000), makes clear that the daughter board is a component part. It provides that "[p]roduct components include raw materials, bulk products and other constituent products sold for integration into other products. Some components, such as raw materials, valves, or switches, have no functional capabilities unless integrated into other products." Restatement (Third) of Torts: Products Liability § 5 cmt. a (1998). The Restatement also provides that "[p]roduct components include products that can be put to different uses depending on how they are integrated into other products." *Id.* at cmt. d.

The daughter board is clearly a component part. It is an electrical circuit board. (SMF 6.) It must be mounted to another electrical circuit board, i.e. the mother board. (SMF 9.) The two joined boards must be installed in a piece of equipment. (SMF 5.) Depending on the user's selection, the daughter board can be used with tachometer feedback drive systems or voltage feedback systems. (SMF 13.) A daughter board, by itself, has no functional capabilities. Thus, it is plain that the daughter board supplied to Proma was a component part, to be integrated with a mother board and then into machinery.

The Supreme Judicial Court, in *Mitchell v. Sky Climber, Inc.*, 487 N.E.2d 1374 (Mass. 1986), stated: "a supplier of a component part containing no latent defect has no duty to warn the subsequent assembler or its customers of any danger that might arise after the components are assembled."[2]  In *Sky Climber*, the component part was a motor for a powered lift.  Contrary to plaintiff's analysis, the court properly did not analyze whether the motor ceased to be a component part because it needed to be set or adjusted when integrated into the finished product. (SMF 72, 73.)  Thus, it is plain that the daughter board was a component part and that Massachusetts law does not impose a duty on component part suppliers to act as guarantors against injuries arising from the manner in which the component parts are integrated by end users.

## CONCLUSION

Plaintiff's claims in this action fail for a lack of proof.  The uncontroverted factual record demonstrates there is no evidence that the drive board at issue was supplied by Valmet Converting, or that it contained any defect at the time of its supply.  Nor does the law impose liability on component part suppliers for claims arising from the manner that the component parts are integrated into the final product.  Accordingly, Valmet Converting respectfully submits that it is entitled to judgment as a matter of law.

---

[2] Plaintiff's reliance on *Jennett v. Colorado Fuel & Iron Corp.*, 398 N.E.2d 755 (1980) is misplaced.  In *Jennett*, Colorado was the *manufacturer* of the sling that failed.  Here, there is no dispute that Valmet Converting was not the manufacturer of the daughter board.  (SMF 1.)  The daughter board was manufactured by Infranor.  (SMF 7.) *Jennett* is fully in accord with *Mitchell v. Sky Climber*.

Date:  August 18, 2006                                    Respectfully submitted,


                                              */s/ David L. Kelleher*_____
David L. Kelleher, Esq. (B.B.O. #543912)
Thelen Reid & Priest, LLP
701 Eighth Street, N.W., Suite 800
Washington, DC 20004
(202) 508-4000

Mark Petersen, Esq. (B.B.O. #396840)
Michelle Hansen, Esq. (B.B.O. #561477)
Law Offices of Mark Petersen
490 Shrewsbury Street
Worcester, MA  01604
(508) 791-0300

*Attorneys for Defendant Valmet Converting, Inc.*